HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PORT OF SEATTLE; KING COUNTY; KITSAP COUNTY; SNOHOMISH COUNTY; THURSTON COUNTY; CITY OF BELLINGHAM; and CITY OF BREMERTON,<br><br>Plaintiffs,<br>v.<br><br>TODD BLANCHE in his official capacity as Attorney General of the United States; the U.S. DEPARTMENT OF JUSTICE; MARKWAYNE MULLIN in his official capacity as Secretary of the U.S. Department of Homeland Security; the U.S. DEPARTMENT OF HOMELAND SECURITY; CAMERON HAMILTON in his official capacity as the Federal Emergency Management Agency Administrator; the FEDERAL EMERGENCY MANAGEMENT AGENCY; LEE ZELDIN in his official capacity as Administrator of the U.S. Environmental Protection Agency; the U.S. ENVIRONMENTAL PROTECTION AGENCY; HOWARD LUTNICK in his official capacity as Secretary of the U.S. Department of Commerce; the U.S. DEPARTMENT OF COMMERCE; BROOKE ROLLINS in her official capacity as Secretary of the U.S. Department of Agriculture; the U.S. DEPARTMENT OF AGRICULTURE; | No. 2:26-cv-03301-BJR<br><br>FIRST AMENDED COMPLAINT |



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

CHRIS WRIGHT in his official capacity as Secretary of the U.S. Department of Energy; the U.S. DEPARTMENT OF ENERGY; KEITH SONDERLING in his official capacity as acting Secretary of the U.S. Department of Labor and as acting Director of the Institute of Museum and Library Services; the U.S. DEPARTMENT OF LABOR; DOUG BURGUM in his official capacity as Secretary of the U.S. Department of the Interior; the U.S. DEPARTMENT OF THE INTERIOR; SARA CARTER in her official capacity as Director of the Office of National Drug Control Policy; the OFFICE OF NATIONAL DRUG CONTROL POLICY; LISA SOLOMSON in her official capacity as Senior Official Performing the Duties of the Director of the Institute of Museum and Library Services; and the INSTITUTE OF MUSEUM AND LIBRARY SERVICES,

Defendants.

## I. INTRODUCTION

1. It is not the prerogative of the President "to be a lawmaker," and "the Constitution is neither silent nor equivocal" in committing that power exclusively to Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). Rather, it is the duty of the President, and, by extension, the Executive Branch agencies he administers, to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3. Among other things, this duty requires the Executive Branch to respect the powers granted to Congress and those reserved to the states, while carefully administering statutes enacted through the legislative process.

2. In authorizing federal grant dispersals, Congress exercised its spending power to establish permissible conditions that agencies may impose on a grant award. An agency lacks



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

authority to impose grant conditions beyond what Congress has authorized, and such "conditions are ultra vires." *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019). In short, an agency's power to condition grants is wholly dependent on the existence of statutory authority. *City & Cnty. of S.F. v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

3. Moreover, Congress's power to attach conditions to federal grants is constrained by the U.S. Constitution. *South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987). The Executive's power to attach conditions to federal grants thus is further restricted by these limits on congressional power.

4. Here, the U.S. Department of Justice ("DOJ"), the U.S. Department of Homeland Security ("DHS"), the Federal Emergency Management Agency ("FEMA"), the U.S. Environmental Protection Agency ("EPA"), the U.S. Department of Commerce ("Commerce"), the U.S. Department of Agriculture ("USDA"), the U.S. Department of Energy ("DOE"), the U.S. Department of Labor ("DOL"), the U.S. Department of the Interior ("Interior"), the Office of National Drug Control Policy ("ONDCP"), and the Institute of Museum and Library Services ("IMLS"), together with each of their component agencies, bureaus, administrations, offices, and other entities (collectively, the "Federal Agencies"), seek to impose conditions on grant funding (collectively, the "Challenged Conditions"), which was provided through congressionally authorized federal grant programs, to coerce grant recipients that rely on federal funds into implementing President Trump's policy agenda, and to direct them to adopt his legal positions, contrary to settled law. By unilaterally imposing grant conditions Congress has not authorized and that even Congress could not constitutionally enact, the Federal Agencies have exceeded their lawful authority and encroached upon Congress's power of the purse. These conditions bear no meaningful relationship to the purposes of the grant programs Congress established and violate



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

bedrock separation of powers principles, the Spending Clause, and the Administrative Procedure Act ("APA"). Compounding these issues, the Federal Agencies have also asserted sweeping authority to terminate grants "for convenience," without meaningful standards or advance notice.

5. Here, the Federal Agencies' unlawful attempts to repurpose federal grant programs established by Congress harm Plaintiffs Port of Seattle, King County, Kitsap County, Snohomish County, Thurston County, City of Bellingham, and City of Bremerton (collectively, the "Local Governments") by threatening more than $32,000,000 in already-awarded and expected-to-be-awarded funds they need to support critical programs and services for their residents, including those that support public health and safety, criminal justice, law enforcement, disaster preparedness, emergency response, environmental health, economic development, agricultural production, food security, wildfire prevention, workforce education and training, natural resource conservation, library services, and more. Allowing the unlawful conditions to stand would negatively impact the Local Governments' committed budgets, disrupt critical programs and services, and undermine their ability to determine for themselves how to meet their communities' unique needs.

6. Just last month, the Ninth Circuit Court of Appeals substantially upheld this Court's first preliminary injunction against materially similar conditions attached to grants by the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Transportation ("DOT"). *County of King v. Turner*, No. 25-3664, 2026 WL 2489361, at *1 (9th Cir. Aug. 25, 2026). The Ninth Circuit explained: "The conditions cannot be sustained as merely ensuring compliance with existing law, as the government argues. The majority of the conditions far exceed the limited authority set out by Congress and superimpose onerous requirements well after the government already awarded grant funds. Although the agencies' position is fairly



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

reduceable to the excuse 'the President made us do this,' we are ultimately not in the business of second-guessing agency policy." *Id.*

7. Consistent with that authority, the Local Governments here seek an order declaring the Challenged Conditions unlawful, void, and unenforceable, and enjoining their imposition and enforcement.

## II. JURISDICTION AND VENUE

8. The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq.*

9. Venue properly lies within the Western District of Washington because this is an action against an officer or employee of the United States and an agency of the United States, there are plaintiffs residing in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e)(1).

## III. PARTIES[1]

10. Plaintiff Port of Seattle ("Port of Seattle" or "Port") is a municipal corporation

[1] Some of the plaintiffs in this lawsuit are involved in litigation involving similar unlawful grant conditions, but in regard either to different federal agencies, different grant programs, or conditions imposed for different award periods than those challenged here. Most prominent among these cases is *Martin Luther King, Jr. County et al. v. Turner et al.*, 798 F. Supp. 3d 1224, 1255–58 (W.D. Wash. 2025), where this Court preliminarily enjoined the government from imposing or enforcing similar grant conditions with respect to certain grants administered by HUD, DOT, the Federal Transit Administration ("FTA"), the Federal Highway Administration ("FHWA"), the Federal Aviation Administration ("FAA"), the Federal Railroad Administration ("FRA"), and the U.S. Department of Health and Human Services ("HHS"). The Ninth Circuit largely affirmed as to the HUD, DOT, and FTA conditions, *see Turner*, 2026 WL 2489361 at *1. The federal government's appeals with respect to the other conditions enjoined in *Turner* are pending in the Ninth Circuit.

Other cases include *County of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1043 (N.D. Cal. 2025), where the district court preliminarily enjoined DHS and FEMA from imposing or enforcing the discrimination and executive order conditions in a prior version of DHS's standard terms—the "FY 2025 DHS Terms and Conditions Version 3 Dated April 18, 2025." *Id.* at 996, 1043. King County, Snohomish County, and Bellingham are also plaintiffs in *Santa Clara* but do not raise any



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

organized and existing under and by virtue of the laws of the State of Washington. The Port of Seattle owns and operates the Seattle-Tacoma International Airport, the largest airport in the State of Washington, Seattle's seaport, Fisherman's Terminal, and other public assets key to the Pacific Northwest. The Port of Seattle depends on federal financial assistance to operate these essential facilities and to undertake projects that it could not fund entirely from other funding sources.

11. The Port of Seattle receives, has been awarded, has applied for, or was deterred from applying for or accepting substantial federal financial assistance administered by, as relevant here, Commerce (through the National Oceanic and Atmospheric Administration ("NOAA")), EPA, and DHS (through FEMA). As further described below, this includes approximately $1,000,000 from Commerce, $3,000,000 from EPA, and $599,500 from DHS.

12. The Port of Seattle has applied for $1,000,000 from Commerce's Community Project Funding ("CPF") for Seattle Waterfront Sea Level Rise Vulnerability Assessment, which is a congressionally directed earmark funding program. This funding will be used to conduct a joint vulnerability assessment to understand the impacts of sea level rise on the Seattle waterfront

---

claims against DHS and FEMA here. *See also Appalachian Voices v. EPA,* No. CV 25-1982 (RJL), 2025 WL 2494905 (D.D.C. Aug. 29, 2025), *vacated and remanded*, No. 25-5333, 2026 WL 2089710 (D.C. Cir. July 21, 2026) (challenging EPA's termination of existing grants, not its imposition of new unlawful grant conditions); *Hennepin County v. HHS*, No. 26-cv-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026) (enjoining HHS from enforcing new, restrictive ideological conditions on the federal Teen Pregnancy Prevention program); *Nat'l All. to End Homelessness v. HUD*, No. 1:25-CV-00636-MSM-AEM, 2025 WL 3719641 (D.R.I. Dec. 23, 2025) (the district court preliminarily enjoined HUD's rescission of a specific notice of funding opportunity ("NOFO") issued for FY 2024–2025, as well as HUD's imposition of certain unlawful conditions in a new NOFO issued for FY 2025, pertaining to HUD's Continuum of Care ("CoC") program); *Washington v. HUD*, Nos. 26-CV-436-MSM-AEM, 26-CV-439-MSM-AEM, 2026 WL 2279514 (D.R.I. Aug. 7, 2026) (setting aside HUD's issuance of a FY 2026 NOFO for the same CoC program); and *Urb. Sustainability Dirs. Network v. USDA*, No. CV 25-1775 (BAH), 2026 WL 1877821 (D.D.C. June 30, 2026) (preliminarily enjoining USDA's termination of existing grants, not its imposition of new unlawful grant conditions). None of the plaintiffs that participated in these other cases seek to duplicate the relief sought here in this lawsuit.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and surrounding communities.

13. In 2024, the Port of Seattle was awarded $2,997,248 through EPA's Clean Ports Program. The Port is currently using this funding to conduct emissions inventory and accounting exercises, analyze emissions reduction strategies, engage with port stakeholders, plan for reducing future port emissions, and conduct a related workforce planning analysis. The grant will continue through the end of 2027, and the Port of Seattle intends to apply for additional funding if and when EPA announces a new Notice of Funding Opportunity ("NOFO") for this program.

14. The Port of Seattle was awarded a $24,500 grant in 2024 under FEMA's Port Security Grant Program, for enhancing and improving security at the Port's maritime facilities. This grant has a three-year period of performance, commencing in January 2025. The Port of Seattle is currently seeking reimbursement for funds expended on security surveillance drones and related equipment and training. The Port of Seattle intends to apply for future Port Security Grant Program funding when the Port has eligible projects.

15. The Port of Seattle also planned to apply for federal funding through FEMA's FIFA World Cup 2026 Grant Program. FEMA set aside approximately $575,000 for the Port of Seattle, to be used for the costs associated with expanded security and policing at the Port's facilities during the FIFA World Cup. However, the Port of Seattle ultimately declined to apply for this funding due to the inclusion of the Challenged Conditions (as defined in Section K.2–12, *infra*) and the inability to seek timely legal redress.

16. The Port of Seattle brings this action as to DHS, FEMA, EPA, and Commerce.

17. Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county and political subdivision of the State of Washington. King County provides regional public services to more than two million residents, including public transportation, public safety and



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

emergency preparedness, environmental protection, flood-risk reduction, agricultural assistance, parks and recreation, public health, housing, and human services.

18. King County receives, has been awarded, has applied for, or was deterred from applying for substantial federal financial assistance administered by, as relevant here, DOJ, EPA, Commerce, USDA, and Interior. The funding at issue includes approximately up to $2,000,000 in DOJ funding; $249,924 in EPA funding; up to $10,000,000 in Commerce funding; $2,000,000 in USDA funding; and $10,000,000 in Interior funding. The estimates are low because they do not include every federal award that King County currently administers or may seek from these agencies.

19. In 2023, King County applied directly to EPA for a Wetland Program Development Grant ("WPDG"). EPA selected King County for an award in 2024, including approximately $249,924 for the Water and Land Resources Division's Wetland Monitoring Program. The proposed project would have strengthened the County's capacity to monitor, protect, manage, and restore wetlands. During award negotiations, repeated turnover among EPA personnel required the County to restart discussions with new agency representatives and, following the change in Administration, the EPA added certain of the Challenged Conditions. Although EPA increased the available award as other selected jurisdictions declined their funding, King County ultimately declined to execute the agreement in 2025 due to the Challenged Conditions. King County therefore lost federal support for its Wetland Monitoring Program and must either reduce that work or divert limited local environmental funding from other programs.

20. King County is eligible and intends to seek funding from Commerce's Economic Development Administration ("EDA") through the Public Works Program and Economic Adjustment Assistance ("EAA") Program. Applications are accepted on a rolling basis. King



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

County would pursue this funding to, among other things, expand its work-based learning program that helps adults develop skills and enter career pathways in areas such as transportation, construction, manufacturing, and technology; expand electric vehicle fast-charging stations in the region; and capitalize a revolving loan fund for electrification and weatherization projects. However, King County has placed its contemplated application on hold because the funding opportunity requires recipients to certify compliance with Challenged Conditions. But for the Challenged Conditions, King County would be prepared to seek as much as $8,000,000 in EDA funding and commit the available matching resources.

21. Commerce also currently funds King County through a direct, competitively selected $2,000,000 award administered by NOAA under the Climate Resilience Regional Challenge. The three-year award supports regional planning, data analysis, community engagement, and coordination to improve resilience to flooding, sea-level rise, extreme heat, wildfire, and other climate hazards throughout the Puget Sound Basin. The award is scheduled to end on December 31, 2027. King County intends to seek a no-cost extension, and NOAA has confirmed that King County is eligible and has sufficient awarded funds to support an extension. However, NOAA has advised that an extension would trigger a new award subject to Challenged Conditions and require certification of compliance with the Challenged Conditions. This has caused King County to place its contemplated extension request on hold.

22. King County also considered applying directly to USDA for approximately $2,000,000 through the competitive Conservation Innovation Grants Classic Program. King County would use the funding to assist farmers and agricultural communities while improving soil health, water and air quality, habitat, and the long-term viability of agriculture. However, the applicable funding opportunity required compliance with the Challenged Conditions; King County



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

therefore did not apply.

23. King County further considered seeking approximately $10,000,000 from Interior's National Park Service ("NPS") through the competitive Outdoor Recreation Legacy Partnership ("ORLP") Program for the White Center Ponds project. King County's contemplated project under this grant program would provide recreation, community-health, environmental, and related benefits to residents of White Center, including residents of a historically underserved community. The funding opportunity required recipients to adhere to the Challenged Conditions, and therefore King County did not apply.

24. There are multiple other Interior grants that King County has applied for and would be applying for if it could do so without agreeing to the Challenged Conditions, including the National Fish Passage Program, which is open through April 2027, and the Coastal Program, which is open through September 2026.

25. King County's Prosecuting Attorney's Office also considered applying directly to DOJ's Office on Violence Against Women ("OVW") for an FY 2026 Grant to Improve the Criminal Justice Response to Domestic Violence, Dating Violence, Sexual Assault, and Stalking ("ICJR"). Depending on the applicable award category, King County could have sought as much as $1,500,000 for specialized prosecution, survivor assistance, safety planning, and coordination with law enforcement, courts, and nonprofit victim-service providers, among other things.

26. The ICJR funding opportunity offered priority consideration to state and local applicants willing to certify compliance with the Challenged Conditions. Therefore, King County declined to apply. As a result, King County must either forego or reduce those activities or divert limited local public-safety resources from other programs. The uncertainty also impairs nonprofit victim-service organizations' ability to plan staffing and services and may reduce survivor safety



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and offender accountability throughout the regional criminal justice system.

27. King County received $227,848 in funding from DOJ's Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program in 2024. The County is using the award to fund portions of two County positions on an ongoing basis for a reentry project. King County intends to continue seeking Byrne JAG funding, including in 2026, to support public safety and the administration of its criminal justice system.

28. From 2022 through 2025, the King County Sheriff's Office ("KCSO") received a $266,401 award from DOJ's Office of Community Oriented Policing Services ("COPS"). The award supported efforts to provide specialized training, coordinate law-enforcement and behavioral-health services, improve outcomes during crisis encounters, and protect both responding personnel and community members. KCSO potentially intends to pursue future COPS funding, including funding under the COPS' Law Enforcement Mental Health and Wellness Act ("LEMHWA") Program.

29. King County brings the action as to DOJ, EPA, Commerce, USDA, and Interior.

30. Plaintiff Kitsap County is a political subdivision of the State of Washington.

31. Kitsap County has received and expects to continue receiving substantial federal funding through grant programs administered by DOJ, DHS, FEMA, EPA, Commerce, USDA, DOL, Interior, and ONDCP.

32. Kitsap County has received and continues to receive annual funding from DHS through the Emergency Management Performance Grant ("EMPG") Program. This program provides funding to state, local, and Tribal governments to assist in preparing for all hazards through building and sustaining core capabilities through the missions of prevention, protection, mitigation, response, and recovery. Between 2022 and 2025, the EMPG Program awarded



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

approximately $420,000 to Kitsap County, and for FY 2025–26, Kitsap County was awarded approximately $130,000. Kitsap County intends to apply for additional funding through the program as it becomes available to support these continued emergency management preparations.

33. Kitsap County has received and continues to receive funding indirectly from EPA through the Puget Sound National Estuary Program ("NEP"). The Puget Sound NEP furthers the goals of restoring and maintaining the Puget Sound estuary, which has been designated as one of 28 estuaries of national significance under section 320 of the Clean Water Act. For Kitsap County, and through multiple grants, this program is providing approximately $790,000 for development and maintenance of the Kitsap Natural Resource Asset Management Program ("KNRAMP"), a first-of-its-kind project to identify, manage, maintain, and improve natural assets. The Puget Sound NEP is also providing approximately $200,000 for the development and maintenance of the Kitsap County Derelict & Abandoned Vessel Program ("DAVP") to remove derelict and abandoned vessels from Kitsap County waters where they pose hazards for boaters and anglers and negatively impact water quality and habitat. The Puget Sound NEP is providing approximately $103,000 for enhanced outreach under Kitsap County's Shore Friendly Program to continue to improve the understanding and implementation of best practices for shoreline habitat protection and restoration. Finally, the Puget Sound NEP is providing approximately $3,000 for Kitsap County's Shore Friendly staff to participate on a multijurisdictional team to identify and select projects that will inform soft shore best practices in Puget Sound. Together, the current funding received by Kitsap County through the Puget Sound NEP is approximately $1,096,000. Kitsap County intends to apply for additional funding through the program as it comes available to support the continued restoration of Puget Sound.

34. Kitsap County has received and continues to receive USDA funding indirectly, as



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

a subrecipient of the State of Washington, on a recurring basis since at least 2002 through the Senior Farmers Market Nutrition Program ("SFMNP"). SFMNP provides food vouchers and delivery service support for low-income seniors to receive fresh food at local farmers' markets. For FY 2026–27, Kitsap County was awarded approximately $70,000 to provide $80 vouchers for approximately 900 individuals. Kitsap County intends to apply for continued funding for this program in the future.

35. Kitsap County has received and continues to receive Commerce funding indirectly, as a subrecipient of the State of Washington, through the Pacific Coastal Salmon Recovery Fund ("PCSRF") for bulkhead removal and restoration projects on Kitsap County shorelines. Most recently, Kitsap County was awarded approximately $97,000 for a three-year project on Dyes Inlet. These funds are critical to restoring nearshore habitats that have been identified as high priority by the West Sound Partners for Ecosystem Recovery and the Washington State Recreation and Conservation Office. Kitsap County manages these projects through its local Shore Friendly Program, which has helped restore approximately 1,300 linear feet of shoreline since 2015. Kitsap County intends to apply for additional funding through the program to support the continued restoration of Kitsap County's shorelines.

36. Kitsap County has received and continues to receive ONDCP funding indirectly, as a subrecipient of the State of Washington, through the High Intensity Drug Trafficking Areas ("HIDTA") Program. The HIDTA Program provides funding to local agencies operating in designated "critical drug-trafficking regions" to reduce drug production, trafficking, and related violence through coordinated enforcement, intelligence sharing, and public health initiatives. Kitsap County is one of these areas. Between 2022 and 2025, Kitsap County has received approximately $130,000, and for FY 2026–27, Kitsap County expects to receive approximately



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

$40,000. Kitsap County will continue to seek additional funding through the program in future years.

37. Kitsap County is preparing an application for grant funding from Interior through the Bureau of Reclamation's ("USBR") WaterSMART Cooperative Watershed Management Program ("CWMP"). This program encourages collaborative solutions to address water management needs and funds provide support of watershed-based groups for the development of watershed restoration planning and watershed management project design. Kitsap County intends to use these funds to facilitate a water availability technical committee within the Kitsap peninsula watershed (Water Resource Inventory Area No. 15).

38. Kitsap County has received and continues to receive funding from DOJ under the Byrne JAG Program on a recurring basis since approximately 2009. This program allows states and local governments to support a broad range of activities to control crime and improve the criminal justice system. With its most recent $39,000 grant, the County will purchase ballistic safety equipment, such as ballistic vests and additional body armor, for sheriff deputies and/or corrections officers. DOJ has also awarded Kitsap County approximately $19,000 through National Criminal History Improvement Program ("NCHIP") to improve the accuracy, completeness, and accessibility of criminal history records used for background checks and public safety systems. Kitsap County was also awarded approximately $16,500 through the Services, Training Officers, and Prosecutors ("STOP") Violence Against Women Formula Grant Program, which was used to improve community responses to violence against women. Kitsap County intends to apply for additional funding through these programs as they become available to support criminal justice.

39. Kitsap County has received and continues to receive indirect DOL funding through



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

a variety of grant programs, including the Federal Workforce Innovation and Opportunity Act ("WIOA") Programs for Adults, Youth, and Dislocated Workers and the Federal Economic Security for All ("EcSA") Program. Kitsap County is part of a coalition of local governments that receives this funding to manage employment and training programs for adult, dislocated workers, and youth in Clallam, Jefferson, and Kitsap Counties. For FYs 2025 and 2026, approximately $4.3 million was awarded to serve almost 1,000 individuals. For FY 2027, the award is approximately $2.1 million to serve over 340 individuals. Supplementing this effort are EcSA grant funds, which have been awarded to the consortium for FY 2026 in the amount of approximately $143,000 to be used to increase program enrollment and measurable outcomes. On behalf of the consortium as its administrative entity, Kitsap County intends to pursue additional funding through these programs as they become available to support workforce development in Clallam, Jefferson, and Kitsap Counties.

40. Kitsap County brings the action as to DOJ, DHS, FEMA, EPA, Commerce, USDA, DOL, Interior, and ONDCP.

41. Plaintiff Snohomish County is a home rule charter county organized and existing under and by virtue of the constitution and the laws of the State of Washington.

42. Snohomish County receives or expects to receive substantial federal funding administered by DOJ, EPA, Commerce, USDA, DOE, and ONDCP. For FYs 2025 and 2026, Snohomish County receives or expects to receive approximately $84,296 from DOJ, $500,295 from EPA, $5,000,000 from Commerce, $5,000,000 from USDA, $420,252 from DOE, and $371,144 from ONDCP.

43. Snohomish County was previously awarded federal funding in FY 2023 under the USDA Forest Services ("USFS") Community Wildfire Defense Grant ("CWDG") Program in the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

amount of $250,000. This money is administered as pass-through funds from the Washington State Department of Natural Resources. Snohomish County used the grant money to support the development of a countywide community wildfire protection plan and its supporting local annexes, along with a public education campaign regarding the same. Snohomish County intends to apply for FY 2026 funding in the amount of $5,000,000 when USDA announces a new NOFO for this program. This funding would be used to do fuel management within Snohomish County, particularly in wildland-urban interface areas.

44. For FY 2022, Snohomish County previously received over $5,000,000 in NOAA grant funding through the National Coastal Resilience Fund, which is administered by the National Fish and Wildlife Foundation, a nonprofit organization created by Congress in 1984. Snohomish County has used these funds to restore natural floodplain conditions and enhance juvenile salmon rearing habitat at Thomas' Eddy on the Snohomish River. Snohomish County anticipates applying for another National Coastal Resilience Fund grant in early 2027 for floodplain restoration work at nearby Chinook Marsh on the Snohomish River.

45. Snohomish County has annually received a formula grant through the DOE's Weatherization Assistance Program ("WAP"), as pass-through funds from the Washington State Department of Commerce. For FY 2024, Snohomish County received $371,712 in WAP funding to provide weatherization services to eligible low-income households. For FY 2025, Snohomish County declined $420,252 in WAP funding due to the inclusion of the Challenged Conditions.

46. Snohomish County applies annually for funding through the ONDCP's HIDTA Program. In FY 2025, the County was awarded $171,080 to support the operation of the Snohomish County Drug Task Force, an interagency task force of law enforcement officers focused on drug trafficking in Snohomish County, including staff salaries, training, and the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

purchase of technical investigative equipment. For FY 2026, Snohomish County was awarded $200,064 under this program, but has not yet executed the grant agreement due to the inclusion of the Challenged Conditions.

47. Snohomish County was awarded federal funding for FY 2025 under DOJ's Byrne JAG program in the amount of $84,296 for the purchase of (a) Grappler Police Bumpers for use in immobilizing fleeing vehicles in a manner that enhances public safety and reduces the risks associated with vehicle pursuits, and (b) drones to enhance situational awareness and provide accurate, real time information to patrol staff. Snohomish County has not yet executed the grant agreement due to the inclusion of the Challenged Conditions.

48. In addition, Snohomish County annually receives funding through the Washington State Department of Commerce's Victim Witness Assistance ("VWA") Grant Program to provide advocacy and services to victims and survivors of violent crime. The VWA grants are funded through a combination of state and DOJ funds. Snohomish County has declined to execute the Victim Witness Assistance grant agreement for FY 2027 due to inclusion of the Challenged Conditions as flow down requirements.

49. Snohomish County has received and continues to receive funding indirectly from EPA through the Puget Sound NEP. As discussed above, the Puget Sound NEP furthers the goals of restoring and maintaining the Puget Sound estuary. For Snohomish County, this program provides approximately $670,000 for identification and correction of fecal coliform non-point source pollution in the Lower Stillaguamish Basin, which Snohomish County received in FY 2024. The Puget Sound NEP is also providing, through multiple grants from FY 2025 and 2026, approximately $500,295 in funding related to improving the effectiveness of Snohomish County critical area regulations that protect rivers, streams, lakes and wetlands as well as funding to



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

support a streamside landowner outreach program. Together, the current funding received by Snohomish County through the Puget Sound NEP is approximately $1,170,295. Snohomish County intends to apply for additional Puget Sound NEP funding in late 2026 or early 2027 to fund continuing work on fecal coliform identification and correction.

50. Snohomish County brings the action as to DOJ, EPA, Commerce, USDA, DOE, and ONDCP.

51. Plaintiff County of Thurston ("Thurston County") is a municipal corporation organized under the laws of the State of Washington.

52. Thurston County receives, or expects to receive, substantial federal funding administered by DHS via FEMA. Thurston County receives, has been awarded, or has applied for approximately $579,676 from the FEMA State Homeland Security Program ("SHSP") and EMPG Program.

53. Thurston County is currently preparing to enter into an agreement to for $160,997 in federal funding under the DHS FY25 SHSP. This funding covers the performance period of September 1, 2025 through August 31, 2028 to enhance regional emergency readiness, response capabilities, and community resilience across a five-county footprint. Thurston County previously received federal funding under the DHS FY24 and FY23 SHSP, for which the remaining balances are $126,402 and $6,945, respectively.

54. Thurston County has applied for $142,430 through the EMPG Program to support core personnel costs and essential operational needs to sustain local emergency management capabilities. Thurston County previously received EMPG federal funding in FY25, for which the remaining balance is $142,902.

55. Thurston County brings the action as to DHS and FEMA.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

56. Plaintiff City of Bellingham ("Bellingham") is a municipal corporation organized and existing under the laws of the State of Washington.

57. Bellingham receives or expects to receive substantial federal funding administered by DOJ and IMLS. For FYs 2025 and 2026, the City of Bellingham receives or expects to receive approximately $514,463 from DOJ and, as a subrecipient of the State of Washington, $6,000 from IMLS.

58. In FY 2024, Bellingham was awarded $40,170 in DOJ funding under the Byrne JAG Program. The grant was used to help the Bellingham Police Department purchase new bicycles for patrol officers and additional safety equipment for police vehicles. A portion of those funds were also passed through to the Whatcom County Sheriff's Office.

59. On July 31, 2026, Bellingham received a notification of a FY 2025 Byrne JAG award for $44,163. Bellingham has not yet signed the grant agreement due to the Challenged Conditions. Bellingham applied for this award to support funding for a Bellingham Police Department Traffic Officer and to bring back its Motorcycle Traffic Unit, previously closed due to the COVID-19 pandemic. The motorcycles will require equipment and technological upgrades such as radios, mobile data terminals, printers, scanners, and communications devices. A portion of those funds will also be passed through to the Whatcom County Sheriff's Office.

60. Bellingham intends to apply for FY 2026 Byrne JAG grant funding, seeking $45,300 to help the Bellingham Police Department purchase equipment, such as night vision goggles to provide to officers working during the night.

61. Bellingham also intends to apply for FY 2026 DOJ funds through Bureau of Justice Assistance's ("BJA") Local Law Enforcement Crime Gun Intelligence Center Integration Initiative. Bellingham intends to seek $425,000 to purchase a new technology platform to assist



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

with scanning and analyzing recovered crime scene evidence. The intent of the technology is to link gun crimes on a broader scope and improve long-term public safety. The cost of the technology is currently outside the scope of the city budget, so without these funds, the Bellingham Police Department would not be able to purchase the software.

62. In FY 2026, Bellingham Public Library, as a subgrantee of the State of Washington, received a Professional Development Grant for approximately $6,000, with federal funding from IMLS. This funding supports professional development for the library system through a reimbursement process. Bellingham has used these funds to help fund professional training for library staff. The Bellingham Public Library intends to apply for future Professional Development Grant funding, including for the upcoming FY 2027 grant cycle. The Bellingham Public Library intends to use the funding for professional training for library staff. Without these funds, the library's all staff learning day would be negatively impacted.

63. Bellingham brings the action as to DOJ and IMLS.

64. Plaintiff City of Bremerton ("Bremerton") is a first-class charter city organized and existing under the laws of the State of Washington.

65. Bremerton receives or expects to receive substantial federal funding administered by DOJ, DHS, and FEMA.

66. Bremerton applied for DHS funding from FEMA's Assistance to Firefighters Grant ("AFG") Program on February 9, 2026, seeking $86,830 for Urban Search and Rescue ("USAR") training classes and wages. In 2023, Bremerton was awarded $53,191.98 through the AFG Program, which was used to procure automatic CPR devices.

67. Bremerton also applied for DHS funding through FEMA's Staffing for Adequate Fire and Emergency Response ("SAFER") Program, on June 19, 2026. Bremerton is seeking



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

$2,867,886 to help fund six full-time firefighters or paramedics in the Bremerton Fire Department. In 2017, the City of Bremerton was awarded a SAFER grant in the amount of $535,171, which was used to help fund three full-time firefighters.

68. Bremerton also applied for DHS funding under FEMA's FIFA World Cup 2026 Grant Program. Bremerton was offered a grant for a maximum reimbursement of approximately $319,000, but Bremerton declined the grant due to the inclusion of the Challenged Conditions.

69. Bremerton has received, and intends to continue to apply for, DOJ Bryne JAG grant funding. Bremerton applied for and was awarded $16,612 in FY 2025 to partially fund the Bremerton Police Department Community Resource Specialist position. Bremerton intends to apply for this grant again for FY 2026 in the amount of $19,117 to continue to partially fund that position.

70. Bremerton brings the action as to DOJ, DHS, and FEMA.

71. Defendant Todd Blanche is the Attorney General of the United States, and DOJ's highest ranking official. He is charged with the supervision and management of all decisions and actions of the DOJ. He is sued in his official capacity.

72. Defendant DOJ is an executive department of the United States federal government. 28 U.S.C. § 501. DOJ is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

73. Defendant Markwayne Mullin is the Secretary of DHS, the highest-ranking official in DHS, and is responsible for the decisions of DHS. He is sued in his official capacity.

74. Defendant DHS is an executive department of the United States government. 6 U.S.C. § 111(a). DHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

75. Defendant Cameron Hamilton is the FEMA Administrator, the highest-ranking official in FEMA, and is responsible for the decisions of FEMA. He is sued in his official capacity.

76. Defendant FEMA is an agency within DHS. Congress has directed that FEMA is and "shall be maintained as a distinct entity" within DHS. 6 U.S.C. § 316(a). FEMA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

77. Defendant Lee Zeldin is the Administrator of the EPA, the highest-ranking official in the EPA, and is responsible for the decisions of the EPA. He is sued in his official capacity.

78. Defendant EPA is an executive agency of the United States federal government. 42 U.S.C. § 13102(2). EPA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

79. Defendant Howard W. Lutnick is the Secretary of Commerce, the highest ranking official in Commerce, and is responsible for the decisions of Commerce. He is sued in his official capacity.

80. Defendant Commerce is an executive department of the United States federal government. 15 U.S.C. § 1501. Commerce is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

81. Defendant Brooke L. Rollins is the Secretary of USDA, the highest ranking official in USDA, and is responsible for the decisions of USDA. She is sued in her official capacity.

82. Defendant USDA is an executive department of the United States federal government. 7 U.S.C. § 2201. USDA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

83. Defendant Christopher Wright is the Secretary of Energy of the United States and DOE's highest-ranking official. He is charged with the supervision and management of all



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

directions and actions of that agency. 42 U.S.C. § 7131. He is sued in his official capacity.

84. Defendant DOE is an executive department of the United States federal government. 42 U.S.C. § 7131. DOE is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

85. Defendant Keith Sonderling is the acting Secretary of DOL, the highest ranking official in DOL, and is responsible for the decisions of DOL. He is sued in his official capacity.

86. Defendant DOL is an executive department of the United States federal government. 29 U.S.C. § 551. DOL is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

87. Defendant Doug Burgum is the Secretary of Interior, the highest ranking official in Interior, and is responsible for the decisions of Interior. He is sued in his official capacity.

88. Defendant Interior is an executive department of the United States federal government. 43 U.S.C. § 1451. Interior is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

89. Defendant Sara Carter is the Director of ONDCP, the highest ranking official in ONDCP, and is responsible for the decisions of ONDCP. She is sued in her official capacity.

90. Defendant ONDCP is an office within the Executive Office of the President ("EOP"). 21 U.S.C. § 1702(a). ONDCP is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

91. Defendant Sonderling is the acting director and Defendant Lisa Solomson is the Senior Official Performing the Duties of the Director of IMLS. They are the highest ranking officials in IMLS, and are responsible for the decisions of IMLS. They are sued in their official capacities.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

92. IMLS is a division within the National Foundation on the Arts and Humanities. 20 U.S.C. § 9102(a). IMLS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

## IV. FACTUAL ALLEGATIONS

### A. DOJ Grant Programs

93. Congress established DOJ in 1870. Act of June 22, 1870, ch. 150, Pub. L. No. 41-97, 16 Stat. 162 (1870). *See also* 28 U.S.C. § 501 *et seq*. According to its website, DOJ's mission is to uphold the rule of law, to keep our country safe, and to protect civil rights.

94. By law, the Attorney General is charged with supervising and directing DOJ's administration and operations, including oversight of all departmental components, the administration of grants and other federal funding, and ensuring that DOJ's actions comply with applicable statutory and executive requirements. *See* 28 U.S.C. § 509.

95. DOJ administers both competitive and formula grant programs that provide federal funding to States, local governments, and other entities to support public safety and justice activities in their communities. Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019). Entitlement grant programs (sometimes referred to as formula grant programs) "are awarded pursuant to a statutory formula" wherein "Congress determines who the recipients are and how much money each shall receive." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (cleaned up). DOJ administers grants directly and through its program offices, including COPS and the Office of Justice Programs ("OJP"), which includes Bureau of Justice Statistics ("BJS"), BJA, and the Office for Victims of Crime ("OVC"). 34 U.S.C. §§ 10101, 10132, 10441–42, 10381, 20111.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

96. Plaintiffs King County, Kitsap County, Snohomish County, City of Bellingham, and City of Bremerton (collectively, the "DOJ Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive DOJ grants. Examples of those DOJ grant programs are discussed below. This list is not exhaustive; DOJ Plaintiffs seek relief as to all federal grants administered by DOJ.

1. Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) Program

97. The Byrne JAG Program is a formula grant program administered by BJA. *See* 34 U.S.C. § 10151 *et seq*. Congress established the Byrne JAG Program to support state and local criminal justice efforts by making grants to be used for "provid[ing] additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice or civil proceedings, including for any one or more of" several enumerated programs, including, *inter alia*, law enforcement, prosecution, crime prevention, corrections, drug treatment, technology, mental health, and victim and witness services. 34 U.S.C. § 10152(a)(1).

98. BJA distributes Byrne JAG grants directly to states and localities according to a statutory formula based on a jurisdiction's population and violent crime statistics. 34 U.S.C. § 10156. By statute, half of a state's allocation is based on the state's population compared to the total U.S. population, and the other half is based on the state's average annual Part 1 violent crimes (murder, nonnegligent manslaughter, forcible rape, robbery, aggravated assault, and severe forms of trafficking in persons, *see* 34 U.S.C. §§ 10410, 10156(i)) over the three most recent years compared to all states. 34 U.S.C. § 10156(a)(1).

99. After each state's allocation is determined, 40% of it is directly awarded to units of local government in the state. Awards to units of local government are based on their proportional share of Part 1 violent crimes, subject to statutory eligibility requirements related to crime data. 34



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

U.S.C. § 10156(b)(2), (d), (e)(3).

100. Congress also established comprehensive safeguards, such as minimum and maximum allocation provisions and detailed application requirements designed to ensure evidence-based criminal justice funding. *See* 34 U.S.C. §§ 10153, 10156(d), (e).

101. Congress funds the Byrne JAG Program through annual appropriations. For each fiscal year that the program receives an appropriation, BJA issues two Byrne JAG NOFOs: one for states and one for eligible units of local government. To receive and draw upon a Byrne JAG award, jurisdictions must submit an application containing statutorily required certifications and assurances, including a certification that federal funds will not supplant state or local funds, but will increase available law enforcement funding; an assurance of governing body review at least 30 days before application submission; assurance of public notice and comment opportunities; and an assurance that applicants will maintain and report required programmatic and financial data. *See* 34 U.S.C. § 10153.

102. To be eligible, states must develop comprehensive statewide strategic plans, in consultation with local governments and criminal justice system representatives. 34 U.S.C. § 10153(a)(6). The plan must detail how grants will improve criminal justice administration, including descriptions of funding allocation approaches, descriptions of evidence-based data gathering processes, and identification of barriers to implementing evidence-based approaches. *Id*.

103. Congress allocated $964,000,000 in funding to the Byrne JAG Program for FY 2026. *See* Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, div. A, tit. II, 140 Stat. 5, 30 (2026). BJA then issued the FY 2026 Byrne JAG NOFOs in August 2026, with application deadlines of September 18, 2026 (state) and October 9, 2026 (local).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

104. To the best of DOJ Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on Byrne JAG grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

2. National Criminal History Improvement Program (NCHIP)

105. NCHIP provides federal grants to improve the accuracy, quality, timeliness, accessibility, and integration of state, local, and tribal criminal history and related records, including by supporting participation in national criminal-justice information systems.

106. BJS launched the NCHIP program in 1995, initially under the authority of the Brady Handgun Violence Prevention Act, 103 Pub. L. No. 159, 107 Stat. 1563, and other statutes.[2] NCHIP is currently authorized under 34 U.S.C. § 10132(c)(19) (authorizing BJS to provide for improvements in, among other things, "the accuracy, quality, timeliness, immediate accessibility, and integration" of state and tribal criminal history and records systems) and 34 U.S.C. § 40301 (authorizing grants to, among other things, "upgrade criminal history and criminal justice record systems, including systems operated by law enforcement agencies and courts").

107. NCHIP grants are awarded to states and Tribal governments, which may use the funds directly or award subgrants to local governments. Grant recipients use NCHIP funds to

[2] *See* National Child Protection Act of 1993, 103 Pub. L. No. 209, 107 Stat. 2490 (1993); Violent Crime Control Act of 1994, 103 Pub. L. No. 322, 108 Stat. 1796 (1994); Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 6092, 102 Stat. 4181, 4339 (1988).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

develop, update, and upgrade state criminal history systems and to improve compatibility and interoperability with other state and national systems. 34 U.S.C. § 40301(a)–(b).

108. Each year, BJS issues a NOFO that identifies the amount of available funding, selection criteria, and application requirements. BJS evaluates NCHIP applications through peer review, followed by programmatic and financial review. The Assistant Attorney General generally makes the final award decisions.

109. Congress funds NCHIP through annual appropriations. For FY 2026, Congress appropriated $83,000,000 for, *inter alia*, NCHIP. Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, div. A, tit. II, 140 Stat. 5, 31 (2026). BSJ then issued the FY 2026 NCHIP NOFO in August 2026, with an application deadline of September 28, 2026.

110. To the best of DOJ Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on NCHIP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

3. <u>STOP Violence Against Women Formula Grant Program</u>

111. Congress enacted the Violence Against Women Act ("VAWA") as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), seeking to "respond both to the underlying attitude that [violence against women] is



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

somehow less serious than other crime and to the resulting failure of our criminal justice system to address such violence." S. Rep. No. 103-138, at 38 (1993).

112. Through VAWA, Congress sought a comprehensive response to the issue of violence against women, focusing primarily on legal protections, increased enforcement and access to legal structures and assistance, and expanded services for victims.

113. Central to this comprehensive approach to addressing violence against women, Congress created a broad set of grant programs for states, local governments, and other entities. *See* 34 U.S.C. § 10441 *et seq.*; 34 U.S.C. § 12291 *et seq.*

114. In VAWA, Congress recognized that violence against women must be addressed within a broader framework and tailored to the unique needs of different women's experiences. Thus, for example, Congress has authorized grants for "developing or improving delivery of victim services and legal assistance to underserved populations" and "developing, enlarging, or strengthening culturally specific victim services programs." 34 U.S.C. § 10441(b)(5), (22).

115. Congress directed the Attorney General to develop regulations to "ensure" that VAWA grant money will be used to, among other things, "recognize and meaningfully respond to the needs of underserved populations and ensure that monies set aside to fund culturally specific services and activities for underserved populations are distributed equitably among those populations." 34 U.S.C. § 10446(e)(2)(D).

116. Congress defined "underserved populations" to include "populations who face barriers in accessing and using victim services, and includes populations underserved because of geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, populations underserved because of special needs . . . ." 34 U.S.C. § 12291(a)(46); *see also* 28 C.F.R. § 90.12(e).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

117. Congress further defined "culturally specific" as "primarily directed toward racial and ethnic minority groups . . . ." 34 U.S.C. § 12291(a)(8); *see also* 28 C.F.R. § 90.11(c)(3).

118. VAWA has, from its inception, included a specific focus on the unique problems faced by immigrant victims of domestic violence and sexual assault. For instance, Congress provided a mechanism for abused spouses and children to self-petition for immigration relief, as well as for suspension of deportation and cancelling of removal. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 40701, 108 Stat. 1796, 1953 (1994) (amending the Immigration and Nationality Act, *see* 8 U.S.C. § 1154, which has been further amended through a VAWA reauthorization in 2005).

119. Through VAWA, Congress recognized the unique problem of gender-based violence that disproportionately targets women and made clear that it considered violence against women to be a systemic issue, not a one-off crime. The Joint Explanatory Statement of the Committee of Conference accompanying VAWA's passage described crimes of violence motivated by gender as crimes of "bias" that violate the victim's right to be free from discrimination on the basis of gender. *See* 140 Cong. Rec. H23479 (daily ed. Aug. 21, 1994). It acknowledged that existing state and federal laws did not adequately protect against the bias element of gender-motivated crimes of violence or allow victims adequate opportunity to vindicate their rights. *Id.* The Committee Statement also stressed that existing bias and discrimination in the criminal legal system often deprived victims of gender-motivated violent crimes equal protection of the laws and the redress to which they were entitled. *Id.*

120. Congress has reauthorized and amended VAWA four times since its enactment. Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, div. B, 114 Stat. 1464, 1491–1539 (2000); Violence Against Women and Department of Justice



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Reauthorization Act of 2005, Pub. L. No. 109-162, tit. I–X, 119 Stat. 2960, 2972–3086 (2006); Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (2013); Violence Against Women Reauthorization Act of 2022, Pub. L. No. 117-103, div. W, 136 Stat. 49, 840–46 (2022).

121. In these reauthorizations, Congress expanded VAWA's scope and added to its complex and integrated system of federal and state funding.

122. In 2002, Congress created the OVW as a permanent office and charged it with administering VAWA grant programs. *See* 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, tit. IV, 116 Stat. 1758, 1789–1791 (2002) (codified at 34 U.S.C. §§ 10442–10445).

123. Congress directed that OVW be headed by a Director, who, while reporting to the Attorney General, has "final authority over all grants, cooperative agreements, and contracts awarded by the Office." 34 U.S.C. § 10442(b).

124. The 2022 reauthorization reauthorized most of the programs under VAWA, including the STOP Violence Against Women Formula Grant Program. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. B, tit. II, 136 Stat. 49, 120–122 (2022); *see also* 34 U.S.C. §§ 10441, 10446.

125. VAWA sets forth specific purposes for all OVW grant programs, *see* 34 U.S.C. § 10441(b), including: (1) training law enforcement and other justice system personnel on how "to more effectively identify and respond to violent crimes against women . . . including the appropriate use of nonimmigrant status under" provisions creating visas for victims of violence, including sexual violence, 34 U.S.C. § 10441(b)(1); (2) "developing or improving delivery of victim services and legal assistance to underserved populations," 34 U.S.C. § 10441(b)(5); (3)



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"providing assistance to victims of domestic violence and sexual assault in immigration matters," 34 U.S.C. § 10441(b)(10); (4) "developing, enlarging, or strengthening programs and projects to provide services and responses targeting male and female victims of" VAWA crimes "whose ability to access traditional services and responses is affected by their sexual orientation or gender identity," 34 U.S.C. § 10441(b)(19), with "gender identity" defined to mean "actual or perceived gender-related characteristics," 18 U.S.C. § 249(c)(4); and (5) other services designed to assist justice system personnel and victim services programs, *see generally* 34 U.S.C. §§ 10441(b)(1)–(24).

126. Critically, VAWA precludes any recipient of OVW grants from discriminating in carrying out its program activities "on the basis of actual or perceived race, color, religion, national origin, sex, gender identity [], sexual orientation, or disability." 34 U.S.C. § 12291(b)(13)(A). Under a limited exception, grantees may provide "sex segregation or sex-specific programming" if it "is necessary to the essential operation of a program," as long as they provide "comparable services to individuals who cannot be provided with the sex-segregated or sex-specific programming." 34 U.S.C. § 12291(b)(13)(B).

127. STOP grants are awarded to states or territories, which may then pass the grants through to local governments and other entities. *See* 34 U.S.C. §§ 10441(a), 10446–10451, 10455; 28 C.F.R. §§ 90.11, 90.17. DOJ Plaintiffs receive STOP grant funds indirectly, as subrecipients of the State of Washington.

128. STOP grants are distributed according to a statutory formula. Certain percentages of STOP grants are distributed to state domestic violence and sexual assault coalitions. 34 U.S.C. § 10446(b)(2)–(3). Additionally, $600,000 of appropriated funding for STOP grants are to be made available for applicants in each state. 34 U.S.C. § 10446(b)(5). All remaining funds appropriated



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

for STOP grants are distributed to the states based on each state's population compared to the total U.S. population. 34 U.S.C. § 10446(b)(6).

129. States must certify to six specific conditions set forth in the statute: (1) funds shall be used for any of the purposes provided in 34 U.S.C. § 10441(b); (2) states and subrecipients will develop a plan for implementation and consult and coordinate with a list of required entities; (3) states will coordinate implementation plans with other statutory plans and programs; (4) certain percentages of amounts granted will be allocated to specific categories and purposes, specifically not less than 25% for law enforcement, 25% for prosecutors, 30% for victims services (of which 10% must be distributed to culturally specific community-based organizations), and 5% for state and local courts, including juvenile courts; (5) federal funds will supplement, rather than supplant, otherwise-available non-federal funds; and (6) not less than 20% of funds will be allocated for programs in two or more of the categories listed above that meaningfully address sexual assault crimes, including rape. 34 U.S.C. §§ 10446(c); 28 C.F.R. § 90.11(c). Grant applications must contain those certifications and other elements including certification of compliance with the grant conditions listed in 34 U.S.C. § 12291(b). 34 U.S.C. §§ 10446(d)(1), (d)(6); *see also* 28 C.F.R. § 90.19(b).

130. The regulations governing the STOP Grant Program provide that, while states are statutorily required to set aside a minimum of 10% of the victim services allocation for culturally specific services, "States are encouraged to provide higher levels of funding to address the needs of racial and ethnic minority groups." 28 C.F.R. § 90.11(c)(3).

131. Congress funds STOP grants through annual appropriations. In FY 2026, Congress appropriated $720,000,000 for all OVW grants, of which a portion was for STOP grants. Commerce, Justice, Science; Energy and Water Development; and Interior and Environment



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Appropriations Act, 2026, Pub. L. No. 119-74, div. A, tit. II, 140 Stat. 5, 25–28 (2026). OVW then issued a NOFO for FY 2026 funding in June 2026, with an application deadline of July 10, 2026.

132. To the best of DOJ Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on STOP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

4. Community Oriented Policing Services (COPS) Law Enforcement Mental Health and Wellness Act (LEMHWA) Grant Program

133. In 1994, Congress enacted the Public Safety Partnership and Community Policing Act of 1994, Pub. L. No. 103-322, § 10002, 108 Stat. 1796, 1807 (1994) ("COPS Statute"), with the goal of "substantially increas[ing] the number of law enforcement officers interacting directly with members of the community" and improving "training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community."

134. To this end, the COPS Statute authorized DOJ to make grants to states and local governments to "increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety." *Id.*, 108 Stat. at 1808. The COPS Statute enumerated purposes for which grants could be made, including, among other things, to "hire and train new, additional career law enforcement officers for deployment in community-oriented policing" and



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to "provide specialized training to law enforcement officers to enhance their conflict resolution, mediation, problem solving, service, and other skills needed to work in partnership with members of the community." *Id.*, 108 Stat. at 1808–09.

135. The COPS Statute has been amended through the years and is currently codified at 34 U.S.C. § 10381 *et seq*. Over time, Congress has expanded the list of approved purposes for COPS grants. *See* 34 U.S.C. § 10381(b) (enumerating twenty-four purposes for which grants may be made, including, *inter alia*, "to provide specialized training to law enforcement officers" to "recognize individuals who have a mental illness" and "properly interact with individuals who have a mental illness, including strategies for verbal de-escalation of crises").

136. In January 2018, Congress enacted the Law Enforcement Mental Health and Wellness Act of 2017, Pub. L. No. 115-113, 131 Stat. 2276 (2018) ("LEMHWA Act"), with the goal of "provid[ing] support for law enforcement agency efforts to protect the mental health and well-being of law enforcement officers." The LEMHWA Act amended the COPS Statute to add the following purpose for which COPS grants may be made: "to establish peer mentoring mental health and wellness pilot programs within State, [T]ribal, and local law enforcement agencies." *Id.* § 2, 131 Stat. at 2276 (currently codified at 34 U.S.C. § 10381(b)(25)). These grants are typically referred to as LEMHWA grants.

137. The COPS Statute sets out various requirements for grant applications, including that applicants must "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11).

138. COPS administers the COPS Grant Program, including LEMHWA grants.

139. Congress appropriates funding annually for COPS grants, including LEMHWA



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

grants. For FY 2026, Congress appropriated $10,000,000 for LEMHWA grants. Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, div. A, tit. II, 140 Stat. 5, 36 (2026).

140. In administering the LEMHWA Grant Program for a particular year, COPS issues a NOFO, setting out the amount of funding available for that year, the agency's goals and priorities for the program, and the application instructions. The FY 2026 LEMHWA NOFO was issued in June 2026, with an application deadline of July 30, 2026.

141. The FY 2026 LEMHWA NOFO states that the program "prioritizes wellness by providing resources to law enforcement agencies to support mental health and wellness efforts." LEMHWA grants support "the delivery of peer support, training, family resources, suicide prevention, stress reduction, clinical support, and other promising practices for wellness programs."

142. To the best of DOJ Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on COPS grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

5. <u>Other DOJ Grants</u>

143. DOJ and its component entities administer a range of other grant programs that some DOJ Plaintiffs have previously received, currently receive, or are otherwise eligible to



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

receive. To the best of DOJ Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations for any DOJ grant program imposes or authorizes directives for or conditions on DOJ grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

**B. DHS Grant Programs**

144. Congress established DHS in the Homeland Security Act of 2002. *See* Pub. L. No. 107-296, 116 Stat. 2135 (2002); *see also* 6 U.S.C. § 111. The primary mission of DHS is to, among other things, "prevent terrorist attacks within the United States," "reduce the vulnerability of the United States to terrorism," "act[] as a focal point regarding natural and manmade crises and emergency planning," and ensure that the "overall economic security of the United States" and the "civil rights and civil liberties of persons" are not "diminished by efforts, activities, and programs aimed at securing the homeland." 6 U.S.C. § 111(b).

145. DHS is made up of 15 component agencies and offices—including, among others, FEMA, the Cybersecurity and Infrastructure Security Agency ("CISA"), U.S. Citizenship and Immigration Services ("USCIS"), United States Coast Guard ("USCG"), and Science and Technology Directorate ("S&T"). By law, the DHS Secretary is responsible for all acts taken by DHS's component entities. 6 U.S.C. § 112(a)(2)-(3).

146. DHS, often acting through its component entities, administers grant programs established by Congress that provide federal funds to public and private entities for a variety of



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

purposes related to preventing targeted violence and terrorism, protecting homeland security, and mitigating and recovering from natural disasters and other emergencies. DHS grant funding provides essential support to critical programs that, among other things, fund research, new equipment, technical assistance, security enhancements, capacity building, training and exercises, victim support, and mental health interventions.

147. Plaintiffs Port of Seattle, Kitsap County, Thurston County, and City of Bremerton (collectively, the "DHS Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive DHS grants. Examples of those DHS grant programs are discussed below. This list is not exhaustive; DHS Plaintiffs seek relief as to all federal grants administered by DHS.

1. <u>FEMA Grant Programs</u>

148. FEMA was established by executive order in 1979 as an independent executive agency to consolidate emergency preparedness, mitigation, and response activities, cut duplicative administrative costs, and strengthen the nation's ability to deal effectively with emergencies. *See* Exec. Order No. 12127, 44 Fed. Reg. 19367 (Mar. 31, 1979); *see also* Reorganization Plan No. 3 of 1978, 43 Fed. Reg. 41943, 92 Stat. 3788. FEMA initially had the dual mission of emergency management and civil defense. *See* Exec. Order No. 12148, 44 Fed. Reg. 43239 (July 20, 1979).

149. FEMA's responsibilities were further defined and expanded by the Disaster Relief and Emergency Assistance Amendments of 1988, Pub. L. No. 100-707, 102 Stat. 4689 (1988), which amended the Disaster Relief Act of 1974 and renamed it the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). The Stafford Act provided clear direction for emergency management and established the current statutory framework for disaster response and recovery through presidential disaster declarations.

150. Under the Homeland Security Act of 2002, *see* Pub. L. No. 107-296, 116 Stat. 2135



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(2002), and 6 U.S.C. § 111, FEMA became an operational component of DHS, with its primary mission to "reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation." 6 U.S.C. § 313(a), (b)(1).

151. DHS Plaintiffs, like virtually every state and local government across the country, rely on these federal grants to support their emergency management and hazard prevention functions.

152. While FEMA makes some of its emergency-management grant funding available directly to local governments, it disburses some of its funding to the states, which are then authorized or required to execute subgrants to distribute the funding to local governments. This is known as "pass-through" grant funding. When it distributes such funding to states, FEMA typically disburses funds to the agencies within each state that FEMA refers to as the State Administrative Agency ("SAA") or the State Emergency Management Agency ("EMA"). FEMA grants contemplate this multi-layered, pass-through structure.

153. Some of the DHS Plaintiffs receive most, if not all, of their FEMA grant funding indirectly, as a subrecipient of funding from the State of Washington. The SAA and EMA for Washington is the Washington State Military Department – Emergency Management Division ("EMD").

*a. Emergency Management Performance Grant (EMPG) Program*

154. Congress first authorized funding for the EMPG Program in the Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, div. K, tit. III, 117 Stat. 11, 514–16 (2003). Congress has since made the program permanent and codified it at 6 U.S.C. § 762. Under the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

EMPG Program, FEMA is authorized to provide federal funding "to assist State, local, and [T]ribal governments in preparing for all hazards." 6 U.S.C. § 762(b).

155. Congress funds the EMPG Program through annual appropriations. In FY 2026, the Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, div. A, tit. III, 140 Stat. 773, 789 (2026), provided $337,250,000 in funding to the EMPG Program.

156. Specifically, the EMPG Program provides federal funding, passed through the states, to assist state, local, Tribal, and territorial emergency management agencies in implementing FEMA's National Preparedness System and the National Preparedness Goal of a secure and resilient nation.

157. In administering the EMPG Program for a particular year, FEMA issues a NOFO setting out the amount of funding available for that year, the agency's goals and priorities for the program, and the application instructions. FEMA's EMPG NOFO for FY 2026 funding was issued in June 2026 with an application deadline of July 15, 2026.

158. EMPG funding supports states and local governments in developing or enhancing emergency management planning activities, emergency operations plans, public alerts and warning systems, emergency response coordination among agencies, mutual aid systems, shelter and evacuation preparedness, and disaster recovery. EMPG funding also supports the purchase of certain forms of equipment, as well as day-to-day activities in support of emergency management.

159. FEMA's allocation of EMPG funds among the states is set by statutory formula. For each year's apportioned amount of EMPG funding, FEMA must allocate to certain territories a baseline amount of 0.25% of the appropriated funds and to the states a baseline amount of 0.75% of the appropriated funds. 6 U.S.C. § 762(d)(1). FEMA must apportion the remaining amount



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

among the States on a population-share basis. 6 U.S.C. § 762(d)(2).

160. To the best of DHS Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on EMPG grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

*b. Transit Security Grant Program (TSGP)*

161. FEMA established the TSGP under authority granted in the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 1406, 121 Stat. 266, 405–408 (2007). Under the TSGP, FEMA is authorized to provide federal funding to "eligible public transportation agencies for security improvements," specifically to "address items included in a security assessment" or to "further a security plan." *See* 6 U.S.C. § 1135(a).

162. Congress funds the TSGP through annual appropriations. In FY 2026, the Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, div. A, tit. III, 140 Stat. 773, 789 (2026), provided $99,750,000 in funding to, *inter alia*, the TSGP.

163. The main purpose of the TSGP Program is to provide federal funding to eligible public transportation agencies to promote sustainable, risk-based efforts to protect critical transportation infrastructure and the traveling public from acts of terrorism and to increase infrastructure resilience in public transportation systems.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

164. Eligible public transportation agencies—including those operating ferries, intra-city bus systems, and all forms of passenger rail—may apply for TSGP funds. 6 U.S.C. § 1135(a)(2). Grant recipients must use TSGP funds for either (1) capital uses such as building systems, purchasing equipment, and implementing security improvements; or (2) operating uses such as providing security training, implementing security exercises, developing security plans, and reimbursing security costs. 6 U.S.C. § 1135(b).

165. The statute authorizing the TSGP specifically requires:

> Before distribution of funds to recipients of grants, the Secretary shall issue guidelines to ensure that, to the extent that recipients of grants under this section use contractors or subcontractors, such recipients shall use small, minority, women-owned, or disadvantaged business concerns as contractors or subcontractors to the extent practicable.

6 U.S.C. § 1135(h).

166. In administering TSGP for a particular year, FEMA issues a NOFO setting out the amount of funding available for that year, the list of eligible public transportation agencies and the amount of funding allocated to each eligible agency, the criteria FEMA will apply in selecting projects, and the application instructions. FEMA's FY 2026 TSGP NOFO was issued in June 2026, with an application deadline of July 24, 2026.

167. FEMA determines which public transportation agencies are eligible for TSGP funding based on ridership (daily unlinked passenger trips) and transit systems that serve historically eligible Urban Area Security Initiative urban areas. Additionally, to be eligible for TSGP funding, public transportation agencies must have developed or updated their security plan and participate in a Regional Transit Security Working Group. Funding designated for eligible applicants who fail to apply is instead distributed among the eligible applicants who did apply.

168. To the best of DHS Plaintiffs' knowledge, nothing in the authorizing statutes,



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on TSGP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

*c. Assistance to Firefighters Grant (AFG) Program*

169. Congress established the AFG Program in the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, which added a new section to the Federal Fire Prevention and Control Act of 1974, 15 U.S.C. § 2201 *et seq*. The AFG Program, which is administered by FEMA, provides federal funding "directly to fire departments of a State for the purpose of enhancing their ability to protect the health and safety of the public as well as that of firefighting personnel facing fire and fire-related hazards." FEMA, Assistance to Firefighters Grant Program, 68 Fed. Reg. 12544 (Mar. 14, 2003); *see also* 15 U.S.C. § 2229(c)(1)(a), (c)(3); Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, Pub. L. No. 106-398, § 1701, 114 Stat. 1654, 1654A-360–63 (2000). Since its launch in 2001, the AFG Program has awarded approximately $9 billion in grants.

170. AFG grant recipients—including fire departments, nonaffiliated emergency medical services ("EMS") organizations, and state fire training academies—must use AFG funds for certain statutory purposes, including to train firefighting personnel in firefighting, emergency medical services, and other emergency response, to establish wellness and fitness programs for firefighting personnel, to educate the public about arson prevention and detection, to provide



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

incentives for the recruitment and retention of volunteer firefighting personnel, and to provide specialized training to firefighters and other personnel to recognize and intervene with individuals with mental illness, including strategies for verbal de-escalation of a crisis. 15 U.S.C. § 2229(c)(1), (c)(3); *see also* 44 C.F.R. §§ 152.1, 152.2.

171. Congress funds the AFG Program through annual appropriations. In FY 2026, Congress appropriated $342,000,000 to the AFG Program. Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, div. A, tit. III, 140 Stat. 773, 789 (2026).

172. In administering the AFG Program for a particular year, FEMA issues a NOFO setting out the amount of funding available for that year, the criteria the agency will apply in selecting projects, and the application instructions. The current NOFO for the AFG Program is from FY 2025, but governs awards that FEMA will make through September 30, 2026.

173. FEMA awards AFG grants "on a competitive basis" and on a rolling basis, in accordance with considerations established by Congress. For example, to ensure that benefits are widespread, the applicable statute and regulations place certain restrictions on AFG funding and allocation, such as setting limits on how much grant funding can be awarded to jurisdictions of certain sizes or to specific types of fire departments, and requiring use of funds on specific kinds of firefighting-related activities. *See* 15 U.S.C. § 2229(c)(2)–(3), (h), (i); *see also* 44 C.F.R. §§ 152.1, 152.3, 152.4. Additional considerations include the degree to which the award will reduce death, injury, and property damage associated with fire-related and other hazards; the need of the applicant; the need to protect the United States as a whole; the number of calls the applicant receives requesting firefighting or emergency medical responses; the impact of the award on the protection of lives and property; and the applicant's ability to respond to fires and related hazards.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*See* 15 U.S.C. § 2229(g), (j)(1)-(2); *see also* 44 C.F.R. § 152.6.

174. To the best of DHS Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on AFG grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

*d. Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program*

175. Congress established the SAFER Program in the National Defense Authorization Act for Fiscal Year 2004, which added new sections to the Federal Fire Prevention and Control Act of 1974, 15 U.S.C. § 2201 *et seq*. Under the SAFER Program, FEMA is authorized to provide federal funding directly to eligible fire departments and volunteer firefighter interest organizations to assist with staffing and deployment capabilities to respond to emergencies, including assisting fire departments with attaining 24-hour staffing to provide adequate protection from fire and fire-related hazards, fulfilling traditional missions of fire departments, and recruiting and retaining volunteer firefighters. *See* 15 U.S.C. § 2229a(a)(1)(A), (a)(2); *see also* National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1057, 117 Stat. 1392, 1616–19 (2003).

176. Congress funds the SAFER Program through annual appropriations. In FY 2026, Congress appropriated $342,000,000 for the SAFER Program. Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, div. A, tit. III, 140 Stat. 773,



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

789 (2026).

177. SAFER grant recipients, which can include career, combination, or volunteer fire departments, as well as national, state, local, or tribal organizations that represent the interests of volunteer firefighters, must use grant funds on programs to (1) hire new, additional firefighters; (2) change the status of part-time or paid-on-call firefighters to full-time firefighters; and/or (3) recruit and retain volunteer firefighters who are involved with or trained in the operations of firefighting and emergency response. 15 U.S.C. § 2229a(a)(1)(A), (a)(2).

178. Since its launch in 2005, the SAFER Grant Program has awarded approximately $6.1 billion in grants. These funds have been used to hire new firefighters, convert part-time or paid-on-call firefighters to full-time roles, and recruit and retain volunteer firefighters.

179. In administering the SAFER Program for a particular year, FEMA issues a NOFO setting out the amount of funding available for that year, the criteria the agency will apply in selecting projects, and the application instructions. The current NOFO for the SAFER Program is from FY 2025 but governs awards that FEMA will make through September 30, 2026.

180. FEMA is required to award SAFER grants "on a competitive basis through a neutral peer review process." 15 U.S.C. § 2229a(a)(1)(G).

181. To the best of DHS Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on SAFER grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

permitting termination for convenience.

2. Other DHS Grants

182. DHS and its component entities administer a range of other grant programs that some DHS Plaintiffs have previously received, currently receive, or are otherwise eligible to receive. To the best of DHS Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations for any DHS grant program imposes or authorizes directives for or conditions on DHS grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

## C. EPA Grant Programs

183. The EPA was established in 1970, consolidating numerous environmental responsibilities of the federal government within a single agency. *See* Reorganization Plan No. 3 of 1970, §§ 1–2, 84 Stat. 2086 (1970), *promulgated pursuant to* 5 U.S.C. ch. 9 (1970). Every year, EPA awards more than $4 billion in grants and other financial assistance to state and local governments and other entities to protect human health and the environment.

184. By law, the EPA Administrator is responsible for overseeing all agency programs and offices, supervising the administration of grants and other funding, and ensuring the agency's actions comply with statutory and executive requirements. *See, e.g.*, 42 U.S.C. §§ 6628, 6912, 13103.

185. EPA has ten regional offices, each of which is responsible for the execution of



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

EPA's programs in geographic regions. The State of Washington is part of Region 10, which is headquartered in Seattle.

186. Plaintiffs Port of Seattle, King County, Kitsap County, and Snohomish County (collectively, the "EPA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive EPA grants. Examples of those EPA grant programs are discussed below. This list is not exhaustive; EPA Plaintiffs seek relief as to all federal grants administered by EPA.

1. <u>Wetland Program Development Grants (WPDG)</u>

187. EPA established the WPDG Program under authority granted in Section 104(b)(3) of the Clean Water Act. Under the WPDG Program, EPA is authorized to make grants for "research, investigations, experiments, training, demonstrations, surveys, and studies relating to the causes, effects, extent, prevention, reduction, and elimination of pollution[.]" *See* 33 U.S.C. § 1254(b)(3); *see also* 40 C.F.R. § 35.380.

188. Grant recipients, including state water pollution control agencies, interstate agencies, and other public or nonprofit private agencies, use WDPG funding to assist in the development and refinement of wetlands protection and management programs. 44 C.F.R. § 35.380(b).

189. Congress funds the WPDG Program through annual appropriations. *See, e.g.*, Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, div. C, tit. II, 140 Stat. 5, 126–27 (2026).

190. In administering the WPDG Program, EPA regional offices periodically issue NOFOs setting out the amount of funding available, the criteria the agency will apply in selecting projects, and the application instructions. The FY 2025 WPDG NOFO for Region 10 was issued in February 2026, with an application deadline of April 10, 2026 for the initial round of grants.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Funding may be awarded under that NOFO over approximately one to four years.

191. To the best of EPA Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on WPDG grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

2. <u>Puget Sound National Estuary Program (NEP)</u>

192. In 1987, Congress established the NEP through the Water Quality Act of 1987, Pub. L. No. 100-4, § 320, 101 Stat. 7, 63 (1987). The NEP empowers governors to nominate an estuary as an "estuary of national significance" and request a management conference to develop a comprehensive management plan for the estuary. 33 U.S.C. § 1330(a)(1). In selecting estuaries for inclusion in the NEP, the EPA must give priority consideration to certain estuaries identified by Congress, including the Puget Sound in Washington. 33 U.S.C. § 1330(a)(2)(B).

193. The management conference must assess the estuary's water quality, natural resources, and uses; collect and assess data on toxics, nutrients, and natural resources to identify the causes of environmental problems; and develop a comprehensive conservation and management plan. 33 U.S.C. § 1330(b). The plan must, among other things, recommend priority corrective actions and compliance schedules, address the effects of recurring extreme weather events, and increase public education and awareness of the estuary's ecological health and water quality conditions. *Id.*; *see generally* 40 C.F.R pt. 35, subpt. P.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

194. Once EPA approves a conservation and management plan, funds authorized under the Clean Water Act may be used to assist with the plan's implementation in accordance with the applicable requirements of the Act. 33 U.S.C. § 1330(f). EPA may award funding to a broad range of eligible recipients, including state, interstate, and regional water pollution control agencies and entities and other public or nonprofit entities. 33 U.S.C. § 1330(g)(1). Funds may only be used to pay for activities "necessary" for the plan's development and implementation. 33 U.S.C. § 1330(g)(2).

195. Congress funds NEP through annual appropriations. For FY 2026, the Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, div. C, tit. II, 140 Stat. 5, 136 (2026), appropriated $2,500,000 for the NEP.

196. The EPA awards NEP funds competitively and must select recipients best able to address urgent, emerging, and challenging issues that threaten the ecological and economic well-being of estuaries of national significance, or that relate to the coastal resiliency of such estuaries. 33 U.S.C. § 1330(g)(4)(C). Congress has identified, among other concerns, seagrass habitat loss, recurring harmful algae blooms, unusual marine mammal mortalities, invasive exotic species, jellyfish proliferation, stormwater runoff, accelerated land loss, and flooding that may be related to sea level rise, extreme weather, or wetland degradation or loss. *Id.*

197. Puget Sound is among the 28 estuaries designated as estuaries of national significance. In 2022, Congress established the Puget Sound Recovery National Program Office within the EPA to coordinate and manage Puget Sound National Estuary Program. 33 U.S.C. § 1276b(b); James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 8501, 136 Stat. 2395, 3847–56 (2022). The Puget Sound's most recent



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

comprehensive conservation and management plan—known as the Puget Sound Action Agenda—was adopted in June 2026.

198. The Puget Sound Recovery National Program Office periodically issues NOFOs for grants to support Puget Sound restoration and protection activities. In March 2026, the office issued the most recent Puget Sound NEP NOFO, with an application deadline of May 11, 2026. The NOFO seeks to establish a "predictable, transparent, and collaborative local/regional funding system" to support implementation of the Puget Sound Action Agenda. The NOFO solicits applications from applicants interested in acting as Strategic Implementation Leads ("SILs") in three focus areas: Habitat/Marine, Shellfish, and Stormwater. The SILs will award and manage subgrants to support the implementation of the Action Agenda, collaborate with other stakeholders and partners to accomplish Action Agenda objectives, and report on progress, outputs, and outcomes. Eligible applicants include the state, local governments, and other entities in the Greater Puget Sound basin.

199. To the best of EPA Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on NEP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

3. Other EPA Grants

200. EPA and its operating divisions and agencies administer a range of other grant



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. To the best of EPA Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations for any EPA grant program imposes or authorizes directives for or conditions on EPA grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

**D. Commerce Grant Programs**

201. Congress established the Department of Commerce and Labor in 1903, which was subsequently renamed Commerce in 1913, when DOL was split off as a separate department. Commerce's purpose is to "foster, promote, and develop the foreign and domestic commerce, [and] the mining, manufacturing, and fishery industries of the United States." 15 U.S.C. § 1512. Commerce is composed of various component entities, including NOAA and EDA. By law, the Commerce Secretary is responsible for all acts taken by Commerce's component entities. *See* 15 U.S.C. §§ 1501, 1511.

202. Commerce, often acting through its component entities, administers grant programs established by Congress to support a wide range of economic development-related purposes, such as job creation, sustainable development, and economic growth.

203. Plaintiffs Port of Seattle, King County, Kitsap County, and Snohomish County (collectively, the "Commerce Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive Commerce grants. Examples of those Commerce grant programs are



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

discussed below. This list is not exhaustive; Commerce Plaintiffs seek relief as to all federal grants administered by Commerce.

1. Community Project Funding (CPF) for Seattle Waterfront Sea Level Rise Vulnerability Assessment

204. The House Appropriations Committee allows congressmembers to submit CPF requests (sometimes referred to congressionally directed spending or "earmarks") to designate funding for local projects.[3] CPF requests are one-time funding requests that can be spent over a one-year project period.[4] Local governments, Tribal entities, and eligible non-profits apply through their representative or senators by providing detailed budgets and proof of community support. Requesting congressmembers are required to submit a statement describing the "federal nexus" for each CPF request, showing that the purpose of the project is tied to a federal authorization law.[5] CPF funding is typically provided through appropriations bills.

205. CPF funding may be requested for NOAA Coastal Zone Management projects that support the protection, restoration, and responsible development of the nation's diverse coastal communities and resources.[6] Funding must be for activities consistent with, and supportive of,

---

[3] *See* House Appropriations Committee, FY27 Guidance Overview, https://appropriations.house.gov/fy27-information/fy27-member-requests-guidance (last visited Sep. 9, 2026).

[4] *See* House Subcommittee on Commerce, Justice, Science, and Related Agencies, Fiscal Year 2027 Member Community Project Funding Request Guide, https://appropriations.house.gov/sites/evo-subsites/republicans-appropriations.house.gov/files/evo-media-document/fy27-cjs-cpf-guidance.pdf (last visited Sep. 9, 2026).

[5] House Appropriations Committee, Guidance for Community Project Funding, https://appropriations.house.gov/sites/evo-subsites/republicans-appropriations.house.gov/files/evo-media-document/fy-2027-community-project-funding-request-general-guidance.pdf (last visited Sep. 9, 2026).

[6] House Subcommittee on Commerce, Justice, Science, and Related Agencies, Fiscal Year 2027 Member Community Project Funding Request Guide, https://appropriations.house.gov/sites/evo-subsites/republicans-



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

NOAA's mission and aligned with one or more of the purposes described in the Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 et seq.

206. Under the Coastal Zone Management Act, Congress found, among other things, that "[t]here is a national interest in the effective management, beneficial use, protection, and development of the coastal zone" and "[b]ecause global warming may result in a substantial sea level rise with serious adverse effects in the coastal zone, coastal states must anticipate and plan for such an occurrence." 16 U.S.C. § 1451. Congress further declared that it is the "national policy" to, among other things, "preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations"; "assist the states in developing management programs providing for, among other purposes, "the study and development . . . of plans for addressing the adverse effects upon the coastal zone of land subsidence and of sea level rise"; and "encourage the preparation of special area management plans which provide for increased specificity in protecting significant natural resources, reasonable coastal-dependent economic growth, improved protection of life and property in hazardous areas, including those areas likely to be affected by land subsidence, [or] sea level rise." 16 U.S.C. § 1452.

207. In recent years, Congresswoman Pramila Jayapal has submitted requests to the House Appropriations Committee for CPF funding on behalf of the Port of Seattle for the Seattle Waterfront Sea Level Rise Vulnerability Assessment project. The funding will be used to conduct a joint vulnerability assessment to understand the impacts of sea level rise on the Seattle waterfront and surrounding communities. The project will "produce a study that can be used to identify and

---

appropriations.house.gov/files/evo-media-document/fy27-cjs-cpf-guidance.pdf (last visited Sep. 9, 2026).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

prioritize resilience needs, sequence investments, and to apply for funding to reduce future community risk in the coming decades."[7] Congresswoman Jayapal's funding requests stated: "The project has a Federal nexus because the funding provided is for purposes authorized by [the Coastal Zone Management Act]."[8] No CPF projects were funded for FY 2025, but Congresswoman Jayapal secured $1 million for the Port of Seattle's Seattle Waterfront Sea Level Rise Vulnerability Assessment for FY 2026.[9] *See* Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, div. A, tit. I, Pub. L. No. 119-74, 140 Stat. 5, 12 (2026).

208. To the best of Commerce Plaintiffs' knowledge, nothing in the appropriations legislation or applicable agency regulations imposes or authorizes directives for or conditions on CPF funding related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

---

[7] Letter from Pramila Jayapal to Tom Cole & Rosa L. DeLauro (May 2, 2025), https://jayapal.house.gov/wp-content/uploads/2025/05/26_FD_CJS_PortOfSeattle_SeaLevelRise.pdf (request for CPF funding for FY 2026).

[8] *Id.*; *see also, e.g.*, Letter from Pramila Jayapal to Tom Cole & Rosa L. DeLauro (May 10, 2024), https://jayapal.house.gov/wp-content/uploads/2024/05/FD_THUD_EDI_DOT_Third_Ave.pdf (similar for FY 2025).

[9] *See* Press Release, Jayapal Secures Nearly $18.4 Million in Community Project Funding for FY 26 (Apr. 10, 2026), https://jayapal.house.gov/2026/04/10/jayapal-secures-nearly-18-4-million-in-community-project-funding-for-fy26/.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

2. Public Works and Economic Adjustment Assistance (EAA) Programs

209. Congress established two core economic development programs under the Public Works and Economic Development Act of 1965, *as amended*, 42 U.S.C. § 3121 *et seq.*: Public Works and Economic Development Facilities ("Public Works") and EAA.

210. The Public Works Program, authorized under 42 U.S.C. § 3141, provides grants to help economically distressed communities develop critical infrastructure and facilities that advance regional development strategies and long-term economic growth. Eligible projects include the acquisition or development of land and improvements for public works, public service, and development facilities; waste management and recycling system improvements; and the design, engineering, construction, rehabilitation, alteration, expansion, resilience, or improvement of such facilities. 42 U.S.C. § 3141(a). To receive a grant, the proposed project must, among other things, fulfill a "pressing need" in the area and further specified economic goals, such as creating additional long-term employment opportunities or primarily benefiting individuals who are long-term unemployed or underemployed or members of low-income families. 42 U.S.C. § 3141(b). Commerce, through EDA, also considers factors such as economic diversification and the project's ability to mitigate economic impacts from extreme weather events. 42 U.S.C. § 3141(c). Eligible recipients include states and local governments, among other entities. *See* 42 U.S.C. §§ 3122(6), 3141(a).

211. The EAA Program, authorized under 42 U.S.C. § 3149, provides grants for a broad range of construction and non-construction activities to alleviate long-term economic deterioration or sudden and severe economic dislocation. Eligible projects include development of public facilities, public services, business development and revolving-loan funds, technical assistance, training, and more. 42 U.S.C. § 3149(a). A proposed project must, among other things, help the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

area meet a special need arising from "actual or threatened severe unemployment" or "economic adjustment problems resulting from severe changes in economic conditions." 42 U.S.C. § 3149(b)(1). Eligible recipients include states and local governments, among other entities. *See* 42 U.S.C. §§ 3122(6), 3149(a).

212. Congress has authorized appropriations for the Public Works and EAA Programs through FY 2029. *See* 42 U.S.C. § 3231(a), (d). Congress funds these programs through appropriations acts, including appropriations for FYs 2024, 2025, and 2026. *See, e.g.*, Consolidated Appropriations Act, 2024, div. C, tit. I, Pub. L. No. 118-42, 138 Stat. 25, 123 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 § 2, 139 Stat. 9, 10–11 (2025); Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74 § 5, 140 Stat. 5, 7–8 (2026).

213. The Public Works and EAA Programs are governed by regulations addressing their purposes and scope, eligible uses of funds, application requirements, award criteria, and requirements applicable to approved projects consistent with the authorizing statutes. *See* 13 C.F.R. pts. 305, 307.

214. EDA currently administers the Public Works and EAA Programs under a NOFO covering FYs 2023, 2024, and 2025 ("EDA NOFO"). Applications are accepted on an ongoing basis until the publication of a new NOFO, cancellation of that NOFO, or expenditure of all available funds.

215. To the best of Commerce Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on Commerce's Public Works or EAA grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology"



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

3. Other Commerce Grants

216. Commerce administers a range of other grant programs that some Commerce Plaintiffs have previously received, currently receive, or are otherwise eligible to receive. To the best of Commerce Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations for any Commerce grant program imposes or authorizes directives for or conditions on Commerce grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

**E. USDA Grant Programs**

217. Congress established USDA in 1862 and elevated it to a cabinet-level department in 1889. USDA's statutory mission is "to acquire and to diffuse among the people of the United States useful information on subjects connected with agriculture, rural development, aquaculture, and human nutrition" and "to procure, propagate, and distribute . . . new and valuable seeds and plants." 7 U.S.C. § 2201. USDA is made up of 29 component entities, including, among others, the Agricultural Marketing Service, the Natural Resources Conservation Service, and USFS. By law, the USDA Secretary is responsible for all acts taken by USDA's component entities. *See* 7



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

U.S.C. § 2202.

218. USDA, often acting through its component entities, administers grant programs established by Congress that provide federal funds to public and private entities for a variety of purposes related to agricultural production, rural development, conservation activities, and food systems. USDA grant funding provides essential support to critical programs that, among other things, increase food security and reduce hunger, support local agriculture, protect forests, and produce research that directly impacts farmers, ranchers, foresters, and local communities.

219. Plaintiffs King County, Kitsap County, and Snohomish County (collectively, the "USDA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive USDA grants. Examples of those USDA grant programs are discussed below. This list is not exhaustive; USDA Plaintiffs seek relief as to all federal grants administered by USDA.

1. Community Wildfire Defense Grant (CWDG) Program

220. USFS administers numerous USDA grant programs, including the CWDG Program. Congress established the CWDG Program through the Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, 135 Stat. 429 ("IIJA"), as a five-year competitive grant program to assist communities at risk from wildfire. The IIJA sets forth eligibility and prioritization requirements governing CWDG Program grants and related wildfire programs. *See id*. § 40803, 135 Stat. at 1102–03.

221. Congress authorized CWDG funding for two principal purposes: (1) developing or revising a community wildfire protection plan, and (2) carrying out projects identified in a community wildfire protection plan that is not more than 10 years old. 16 U.S.C. § 6592(f)(1). Congress directed the USDA Secretary, when awarding CWDG funds, to give priority to at-risk communities located in areas of high or very high wildfire hazard potential, low-income



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

communities, and communities impacted by severe disasters. 16 U.S.C. § 6592(f)(2).

222. Eligible applicants include local governments, state forestry agencies, and other entities. Local governments may also receive CWDG funds passed through by a state forestry agency. CWDG awards are therefore restricted to eligible recipients and projects that satisfy the statutory requirements established by Congress.

223. USFS administers the CWDG Program through annual NOFOs that identify the available funding, eligibility and project-selection criteria, and application requirements. USFS issued the FY 2025 CWDG NOFO in November 2024, with an application deadline of March 14, 2025. The next round of CWDG funding (for FY 2026) is expected to open for applications in or around fall 2026.

224. To the best of USDA Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on CWDG grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

2. <u>Senior Farmers Market Nutrition Program (SFMNP)</u>

225. USDA's SFMNP awards grants to states, territories, and Tribes to provide low-income seniors with benefits that may be exchanged for eligible foods at farmers' markets, roadside stands, and community supported agriculture ("CSA") programs. USDA established the SFMNP as a pilot program in November 2000, and Congress permanently authorized and funded



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

it through the 2002 Farm Bill. Farm Security and Rural Investment Act of 2002, Pub. L. 107-171, § 4402, 116 Stat 134, 334 (2002). Congress has continued to fund the program through subsequent appropriation and farm bills. *See, e.g.*, Agriculture Improvement Act of 2018, Pub. L. No. 115-334 § 4201,132 Stat. 4490, 4655 (2018); Consolidated Appropriations Act, 2023, div. A, tit. IV, Pub. L. No. 117-328, 136 Stat. 4459, 4489 (2022); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. B, tit. IV, 138 Stat. 25, 94 (2024). Although initially a competitive grant program, SFMNP is now administered as a formula grant.

226. Congress established three purposes for SFMNP: (1) to provide low-income seniors with fresh, nutritious, unprepared, locally grown fruits, vegetables, honey, and herbs; (2) to increase the domestic consumption of agricultural commodities by supporting domestic farmers' markets, roadside stands, and CSA programs; and (3) to develop or expand those markets and programs. 7 U.S.C. § 3007(b).

227. USDA administers SFMNP through its Food and Nutrition Administration ("FNA"), under regulations set forth in 7 C.F.R. Part 249.[10] 7 C.F.R. § 249.3. FNA provides grants to state agencies, which administer the program directly or through subawards to local governments or nonprofits. *Id*. The regulations establish requirements governing state-agency eligibility, participant age and income eligibility, program administration and oversight, and distribution of funds. *See* 7 C.F.R. pt. 249, subpts. B–F.

228. USDA Plaintiffs receive their SFMNP funding indirectly, as subrecipients of the Washington Department of Social and Health Services. USDA Plaintiffs rely on SFMNP funds to provide food vouchers and delivery service support for low-income seniors to receive fresh food at local farmers' markets.

---

[10] Prior to June 1, 2026, FNA was known as the Food and Nutrition Service ("FNS").



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

229. To the best of USDA Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on SFMNP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

3. Other USDA Grants

230. USDA and its component agencies and offices administer a range of other grant programs that some USDA Plaintiffs have previously received, currently receive, or are otherwise eligible to receive. To the best of USDA Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations for any USDA grant program imposes or authorizes directives for or conditions on USDA grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

**F. DOE Grant Programs**

231. Congress established DOE through the Department of Energy Organization Act of 1977. *See* Pub. L. No. 95-91, 91 Stat. 565 (1977); *see also* 42 U.S.C. § 7101. DOE's statutory mission is to ensure the United States' security and prosperity by addressing its energy,



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

environmental, and nuclear challenges through science and technology. *See* 42 U.S.C. § 7112. By law, the DOE Secretary is responsible for DOE's operations, including the acts of its component entities. 42 U.S.C. § 7131; *see also* 42 U.S.C. § 7133 *et seq.*

232. DOE, often acting through its component entities, administers grant programs established and funded by Congress to advance federal objectives concerning energy, environmental protection, and nuclear security. Through these programs, DOE provides federal grants to eligible public and private entities for activities authorized by Congress and governed by applicable statutory and regulatory requirements.

233. Plaintiff Snohomish County (the "DOE Plaintiff") has previously received, currently receives, or is otherwise eligible to receive DOE grants. An example DOE grant program is discussed below. This list is not exhaustive; DOE Plaintiff seeks relief as to all federal grants administered by DOE.

1. <u>Weatherization Assistance Program (WAP)</u>

234. DOE's WAP enables low-income families to reduce their energy consumption by making their dwellings more energy efficient. The WAP was established in 1976 under Title IV of the Energy Conservation and Production Act, 42 U.S.C. § 6861 *et seq.* This act authorized the administrator of the Federal Energy Administration (and later the DOE Secretary) to provide weatherization assistance, with the stated purpose to "increase the energy efficiency of dwellings owned or occupied by low-income persons, reduce their total residential energy expenditures, and improve their health and safety, especially low-income persons who are particularly vulnerable such as the elderly, the handicapped, and children." 42 U.S.C. § 6861(b); *see also* 42 U.S.C. § 6863(a).

235. The WAP is a formula grant program. DOE allocates funds to state and territorial



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

governments based on "the relative need for weatherization assistance among low-income persons throughout the States, taking into account the following factors:" "the number of dwelling units to be weatherized"; the "climatic conditions" in the jurisdiction at issue; the "type of weatherization work to be done"; and other factors the Secretary of Energy may determine necessary. 42 U.S.C. § 6864(a); *see also* 10 C.F.R. § 440.10 (DOE's allocation formula). The Secretary "shall not" award funds unless the applicant provides reasonable assurances that, among other things, it has "established priorities to govern the provision of weatherization assistance to low-income persons, including methods to provide priority to elderly and handicapped low-income persons, and such priority as the applicant determines is appropriate for single-family or other high-energy-consuming dwelling units." 42 U.S.C. § 6864(b)(2); *see also* 10 C.F.R. §§ 440.16, 440.18.

236. Local governments and weatherization agencies apply for WAP funds from their states. *See* 10 C.F.R. § 440.15. Each state decides how to allocate its share of the funding to those local entities.

237. DOE program regulations govern the WAP application process and specify that a variety of energy efficiency measures are eligible for support under the program. *See generally* 10 C.F.R. pt. 440. The eligible measures include, for example, insulation, space-heating equipment, energy-efficient windows, water heaters, and efficient air conditioners. *See* 10 C.F.R. §§ 440.3, 440.18, 440.21. The regulations also require that "priority" be given to identifying and providing weatherization assistance to certain populations, including the elderly, people with disabilities, families with children, high residential energy users, and households with a high energy burden. 10 C.F.R. § 440.16(b).

238. Congress funds DOE's WAP through annual appropriations. The Energy Act of 2020, Pub. L. No. 116-260, div. Z, 134 Stat. 1182, 2418–615 (2020) amended the program and



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

reauthorized annual appropriations from FY 2021 through FY 2025. Among other changes, the act clarified that renewable energy technologies and other advanced technologies are considered to be weatherization materials. *See* 42 U.S.C. §6862(9). The act also authorized DOE to account for the non-energy benefits of weatherization improvements—such as improvements to health and safety—when determining appropriate standards and procedures for WAP. *See* 42 U.S.C. § 6863(b)(4). FY 2026 appropriations for WAP were provided in the Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, div. B, tit. III, 140 Stat. 5, 74–89 (2026).

239. DOE Plaintiff receives its WAP grant funding indirectly, as subrecipient of the State of Washington. DOE Plaintiff relies on this WAP funding to support energy efficiency measures that benefit its residents who can least afford high energy costs.

240. DOE issues an administrative and legal requirements document ("ALRD") for each WAP program year ("PY"). The PY 2026 ALRD describes eligibility and application requirements, and states that "[a]ll grant awards made under this Program shall comply with applicable laws and regulations, including but not limited to the regulations contained in 2 Code of Federal Regulations (C.F.R.) § 200 and 10 C.F.R. § 440 and other policies and procedures as DOE may, from time-to-time, prescribe for the administration of financial assistance."

241. To the best of DOE Plaintiff's knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on DOE WAP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

2. Other DOE Grants

242. DOE administers a range of other grant programs that DOE Plaintiff has previously received, currently receives, or is otherwise eligible to receive. To the best of DOE Plaintiff's knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations for any DOE grant program imposes or authorizes directives for or conditions on DOE grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

## G. DOL Grant Programs

243. Congress established DOL in 1913 "to foster, promote, and develop the welfare of the wage earners of the United States, to improve their working conditions, and to advance their opportunities for profitable employment." 29 U.S.C. § 551. DOL is composed of various component entities. By law, the DOL Secretary is responsible for DOL's operations, including the acts of its component entities. *See* 29 U.S.C. §§ 553, 557, 557a, 557b, 562.

244. DOL, often acting through its component entities, administers grant programs established by Congress that provide federal funds to public and private entities for a variety of purposes related to employment and economic development.

245. Plaintiff Kitsap County (the "DOL Plaintiff") has previously received, currently



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

receives, or is otherwise eligible to receive DOL funding. An example DOL grant program is discussed below. This list is not exhaustive; DOL Plaintiff seeks relief as to all federal grants administered by DOL.

1. Workforce Innovation and Opportunity Act (WIOA) Grants

246. In 2014, Congress enacted WIOA to expand access to employment, education, training, and supportive services; align workforce, education, and economic-development systems; and improve workers' skills and employment opportunities. 29 U.S.C. § 3101. DOL's Employment and Training Administration ("ETA") administers WIOA's formula and discretionary grant programs, including the Adult, Dislocated Worker, and Youth Activities Programs.

247. The WIOA Adult and Dislocated Workers Programs provide employment, career, training, and supportive services to adults and workers who have lost or are at risk of losing employment. *See* 29 U.S.C. §§ 3171–74. The act requires that priority for certain Adult Program services be given to public assistance recipients, other low-income individuals, and individuals who are basic-skills deficient, and emphasizes serving individuals facing barriers to employment, including veterans and individuals with disabilities. *See* 29 U.S.C. § 3174(c)(3)(E).

248. The WIOA Youth Activities Program provides comprehensive services to youth facing barriers to employment, including education, training, work experience, counseling, leadership development, and supportive services, with particular priority for eligible out-of-school youth. *See* 29 U.S.C. §§ 3161–64.

249. WIOA funds for the Adult, Dislocated Worker, and Youth Activities Programs are distributed to States and outlying areas pursuant to statutory formulas, with States allocating funds to local workforce-development areas for eligible employment and training activities. *See* 29



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

U.S.C. §§ 3162–63, 3172–73. The programs are governed by DOL regulations addressing eligibility, program design, allowable services and expenditures, and administration, consistent with the act. See 20 C.F.R. pts. 680–81.

250. Congress appropriates WIOA funds through annual Labor, Health and Human Services, and Education appropriations acts, and ETA thereafter allots and distributes funds to States according to the statutory formulae. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. I, 138 Stat. 460, 628–31 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, tit. IX, 139 Stat. 9, 32–33 (2025); Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. B, tit. I, 140 Stat. 173, 237–39 (2026).

251. WIOA and its implementing regulations impose requirements concerning allowable expenditures, fiscal controls, monitoring, reporting, and administration. Among other things, WIOA prohibits the use of funds for employment-generating, economic-development, revolving-loan, or similar activities that are not directly related to training eligible individuals. 29 U.S.C. § 3241(e). The statute further requires programs to provide opportunities to individuals who can benefit from and are most in need of employment and training services. 29 U.S.C. § 3254(1).

252. WIOA also contains generally applicable nondiscrimination and equal opportunity provisions, codified at 29 U.S.C. § 3248, and implemented by DOL regulations at 29 C.F.R. pt. 38. The statute prohibits discrimination in programs or activities funded in whole or part under WIOA on the basis of, *inter alia*, sex (except as otherwise permitted under title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*). 29 U.S.C. § 3248(a)(1)–(2). DOL regulations define "sex" to include "pregnancy, childbirth, and related medical conditions, transgender status,



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and gender identity," 29 C.F.R. § 38.7(a), and define "unlawful sex-based discriminatory practices" as including "[t]reating an individual adversely because the individual identifies with a gender different from that individual's sex assigned at birth, or the individual has undergone, is undergoing, or is planning to undergo, any processes or procedures designed to facilitate the individual's transition to a sex other than the individual's sex assigned at birth," and "[d]enying individuals access to the restrooms, locker rooms, showers, or similar facilities consistent with the gender with which they identify," 29 C.F.R. § 38.7(b)(6), (9).

253. Congress authorized states to reserve up to 15% of their WIOA allocations for "statewide workforce investment activities." *See* 29 U.S.C. §§ 3163(a), 3173(a); *see generally* 20 C.F.R. pt. 682. Those funds may be used for specified required and allowable activities, including administration, program oversight and evaluation, technical assistance, workforce strategies, training and education initiatives, services for individuals facing barriers to employment, and coordination of workforce and economic-development programs. *See* 29 U.S.C. § 3164(b); 29 U.S.C. § 3174(a)(2)(B)–(3); *see also* 20 C.F.R. § 682.100.

254. Washington State has used WIOA statewide-activity funds to support Economic Security for All ("EcSA"), a workforce and poverty-reduction initiative launched in 2019, and subsequently codified by the Washington Legislature. EcSA uses workforce, education, and supportive services to help eligible participants experiencing poverty obtain employment and achieve economic self-sufficiency, including through coordination among workforce-development boards and community service providers. EcSA is funded, in part, with WIOA statewide-activity funds, including in the State's most recent FY 2026 Supplemental Budget.

255. To the best of DOL Plaintiff's knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

conditions on DOL WIOA grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

2. Other DOL Grants

256. DOL and its component entities administer a range of other grant programs. To the best of DOL Plaintiff's knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations for any DOL grant program imposes or authorizes directives for or conditions on DOL grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

### H. Interior Grant Programs

257. In 1849, Congress established Interior to protect and manage the United States' natural and cultural resources. 43 U.S.C. § 1451. Interior is composed of eleven bureaus and multiple other component entities, including the Bureau of Reclamation ("USBR"), National Park Service ("NPS"), Bureau of Land Management, the U.S. Fish and Wildlife Service, the U.S. Geological Survey, and the Bureau of Indian Affairs. By law, the Secretary of the Interior is responsible for Interior's operations, including the acts of its component entities. *See* 43 U.S.C.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

§§ 1451, 1457.

258. Interior, often acting through its component entities, administers grant programs established by Congress that provide federal funds to public and private entities for a variety of purposes related to natural resource conservation, historic preservation, recreation, public and social services, land and water management, and scientific research, among other things.

259. Plaintiffs King County and Kitsap County (collectively, the "Interior Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive Interior grants. Examples of those Interior grant programs are discussed below. This list is not exhaustive; Interior Plaintiffs seek relief as to all federal grants administered by Interior.

1. WaterSMART Cooperative Watershed Management Program (CWMP)

260. Interior, through USBR,[11] administers CWMP, which provides competitive grants to local watershed groups for development of watershed groups, watershed restoration planning, and watershed management project design. The program is intended to help diverse local stakeholders collaboratively address watershed and water-management needs.

261. Congress established the CWMP in the Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, §§ 6001–03, 123 Stat. 991, 1165–1170 (2009) (codified at 16 U.S.C. § 1015 *et seq.*). The governing statutes set forth the eligible uses and grant recipients, application and award requirements, and other conditions. *See generally* 16 U.S.C. § 1015a. One of the governing statutes also defines "watershed group" as a self-sustaining, non-regulatory group

[11] USBR's origins date to the Reclamation Act of 1902, pursuant to which the U.S. Reclamation Service was established within the U.S. Geological Survey ("USGS"). In 1907, the Secretary of the Interior separated the Reclamation Service from the USGS and created an independent bureau within Interior. The Reclamation Service was renamed USBR in 1923. USBR operates under the direction, supervision, and control of the Secretary of the Interior. *See* 43 U.S.C. §§ 373, 373a, 373b; *see also* USBR, Brief History of The Bureau of Reclamation, https://www.usbr.gov/history/briefhis.pdf.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

representing affected stakeholders and incorporating, "to the maximum extent practicable," diverse perspectives, including representatives of hydroelectric production, livestock grazing, timber production, land development, recreation or tourism, irrigated agricultural production, the environment, potable water purveyors and industrial water users, private property owners, and "disadvantaged communities." 16 U.S.C. § 1015(6).

262. Congress has authorized $20,000,000 for the CWMP for each FY from 2012 through 2026. 16 U.S.C. § 1015a(g)(4); *see also, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 1107, 134 Stat. 1182, 3243 (2020).

263. On June 10, 2026, USBR issued the 2026 CWMP NOFO. The NOFO establishes four application periods and anticipates approximately 20 to 25 awards during each period. The first application deadline is October 7, 2026. Eligible applicants include, as relevant here, local governmental entities.

264. To the best of Interior Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on Interior CWMP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

2. Outdoor Recreation Legacy Partnership Program (ORLP)

265. Interior, through NPS,[12] administers ORLP, which provides competitive grants to expand and improve outdoor recreation opportunities in qualifying communities.

266. Congress first established the program in 2014. *See* Expanding Public Lands Outdoor Recreation Experiences Act, Pub. L. No. 118-234, § 156, 138 Stat. 2836, 2876 (2025) (codified at 16 U.S.C. § 8464). ORLP funds may be used to acquire land and water for parks and outdoor recreation and to develop or renovate outdoor recreation facilities in qualifying areas. 16 U.S.C. § 8464(b)(1)(A), (b)(4). Congress defined "qualifying areas" as urban areas with a population of 25,000 or more; adjacent urban areas with combined population of 25,000 or more; and areas administered by Tribal entities. 16 U.S.C. § 8464(a)(6). Funded projects generally must remain available for public outdoor recreation in perpetuity. *See* 54 U.S.C. § 200305(f)(3); 36 C.F.R. pt. 59.

267. Congress directed the Secretary of the Interior to prioritize projects that, among other things, "create or significantly enhance access to park and recreational opportunities," "engage and empower low-income communities and youth," and "provide employment or job training opportunities for youth or low-income communities." 16 U.S.C. § 8464(b)(1)(B). The Secretary must also consider factors such as whether a project addresses inadequate recreational access in low-income communities, provides outdoor recreation or volunteer opportunities, supports Native American event sites and cultural spaces, and advances community resilience, environmental quality, or fish and wildlife habitat. *See* 16 U.S.C. § 8464(b)(3). Congress also established certain limitations on use of ORLP funds, such as prohibiting using grant funds on

[12] NPS was established in 1916 as a service within Interior. *See* 54 U.S.C. § 100301. NPS operates under the direction, supervision, and control of the Secretary of the Interior. *See* 54 U.S.C. § 100302.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

operation and maintenance activities, semiprofessional or professional athletic facilities, and indoor facilities that support primarily nonoutdoor purposes. *See* 16 U.S.C. § 8464(b)(4).

268. ORLP is funded through the Land and Water Conservation Fund ("LWCF"), which Congress established to safeguard natural areas, water resources, and cultural heritage and provide recreation opportunities. *See* 54 U.S.C. § 200301 *et seq.*; *see* also Land and Water Conservation Fund Act of 1965, Pub. L. No. 88-578, § 1, 78 Stat. 897, 897 (1964).

269. Each state designates a lead agency to administer LWCF programs. *See* 54 U.S.C. § 200305(a). ORLP applications from cities, counties, and eligible special-purpose districts generally must be submitted through the state lead agency. In Washington, that agency is the Recreation and Conservation Office.

270. NPS administers ORLP through periodic NOFOs. NPS issued the current five-year ORLP NOFO on June 8, 2026 (the "2026 ORLP NOFO"), covering funding opportunities through 2030. Applications are accepted on a rolling basis and reviewed annually after the November 1st deadline. NPS will announce selections within six months after the application deadline, around May 1st of each year.

271. To the best of Interior Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or conditions on ORLP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

3. Other Interior Grants

272. Interior administers a range of other grant programs that some Interior Plaintiffs have previously received, currently receive, or are otherwise eligible to receive. To the best of Interior Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations for any Interior grant program imposes or authorizes directives for or conditions on Interior grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

**I. ONDCP Grant Programs**

273. The EOP, organized by presidential action in 1939, assists the President in the administration and management of the Executive Branch. *See* Exec. Order No. 8248, 4 Fed. Reg. 3864 (Sep. 8, 1939). Congress has established specific offices within the EOP by statute, including ONDCP. 21 U.S.C. § 1702(a).

274. ONDCP leads the national drug-control effort, coordinating and overseeing implementation of national drug-control policy, assessing and certifying the adequacy of National Drug Control Programs and their budgets, evaluating the effectiveness of national drug-control efforts, identifying and responding to emerging drug threats, and facilitating information sharing and data standardization among federal, state, local, and Tribal entities. 21 U.S.C. § 1702(a)(1)–(7).

275. ONDCP administers various grant programs, including the HIDTA Program.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Established by Congress in 1988, *see* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 1005, 102 Stat. 4181, 4186–87 (1988), the HIDTA Program provides funding and other resources to designated areas across the country experiencing significant drug-trafficking problems. 21 U.S.C. § 1706(a), (d). The HIDTA Program facilitates collaboration among federal, state, local, and Tribal law enforcement agencies through task forces and other coordinated initiatives aimed at disrupting and dismantling drug-trafficking organizations, reducing the availability of illicit drugs, and supporting related intelligence and investigative activities. HIDTA funds are distributed to designated HIDTA regions, which use them to support approved enforcement, intelligence, and other authorized activities carried out by participating agencies. *See generally* 21 U.S.C. § 1706.

276. The ONDCP Director has authority to designate HIDTAs based on statutory factors concerning an area's drug-trafficking threat and need for federal resources. 21 U.S.C. § 1706(d). To be eligible for funding, a designated HIDTA must be governed by an Executive Board, which is responsible for "providing direction and oversight in establishing and achieving" the HIDTA's goals, "managing the funds" of the HIDTA, and "reviewing and approving all funding proposals" consistent with the program's overall objective. 21 U.S.C. § 1706(e)(1)–(2). The Executive Board must have equal voting representation between participating federal agencies and participating state, local, and Tribal law enforcement agencies. 21 U.S.C. § 1706(e)(3).

277. Northwest HIDTA was created in 1997 and is responsible for supporting drug prevention, treatment, education, training, and enforcement efforts in Washington State.[13] The HIDTA program provides direct service to 15 counties in Washington, including King, Kitsap, Snohomish, and Thurston Counties.

[13] Northwest HIDTA, About Us, https://northwesthidta.org/about-us/ (last visited Sep. 11, 2026).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

278. Each year, the Northwest HIDTA Executive Board assesses the drug trafficking threat in its defined area, develops a strategy to address the threat, designs initiatives to implement the strategy, and proposes funding needed to carry out the initiatives in the coming year. ONDCP awards funds to designated grant recipients.

279. Congress consistently appropriates funding for the HIDTA program. In 2026, Congress appropriated almost $300 million for the program through September 30, 2027, of which not less than 51 percent must be transferred to state and local entities for drug control activities. Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. E, tit. II, 140 Stat. 173, 453 (2026). Congress directed each designated HIDTA must be funded at not less than the FY 2025 base level, unless the ONDCP Director submits written justification. *See id.*

280. Plaintiffs Kitsap County and Snohomish County (collectively, the "ONDCP Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive ONDCP grants, including the program identified above.

281. To the best of ONDCP Plaintiffs' knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable regulations imposes or authorizes directives for or conditions on ONDCP grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

## J. IMLS Grant Programs

282. Congress established IMLS to advance, support, and empower America's



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

museums, libraries, and related organizations through grantmaking, research, and policy development. 20 U.S.C. § 9102(a). IMLS administers the Library Services and Technology Act Grants to States program, which provides federal funding to state library administrative agencies for library services. 20 U.S.C. §§ 9121, 9141. IMLS distributes these funds to eligible state agencies according to a statutory formula. 20 U.S.C. § 9131. Congress authorized state agencies to use the funds to, among other things, "enhance[] efforts to recruit future professionals, including those from diverse and underrepresented backgrounds, to the field of library and information services" and to "target[] library services to individuals of diverse geographic, cultural, and socioeconomic backgrounds, to individuals with disabilities, and to individuals with limited functional literacy or information skills[.]" 20 U.S.C. § 9141(a)(3)(B), (a)(5).

283. Congress reserved to state and local government recipients discretion in determining how to use Grants to States funds consistent with the statutory purposes:

> Nothing in this subchapter shall be construed to interfere with State and local initiatives and responsibility in the conduct of library services. The administration of libraries, the selection of personnel and library books and materials, and insofar as consistent with the purposes of this subchapter, the determination of the best uses of the funds provided under this subchapter, shall be reserved for the States and their local subdivisions.

20 U.S.C. § 9163.

284. The Washington State Library ("WSL") receives Washington State's Grants to States allocation. WSL offers a variety of subgrant opportunities consistent with its five-year plan.

285. Plaintiff City of Bellingham (the "IMLS Plaintiff") has previously received, currently receives, or is otherwise eligible to receive IMLS grants, including subawards from WSL's Grants to States allocation.

286. To the best of IMLS Plaintiff's knowledge, nothing in the authorizing statutes, appropriations legislation, or applicable agency regulations imposes or authorizes directives for or



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

conditions on IMLS grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

**K. Following President Trump's Inauguration, the Federal Agencies Unilaterally Impose New Conditions on Grants.**

1. <u>The Executive Branch Seeks to Impose Its Political Agenda Through Federal Grant Funding</u>

287. Since taking office in January 2025, President Trump has issued numerous executive orders purporting to direct the heads of executive agencies to impose conditions on federal funding that bear no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend. Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including, *inter alia*, opposition to all forms of DEI policies and initiatives, participation in aggressive and lawless immigration enforcement, exclusion of transgender people, and cutting off information about lawful abortion. These unlawful conditions are imposed to direct and coerce grant recipients to comply with the President's policy agenda.

288. President Trump issued an executive order that directs agency heads to include "in every . . . grant award" a term that the recipient "certify that it does not operate any programs promoting DEI" that would violate federal civil rights laws. Exec. Order No. 14173 § 3(b)(iv)(B),



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order"). The certification is not limited to programs funded with federal grants; instead, it appears to encompass all the recipient's "programs" (a term that is not defined). *Id*. The DEI Order does not define the terms "DEI" or "DEIA," but does state that "critical and influential institutions of American society have adopted . . . dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation" and "undermine [] national unity." *Id.* § 1.

289. The DEI Order also directs each agency head to include a term requiring the recipient to agree that its compliance "in all respects" with all applicable federal anti-discrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq. Id.* § 3(b)(iv)(A). The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Each violation of the FCA is punishable by a civil penalty, plus mandatory treble damages sustained by the federal government because of that violation. 31 U.S.C. § 3729(a); *see also* 28 C.F.R. § 85.5(a). Given the demands of proving materiality and the severity of penalties imposed by the FCA, the materiality certification condition represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of a FCA claim.

290. The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" executive order directs agency heads to "take all



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences" to "ensure grant funds do not promote gender ideology." Exec. Order No. 14168 § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology Order does not clearly define "gender ideology," but states that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

291. Another executive order, entitled "Ending Radical Indoctrination in K–12 Schooling," directs federal agencies to develop an "Ending Indoctrination Strategy" to eradicate federal support for "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology." Exec. Order No. 14190 § 3(b)(i)–(ii), 90 Fed. Reg. 8853 (Jan. 29, 2025) (the "Radical Indoctrination Order"). Relevant here, the Radical Indoctrination Order defines the phrase "[d]iscriminatory equity ideology" as follows:

> "Discriminatory equity ideology" means an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations, including that:
>
> (i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin;
>
> (ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
>
> (iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin;



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin;

(v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part;

(vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;

(vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin; or

(viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

*Id.* § 2(b); *see also* Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14151 § 2(b)(i), 90 Fed. Reg. 8339 (Jan. 20, 2025) ("Government DEI Order") (directing all federal agency heads to terminate "all . . . 'equity-related' grants or contracts[] and all DEI or DEIA performance requirements for employees, contractors, or grantees," without substantively defining DEI or DEIA).

292. The "Improving Oversight of Federal Grantmaking" executive order requires federal officials to ensure discretionary grants "demonstrably advance the President's policy priorities" and prohibits them from awarding discretionary grants that "fund, promote, encourage, subsidize, or facilitate . . . racial preferences or other forms of racial discrimination by the grant recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation" or "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," or grants that "promote anti-American values." Exec. Order No. 14332 § 4(b), 90 Fed. Reg. 38929 (Aug. 7,



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

2025) (the "Grantmaking Order").[14]

293. The Grantmaking Order also directs agency heads to, among other things, "take steps to revise the terms and conditions of existing discretionary grants to permit immediate termination for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest." *Id*. § 6(b).

294. The "Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" executive order directs the Attorney General to, among other things, "prioritize prosecution of any applicable violations of Federal criminal law with respect to State and local jurisdictions" whose officials "willfully and unlawfully direct the obstruction of criminal law, including by directly and unlawfully prohibiting law enforcement officers from carrying out duties necessary for public safety and law enforcement" or "unlawfully engage in discrimination or civil-rights violations under the guise of 'diversity, equity, and inclusion' initiatives that restrict law enforcement activity or endanger citizens." Exec. Order No. 14288 § 5, 90 Fed. Reg. 18765 (Apr. 28, 2025).

295. Subsequent executive agency memoranda and communications make clear that the Administration's conception of what federal civil rights law requires, including what constitutes a purportedly "illegal" DEI, DEIA, or gender-related program, is inconsistent with the requirements of federal civil rights statutes as interpreted by the courts.

296. For instance, in a memorandum dated February 5, 2025, then-Attorney General Pamela Bondi informed DOJ employees that the DEI Order "mak[es] clear that policies relating

[14] *See also* Exec. Order No. 14148, 90 Fed. Reg. 8237 (Jan. 20, 2025) (revoking President Biden's executive orders relating to, among other topics, diversity, equity, gender identity, and sexual orientation).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to [DEI] and [DEIA] 'violate the text and spirit of our longstanding Federal civil-rights laws.'"[15] The memorandum states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex," potentially reaching affinity groups or teaching about racial history. *Id*.

297. Next, in a July 29, 2025 memorandum titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination" (the "Discrimination Guidance Memo"), then-Attorney General Bondi promoted the Administration's skewed view of DEI and DEIA programs by purporting to provide "guidance" concerning various practices that would be viewed as constituting unlawful discrimination.[16] For instance, despite court decisions holding exactly to the contrary, the Discrimination Guidance Memo states that "allow[ing] males, including those self-identifying as 'women,' to access single-sex spaces designed for females . . . undermine[s] the privacy, safety, and equal opportunity of women and girls." Discrimination Guidance Memo at 6. The Memo directs federal funding recipients to "affirm sex-based boundaries rooted in biological differences" to "ensure compliance with federal law." *Id*.

298. President Trump and the current federal Administration have also undertaken executive actions in a coordinated effort to force state and local governments to assist Immigration and Customs Enforcement ("ICE") in carrying out federal civil immigration enforcement efforts, notwithstanding laws and policies through which these state and local governments have exercised

---

[15] Memorandum from the Att'y Gen. to all Dep't Emps., Ending Illegal DEI and DEIA Discrimination and Preferences 1 (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline (quoting the DEI Order).

[16] Memorandum from the Att'y Gen. to all Fed. Agencies, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (July 29, 2025), https://www.justice.gov/ag/media/1409486/dl.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

their rights under the Tenth Amendment to dedicate their law enforcement efforts elsewhere. These orders are referred to collectively herein as the "Immigration Orders":

- The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure that "Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Exec. Order No. 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025). It also directs all agency heads to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law." *Id.* § 2(i).
- The "Protecting American Communities from Criminal Aliens" executive order states that "some State and local officials . . . continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to withhold federal funding from such places, and develop "mechanisms to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits . . . from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf." Exec. Order No. 14287 §§ 1–5, 90 Fed. Reg. 18761 (Apr. 28, 2025).
- The "Protecting the American People Against Invasion" executive order states that



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

it is the policy of the United States to achieve the "total and efficient enforcement of [immigration] laws" because "[m]any . . . aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." Exec. Order No. 14159 §§ 1, 2, 90 Fed. Reg. 8443 (Jan. 20, 2025). It directs the Attorney General and Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds" and directs the Office of Management and Budget ("OMB") Director to "take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them." *Id.* §§ 17, 20.

299. The "Enforcing the Hyde Amendment" executive order declares it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (the "Abortion Order").

300. More broadly, President Trump has used executive orders as a forum to direct Administration officials to take steps to embed his political agenda into the federal government's grant agreements across subject-matter areas and around the country. In the first year of his current term, President Trump issued 230 executive orders, many of them purporting to leverage federal grants to achieve political ends, including, *inter alia*, termination of all DEI and DEIA initiatives, exclusion of transgender people, and aggressive and lawless immigration enforcement. There is no way to know whether, how frequently, and when the President will issue additional executive orders, the subject matters of those executive orders, or the extent to which they would purport to direct Executive Branch officials to take actions related to federal grants. Based on the President's practice to date, however, it appears exceedingly likely that he will continue to do so.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

301. On May 29, 2026, the OMB issued a proposed rule titled "Regulation for Federal Financial Assistance" (hereinafter "Proposed OMB Rule"). *See* 91 Fed. Reg. 32198 (May 29, 2026). The executive summary asserts that between 2021 and 2024, federal awards were "often used . . . to promote a 'woke' policy agenda, including to advance unlawful identity-based [DEI] policies and preferences" that "were inconsistent with basic American values and civil rights laws, including the equal protection principles of the U.S. Constitution." *Id*. at 32199; *see also id*. at 32202–03 (referring to "unlawful DEI policies" and "government sponsorship of gender ideology and other radical doctrines").

302. The Proposed OMB Rule proposes numerous rule changes to 2 C.F.R. Part 200, formally known as the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, related to how the federal government handles the management of grants and other forms of financial assistance. Among other things, those changes include:

- Requiring the agency or pass-through entity to ensure federal funds are not used to "fund, promote, encourage, subsidize, or facilitate" "[DEI] or [DEIA] policies, principles, or practices that violate any applicable Federal anti-discrimination laws," "[g]ender ideology as defined in Executive Order 14168," or the "so-called 'transition' of a child under 19 years of age from one sex to another." *Id*. at 32253 (proposed revision to 2 C.F.R. § 200.300).
- Establishing a new "pre-issuance review" process by senior political appointees for all discretionary awards. *Id.* at 32249 (proposed revision to 2 C.F.R. § 200.205). OMB proposes the following principles that would be applied to this "pre-issuance review":
    - "Discretionary awards must, where applicable, demonstrably advance the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

President's policy priorities."

- "Discretionary awards must not be used to fund, promote, encourage, subsidize, or facilitate" "[r]acial preferences or other forms of racial discrimination by the recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation"; "[d]enial by the recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic"; "[i]llegal immigration"; or "[a]ny other initiatives that compromise public safety or promote anti-American values." *Id.*

- Expanding authority to terminate grants "[a]t the discretion of the Federal agency or pass-through entity," to the extent permitted by law, "including if a Federal award does not effectuate program goals, Federal agency priorities, or the national interest as they exist at the time of the termination." *Id.* at 32258–59 (proposed revision to 2 C.F.R. § 200.340).
- Expanding authority of the agency or pass-through entity to temporarily suspend grants for up to 90 days "if the Federal agency or pass-through entity determines that a suspension is in the interest of the Federal agency or pass-through entity." *Id.* at 32259 (proposed revision to 2 C.F.R. § 200.340(e)).

303. The Proposed OMB Rule would make the entirety of 2 C.F.R. Part 200, including the proposed changes set forth above, into a set of "grants management requirements" applicable to all federal agencies with "one government-wide effective date." *Id.* at 32207. Future changes would apply government-wide, absent rulemaking by a particular agency. *See id.* By contrast, currently, 2 C.F.R. Part 200 operates as guidance, not regulation, 2 C.F.R. § 1.105, which agencies



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

can then incorporate, in whole or in part, through rulemaking. *See generally* 2 C.F.R. § 200.

304. OMB provided a 45-day comment period for the Proposed OMB Rule and anticipates issuing a final rule effective by October 1, 2026. *See* 91 Fed. Reg. 32198, 32235.

2. <u>DOJ Attaches New, Unlawful Conditions to Grants.</u>

305. DOJ and its component entities have implemented President Trump's executive orders by making changes to DOJ policy and attaching new and unlawful conditions across the portfolio of DOJ grants established by Congress and demanding grant recipients' agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the "DOJ Conditions."

306. DOJ promptly took steps to comply with President Trump's executive orders, including issuing letters and memoranda related to DEI, gender identity, civil immigration enforcement, and FCA investigations and enforcement actions. For example, former Attorney General Bondi issued the Discrimination Guidance Memo, providing "guidance" on the Administration's unsupported views of federal civil rights law, including what constitutes a purportedly "illegal" DEI, DEIA, or gender-related program.

307. Additionally, on January 21, 2025, then-acting Deputy Attorney General Emil Bove sent a memorandum to all DOJ employees asserting that "[f]ederal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests," and immediately requiring DOJ's Civil Division to "work with the newly established Sanctuary Cities Enforcement Working Group . . . to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and, where appropriate, to take legal action to challenge such laws."[17] That directive further required that U.S. Attorney's Offices and DOJ litigating components "investigate . . . for potential prosecution" any "resistance, obstruction, or other non-compliance with lawful immigration-related commands."

308. In another February 5, 2025 memorandum to all DOJ employees, former Attorney General Bondi directed DOJ to undertake wide-ranging efforts to punish "[s]o-called 'sanctuary jurisdictions'" for failing to assist in federal immigration enforcement.[18] This included requiring DOJ to identify and evaluate "all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens" for potential termination. It further directed DOJ to investigate and prosecute "violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373," to promptly report declination decisions to DOJ leadership, and to investigate and challenge state and local laws and policies "that facilitate violations of federal immigration laws or impede lawful federal immigration operations." The memorandum also stated that DOJ "will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate."

309. In May 2025, DOJ OJP issued "General Conditions" (the "FY 2025 OJP General Terms") applicable to "all (or virtually all) awards made in FY 2025," including Byrne JAG and

[17] *See* Memorandum from the Acting Deputy Att'y Gen. to All Dep't Emps., Interim Policy Changes Regarding Charging, Sentencing, and Immigration Enforcement (Jan. 21, 2025), https://www.washingtonpost.com/documents/2f9af176-72c5-458a-adc4-91327aa80d11.pdf.

[18] *See* Memorandum from the Att'y Gen. to All Dep't Emps., Sanctuary Jurisdiction Directives (Feb. 5, 2025) https://www.justice.gov/ag/media/1388531/dl?inline.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

NCHIP grants. In May 2026, OJP issued updated "General Conditions" (the "FY 2026 OJP General Terms") applicable to FY 2026 grants. The FY 2025 and FY 2026 OJP General Terms contain materially similar new conditions, except as noted below.

310. The FY 2026 OJP General Terms provide that "[t]he recipient, and any subrecipient ('subgrantee') at any tier, must comply with all applicable requirements for authorization of any subaward." They also provide that "[t]he conditions of this award are material requirements of the award. Compliance with any assurances or certifications submitted by or on behalf of the recipient that relate to conduct during the period of performance also is a material requirement of this award."

311. The FY 2026 OJP General Terms contain a section called "Federal Civil Rights and Nondiscrimination Laws (certification)" (the "DOJ OJP Discrimination Condition") which states:

> The recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

312. The DOJ OJP Discrimination Condition implements President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA.

313. Separate from the DOJ OJP Discrimination Condition, the FY 2026 OJP General Terms include long-standing provisions requiring that grant recipients comply with specified civil rights laws. These provisions are referred to collectively as the "DOJ OJP Civil Rights Provisions" and include the following:

> **Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 42**



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 42, specifically including 28 C.F.R. § 42.106(d), 28 C.F.R. § 42.405(c), and 28 C.F.R. § 42.505(f), which contain notice requirements that covered recipients must follow regarding the dissemination of information regarding federal nondiscrimination requirements.
>
> **Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 54**
>
> The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 54, which relates to nondiscrimination on the basis of sex in certain "education programs."
>
> Among other items, 28 C.F.R. § 54.140 contains notice requirements that covered recipients must follow regarding the dissemination of information regarding federal nondiscrimination requirements.

314. OJP has also included new conditions in NOFOs for grant programs in FY 2025 and 2026. For example, the FY 2025 and 2026 NOFOs for the Byrne JAG Program and NCHIP identify "unallowable activities" that are "out of the program scope and will not be funded" related to immigration:

> 1. Out of program scope is any program or activity, at any tier that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents.
>
> . . . .
>
> 3. As specified in the DOJ Grants Financial Guide, in Chapter 3.13 "Unallowable Costs" ("Legal Services for Aliens"), any obligations of funds, at any tier, under this award to provide (or to support the provision of) legal services to any removable alien or any alien otherwise unlawfully present in the United States shall be unallowable costs for purposes [of] any award made under this notice, but the foregoing shall not be understood to apply: (1) to legal services to obtain protection orders for victims of crime; or (2) to immigration-related legal services that may be expressly authorized or required by any law, or any judicial ruling, governing or applicable to the award.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

These NOFOs also identify OJP funding priorities, including "[d]irectly supporting law enforcement operations (including immigration law enforcement operations)," and state that OJP may prioritize proposed projects that advance those priorities.

315. The FY 2025 grant agreement for the Byrne JAG program also includes the following conditions:

> **Condition 52**
> Noninterference (with award funds and within the funded "program or activity") with federal law enforcement: information-communication restrictions
>
> SCOPE. This condition applies throughout the entire award period of performance. Its provisions must be among those included in any subaward (at any tier).
>
> 1. Throughout the entire award period of performance, no State or local government entity, agency, or official may use funds under this award (including under any subaward, at any tier) to prohibit or in any way restrict—
>
> (1) any government entity or official from sending or receiving information regarding citizenship or immigration status to or from DHS; or
> (2) a government entity or agency from sending, requesting or receiving, or exchanging information regarding immigration status to, from, or with DHS, or from maintaining such information.
>
> Any prohibition (or restriction) that violates this condition is an "information-communication restriction" under this award.
>
> 2. With respect to the "program or activity" funded in whole or part under this award (including any such program or activity of any subrecipient at any tier), throughout the entire award period of performance, no State or local government entity, agency, or official may implement an "information-communication restriction."
>
> 3. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of this condition.
>
> 4. Allowable costs. Compliance with these requirements is an authorized and priority purpose of this award. To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) that the recipient, or any subrecipient at any tier that is a State or local government incurs to implement this condition.
>
> 5. Rules of Construction.
>
> A. For purposes of this condition:



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(1) "State" and "local government" include any agency or other entity thereof, but not any public institution of higher education or Indian [T]ribe.
(2) "Program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. 2000d-4a).
(3) "Immigration status" means what it means under 8 U.S.C. 1373 and 8 U.S.C. 1644; and terms that are defined in 8 U.S.C. 1101 mean what they mean under that section 1101, except that "State" also includes American Samoa.
(4) "DHS" means the U.S. Department of Homeland Security.

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity (or individual) to violate any federal law, including any applicable civil rights or nondiscrimination law.

C. This condition shall be enforceable to the extent that it does not otherwise contravene any express requirement of any federal law, or of any judicial ruling, governing or applicable to the award.

**Condition 53**
Noninterference (with award funds and within the funded "program or activity") with federal law enforcement: Notice of scheduled release

SCOPE. This condition applies throughout the entire award period of performance. Its provisions must be among those included in any subaward at any tier.

1. No use of funds to interfere with "removal" process: Notice of scheduled release date and time.

Consonant with federal law enforcement statutes—including 8 U.S.C. 1231 (for an alien incarcerated by a State or local government, a 90-day "removal period" during which the federal government "shall" detain and then "shall" remove an alien from the U.S. "begins" no later than "the date the alien is released from ... confinement"; also, the federal government is expressly authorized to make payments to a "State or a political subdivision of the State ... with respect to the incarceration of [an] undocumented criminal alien"); 8 U.S.C. 1226 (the federal government "shall take into custody" certain criminal aliens "when the alien is released"); and 8 U.S.C. 1366 (requiring an annual report to Congress on "the number of illegal alien[ felons] in Federal and State prisons" and programs underway "to ensure the prompt removal" from the U.S. of removable "criminal aliens")—no State or local government entity, agency, or official (including a government-contracted correctional facility) may use funds under this award to interfere with the "removal" process by failing to provide (as early as practicable (see para. 5.B. below)) advance notice to DHS of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from DHS a formal written request pursuant to the INA that seeks such advance notice.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

2. Noninterference with "removal" process: Notice of scheduled release date and time within the funded "program or activity."

> With respect to the "program or activity" funded in whole or part under this award (including any such program or activity of any subrecipient at any tier), and consonant with federal law enforcement statutes as cited in para. 1 of this condition, no State or local government entity, agency, or official (including a government-contracted correctional facility) within the funded program or activity may interfere with the "removal" process by failing to provide (as early as practicable (see para. 4.B. below)) advance notice to DHS of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from DHS a formal written request pursuant to the INA that seeks such advance notice.

3. Monitoring. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

4. Allowable costs. To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

5. Rules of construction

A. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity or individual to maintain (or detain) any individual in custody beyond the date and time the individual otherwise would have been released.

B. Applicability.

(1) Current DHS practice is ordinarily to request advance notice of scheduled release "as early as practicable (at least 48 hours, if possible)." (See DHS Form I-247A (3/17)). If (e.g., in light of the date DHS made such request) the scheduled release date and time for an alien are such as not to allow for the advance notice that DHS has requested, it shall NOT be a violation of this condition to provide only as much advance notice as, in fact, practicable.

(2) Current DHS practice is to use the same form for a second, distinct purpose—to request that an individual be detained for up to 48 hours AFTER the scheduled release. This condition does NOT encompass such DHS requests for detention.

C. This condition shall be enforceable to the extent that it does not otherwise contravene any express requirement of any federal law, or of any judicial ruling, governing or applicable to the award.

D. The "Rules of Construction" set out in the "Noninterference (with award funds and within the funded "program or activity") with federal law enforcement: Interrogation of certain aliens" award condition are incorporated by reference as though set forth here in full.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**Condition 54**
Noninterference (with award funds and within the funded "program or activity") with federal law enforcement: Interrogation of certain aliens

SCOPE. This condition applies throughout the entire award period of performance. Its provisions must be among those included in any subaward (at any tier).

1. No use of funds to interfere with statutory law enforcement access to correctional facilities.

> Consonant with federal law enforcement statutes and regulations—including 8 U.S.C. 1357(a) (under which certain federal officers and employees "have power without warrant ... to interrogate any alien or person believed to be an alien as to his right to be or to remain" in the United States), and 8 C.F.R. 287.5(a) (under which that power may be exercised "anywhere in or outside" the United States)—no State or local government entity, agency, or official within the funded program or activity may use funds under this award to interfere with the exercise of that power to interrogate "without warrant" (by agents of the United States acting under color of federal law) by impeding access to any State or local government (or government-contracted) correctional facility by such agents for the purpose of "interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States."

2. Noninterference with statutory law enforcement access to correctional facilities within the funded "program or activity."

> With respect to the "program or activity" funded in whole or part under this award (including any such program or activity of any subrecipient at any tier), and consonant with federal law enforcement statutes and regulations as cited in para. 1 of this condition, no State or local government entity, agency, or official within the funded program or activity may interfere with the exercise of that power to interrogate "without warrant" (by agents of the United States acting under color of federal law) by impeding access to any State or local government (or government-contracted) correctional facility by such agents for the purpose of "interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States."

3. Monitoring. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with this condition.

4. Allowable costs. To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated for the reasonable, necessary, and allocable costs (if any) of actions (e.g., training) designed to ensure compliance with this condition.

5. Rules of construction

A. For purposes of this condition:



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> (1) The term "alien" means what it means under sec. 101 of the Immigration and Nationality Act (INA) (8 U.S.C. 1101(a)(3)), except that, with respect to a juvenile offender, it means "criminal alien."
> (2) The term "juvenile offender" means what it means under 28 C.F.R. 31.304(f) (as in effect on Jan. 1, 2026.)
> (3) The term "criminal alien" means, with respect to a juvenile offender, an alien who is deportable on the basis of—
> (a) conviction described in 8 U.S.C. 1227(a)(2), or
> (b) conduct described in 8 U.S.C. 1227(a)(4).
> (4) The term "conviction" means what it means under 8 U.S.C. 1101(a)(48). (Adjudication of a juvenile as having committed an offense does not constitute "conviction" for purposes of this condition.)
> (5) The term "correctional facility" means what it means under 34 U.S.C. 10251(a)(7)) as of Jan. 1, 2026.
> (6) The term "impede" includes taking or continuing any action, or implementing or maintaining any law, policy, rule, or practice, that—
> (a) is designed to prevent or to significantly delay or complicate, or
> (b) has the effect of preventing or of significantly delaying or complicating.
> (7) "State" and "local government" include any agency or other entity thereof, but not any public institution of higher education or Indian tribe.
> (8) "Program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. 2000d-4a).
>
> B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity (or individual) to violate any federal law, including any applicable civil rights or nondiscrimination law.
> C. This condition shall be enforceable to the extent that it does not otherwise contravene any express requirement of any federal law, or of any judicial ruling, governing or applicable to the award.

316. Collectively, the above conditions in DOJ OJP'S NOFOs, as well as the FY 2025 Byrne JAG grant agreement, are defined as "the DOJ OJP Immigration Conditions."

317. The FY 2025 and 2026 NOFOs for Byrne JAG and NCHIP also contain similar language to the DOJ OJP Discrimination Condition, for instance, identifying as "[o]ut of program scope" activities that "indirectly violate [federal civil rights or nondiscrimination] law, including by promoting or facilitating violations" or "unlawfully favor individuals in any race or protected group, including on a majority or minority, or privileged or unprivileged, basis, within a given area, population, or sector."



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

318. Since 2025, OVW also has imposed new conditions through its general terms and conditions, as well as grant program NOFOs.

319. The FY 2025 and FY 2026 OVW General Terms and Conditions include conditions substantially similar to the DOJ OJP Discrimination Condition.

320. The FY 2025 NOFO for the STOP Grant Program provides a list of "[o]ut-of-scope activities" that "will not be funded" and "must be removed from the application," and require each applicant to submit a letter signed by an authorized representative certifying that grant funds will not be used for those activities. The out-of-scope activities include, among others:

- "Promoting or facilitating the violation of federal immigration law"; "[p]rograms that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women"; and "[i]nitiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support" (the "DOJ OVW Immigration Conditions");
- "Inculcating or promoting gender ideology as defined in [the Gender Ideology Order]" (the "DOJ OVW Gender Ideology Condition");
- "Promoting or facilitating discriminatory programs or ideology, including illegal DEI and 'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect, as described in [the DEI Order]" (the "DOJ OVW Discrimination Condition");
- "Activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses (e.g., prioritizing criminal justice reform or social justice theories over victim safety and offender accountability)" (the "DOJ



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Social Justice Condition"); or

- "Any activity or program that unlawfully violates an Executive Order" (the "DOJ OVW Executive Order Condition").

A district court has preliminarily enjoined these OVW Conditions in an ongoing lawsuit. *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 62 (D.R.I. 2025). On its website, OVW concedes that these listed conditions "are not enforceable as to any OVW FY 2026 awards" but only "unless and until the preliminary stay is lifted."

321. DOJ COPS also has included similar conditions in its guidance and NOFOs. For example, the FY 2026 COPS LEMHWA Application Resource Guide ("LEMHWA Guide") states that "COPS Office funding must not be used" for the following:

- "To directly or indirectly support or subsidize an educational service agency, state educational agency, local educational agency, elementary school, secondary school, or institution of higher education that requires students to have received a COVID-19 vaccination to attend any in-person education program" (the "DOJ LEMHWA Guide COVID Condition");
- "To promote gender ideology" (the "DOJ LEMHWA Guide Gender Ideology Condition"); or
- "For projects that provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities" (the "DOJ LEMHWA Guide Discrimination Condition").

322. The LEMHWA Guide further states "[i]f awarded, and it is determined that the applicant is not in compliance with the funding restrictions, the COPS Office may place a hold on the award and/or take other remedial action" (the "DOJ LEMHWA Guide Termination



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Condition”).

323. The LEMHWA Guide also requires that recipients “must comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President” (the “DOJ LEMHWA Guide Executive Order Condition”).

324. The FY 2026 LEMHWA NOFO states that “[t]he COPS Office has identified activities that are unallowable and will not be funded” and directs applicants to “read the [LEMHWA Guide] for details.”

3. <u>DHS Attaches New, Unlawful Conditions to Grants.</u>

325. DHS and its component entities have implemented President Trump’s executive orders by making changes to DHS policy and attaching new and unlawful conditions across the portfolio of DHS grants established by Congress and demanding grant recipients’ agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the “DHS Conditions.”

326. DHS promptly took steps to comply with President Trump’s executive orders. For example, shortly after her confirmation, then-DHS Secretary Kristi Noem made clear she would implement the President’s Immigration Orders. She posted to X on January 29, 2025 that she “froze grant funding to NGOs where the grant touches immigration . . . . We will not give taxpayer dollars to NGOs who facilitate illegal immigration.”

327. Beginning in May 2024, DHS issued Standard Terms and Conditions (“DHS Standard Terms”) applicable to all DHS grant recipients, pass-through entities, and grant recipients, incorporating new conditions that purport to implement President Trump’s executive orders. This included several versions applicable to FY 2025 grants and, in April 2026, an updated version of applicable to FY 2026 grants. In a widely disseminated grant alert, DHS directed that



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

all new grant award packages must refer to, and new grant award recipients must use, the FY 2026 DHS Standard Terms.

328. Page 10 of the FY 2026 DHS Standard Terms contain a condition titled "Federal Anti-Discrimination Laws Material to the Government's Payment Decisions under the False Claims Act" (the "DHS Discrimination Condition"), which states:

> Recipients must agree that [their] compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of 31 U.S.C. § 3729(b)(4) (Definition of "material").
>
> (1) Definitions. As used in this term –
>
> (a) DEI means "diversity, equity, and inclusion."
>
> (b) DEIA means "diversity, equity, inclusion, and accessibility."
>
> (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190.
>
> (d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.
>
> . . .
>
> (2) Grant award certification.
>
> (a) By accepting the grant award, recipients are certifying that:
>
> (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal antidiscrimination laws; and
>
> . . . (3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or the Secretary's designee determines that the recipient has violated any provision of subsection (2).

329. DHS added the DHS Discrimination Condition beginning in FY 2025.

330. The DHS Discrimination Condition implements President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA.

331. Separate from the DHS Discrimination Condition, the DHS Standard Terms have



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

long required recipients of grant funding to comply with specified civil rights and nondiscrimination laws while performing activities under the grant at issue. These provisions are referred to collectively as the "DHS Civil Rights Provisions," provide that recipients "must comply with" specified federal civil rights statutes, including of the Title VI of the Civil Rights Act of 1964 ("Title VI"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Americans with Disabilities Act of 1975 ("ADA"). The DHS Standard Terms also contain multiple new provisions related to the Administration's immigration enforcement policies (collectively, the "DHS Immigration Conditions"). For example, page 5 of the FY 2026 DHS Standard Terms provides:

> (2) Where applicable, recipients and subrecipients of funds under an award must agree that they will comply with the following requirements related to coordination and cooperation with DHS and immigration officials:
>
>> (a) They must comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. §§ 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status of any individual: 1) sending such information to, or requesting or receiving such information from, Federal immigration officials; 2) maintaining such information; or 3) exchanging such information with any other Federal, State, or local government entity;
>>
>> (b) They must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes;
>>
>> (c) That they will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> with this requirement merely because it lacks the necessary resources to assist in a particular instance;
>
> (d) That they will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien; and
>
> (e) That they will not leak or otherwise publicize the existence of an immigration enforcement operation.

(3) The recipient must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that it will comply with the requirements of this term. Additionally, the recipient agrees that it will require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award.

(4) The recipient agrees that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of Homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term.

332. Additionally, page 10 of the FY 2026 DHS Standard Terms requires recipients to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration."

333. While the DHS Standard Terms suggest that immigration-related conditions may not apply to all grant programs, the grant agreements for at least some DHS programs include and expand upon the conditions. For example, the FY 2025 EMPG grant agreement provides:

**Compliance with Federal Immigration Law**

1. Prohibition

> a. The state, territorial, or local government recipient is prohibited from being designated by the Department of Homeland Security or Department of Justice as a sanctuary jurisdiction. If the Department of Homeland Security or Department of Justice designates the state, territory, or local government as a sanctuary jurisdiction after the Department of Homeland Security has made the grant award, the state, territorial, or local government recipient is prohibited from making any financial obligations under the grant award on or after the date of designation until the Department of Homeland Security or Department of Justice removes that designation. The Department of Homeland Security will suspend the grant award and not



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

make payments to the state, local, or territorial recipient on or after the date of designation until the Department of Homeland Security or Department of Justice removes that designation.

b. The state, local, or territorial recipient is prohibited from making subawards to a state, local, or territorial government that the Department of Homeland Security or Department of Justice has designated as sanctuary jurisdiction. If the Department of Homeland Security or Department of Justice designates a state, local, or territorial government as a sanctuary jurisdiction after the recipient makes a subaward, the recipient must suspend the subaward, the recipient must not make any additional payments to the subrecipient, and the subrecipient is prohibited from making any financial obligations under the subaward on and after the date of designation until the Department of Homeland Security or Department of Justice removes that designation. c. The Department of Homeland Security designates a state, local, or territorial government as a sanctuary jurisdiction if it fails to comply with the requirements set forth in paragraphs 2.a.i to v of this term and condition.

2. Certification

a. The state, territorial, or local government recipient and all state, territorial, and local government subrecipients must certify under penalty of perjury pursuant to 28 U.S.C. § 1746, and using a form that is acceptable to the Department of Homeland Security, that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

i. They will comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with the Department of Homeland Security regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, state, or local government entity from doing any of the following with respect to information regarding the immigration status of any individual:

(1) sending such information to, or requesting or receiving such information from, Federal immigration officials;

(2) maintaining such information; or

(3) exchanging such information with any other federal, state, or local government entity.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> ii. They will comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes.
>
> iii. They will honor requests for cooperation, such as participating in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance.
>
> iv. They will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien.
>
> v. They will not leak or otherwise publicize the existence of an immigration enforcement operation.
>
> b. The state, local, or territorial recipient must require a state, local, or territorial subrecipient to make the certification above before providing them with any funding under the subaward.
>
> 3. Materiality and Remedies for Noncompliance This term and condition is material to the Department of Homeland Security's decision to make this grant award and the Department of Homeland Security may take any remedy for noncompliance, including termination, if the state, territorial, or local government recipient or any state, territorial, or local government subrecipient fails to comply with this term and condition.

334. Some DHS grant agreements and NOFOs, such as the AFG and SAFER NOFOs, specifically exclude the DHS Immigration Conditions. However, while DHS has represented that it will not apply the DHS Immigration Conditions to every grant award, those representations have proven unreliable. On March 25, 2025, then-DHS Secretary Kristi Noem endorsed the recommendation of Cameron Hamilton, the former Senior Official Performing the Duties of FEMA Administrator, to attach the conditions related to cooperation with ICE to all open and future awards under 12 grant programs; not to attach those conditions to awards under several



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

other grant programs, including AFG and SAFER; and to reserve the possibility of attaching those conditions to yet more other grant programs. Then-Secretary Noem endorsed the recommendation even though Mr. Hamilton's memorandum had identified no authority to support its categorization. Yet, when DHS adopted the FY 2025 DHS Standard Terms (including conditions related to cooperation with ICE) several weeks later, they stated that they would apply to "all new federal awards," without excluding the programs identified in the memorandum.

335. Though the EMPG and TSGP NOFOs acknowledge that that"[n]o final agency determination has been made as of the date of [the publication of these NOFOs]," they also state that "[a]n immigration term and condition, including those in the FY 2026 DHS Standard Terms and Conditions, may be material to the Department of Homeland Security's decision to make this grant award" and that "the Department of Homeland Security may take any remedy for noncompliance, including termination, if the state or territorial recipient or any local government subrecipient fails to comply with this term and condition."

336. The FY 2026 DHS Standard Terms also contain a condition titled "All Executive Orders Related to Grants" (the "DHS Executive Order Condition"), which states:

> Presidential Executive Orders. Recipients must comply with the requirements and actions of Presidential executive orders related to grants (also known as federal assistance and financial assistance), including those published after the date of this publication, the full text of which are incorporated by reference.

337. DHS added the DHS Executive Order Condition beginning in FY 2025.

338. The FY 2026 DHS Standard Terms contain a new provision providing in relevant part that a federal award may be terminated, in whole or in part, by DHS "[f]or convenience, pursuant to [the Grantmaking Order], including when the award no longer advances agency priorities or the national interest," subject to "appropriate" exceptions that do not appear to be relevant here (the "DHS Termination Condition"). This provision was not included in any prior



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

version of DHS's Standard Terms and Conditions.

339. NOFOs for DHS grant programs, including those administered by FEMA, consistently incorporate the applicable FY's DHS Standard Terms. DHS NOFOs often include additional conditions similar to and/or expanding upon the new conditions identified above.

340. For instance, the FY 2026 TSGP NOFO further requires recipients to report whether "subrecipient's work or mission involves supporting aliens, regardless of whether FEMA funds support such activities," "[w]hether the payment request includes an activity involving support to aliens," and "[w]hether the subrecipient has any diversity, equity, and inclusion practices." The NOFO also contains conditions requiring recipients to "comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference"; requiring recipients to "ensur[e] compliance with and enforce[] federal civil rights obligations in connection with programs and services conducted by FEMA" "[c]onsistent with Executive Order 14173, Ending Illegal Discrimination & Restoring Merit-Based Opportunity"; and stating that "FEMA, in its sole discretion, may terminate the federal award . . . [f]or convenience, including if the award no longer advances the national interest." These conditions (collectively, the "DHS TSGP Conditions") are similar to, or expand upon, the DHS Discrimination, Immigration, Executive Order, and Termination Conditions in the FY 2026 DHS Standard Terms.

4. EPA Attaches New, Unlawful Conditions to Grants

341. EPA and its component entities have implemented President Trump's executive orders by making changes to EPA policy and attaching new and unlawful conditions across the portfolio of EPA grants established by Congress and demanding grant recipients' agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section,



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

are referred to collectively as the "EPA Conditions."

342. EPA promptly took steps to comply with President Trump's executive orders. For example, on February 14, 2025, EPA announced that EPA Administrator Zeldin, "with the assistance of the Department of Government Efficiency (DOGE)," had cancelled nine contracts "related to DEI, environmental justice, and more."[19] According to EPA's press release, the cancelled contracts represented almost $60 million "saved from wasteful DEI and environmental justice initiatives," and "EPA has worked diligently to implement President Trump's executive orders," including the Government DEI Order and subsequent implementation memos.

343. On March 12, 2025, EPA announced that it would terminate the Biden-Harris Administration's Environmental Justice and Diversity, Equity, and Inclusion arms of the agency, in compliance with President Trump's executive orders.[20] Administrator Zeldin explained that President Trump was elected with a "mandate" to "eliminat[e] . . . forced discrimination programs."

344. In response to Agency-wide direction in March 2025, the EPA Office of the Chief Grants Officer conducted a review of the EPA's FY 2021–2025 Grants Management Plan to ensure alignment with the President's executive orders, including those related to DEI and gender.[21] The EPA the removed the Plan from its website, purportedly to ensure "full compliance with the direction of the new administration." EPA has not yet issued a revised Grants Management Plan,

[19] Press Release, EPA, EPA Administrator Lee Zeldin Cancels Nine More Contracts, Saving Nearly $60 Million (Feb. 14, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-nine-more-contracts-saving-nearly-60-million.

[20] Press Release, EPA, EPA Terminates Biden's Environmental Justice, DEI Arms of Agency (Mar. 12, 2025), https://www.epa.gov/newsreleases/epa-terminates-bidens-environmental-justice-dei-arms-agency.

[21] *See* EPA Office of Inspector Gen., Management Alert: Alteration of the EPA's Grants Management Plan 2021–2025, Report No. 26-N-0034 (June 1, 2026), https://www.epa.gov/system/files/documents/2026-06/_epaoig_20260601-26-n-0034_cert.pdf.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

stating that a revised Grants Management Plan is "under consideration by Agency in line with the President's release of his strategic plan for EPA which is part of the FY 2027 President's Budget."

345. On April 7, 2025, the EPA issued a notification effectively suspending its Disadvantaged Business Enterprise ("DBE") Program for grant recipients as set forth in 40 C.F.R. Part 33.[22] The program seeks to "ensure nondiscrimination" and "remove barriers" in the award of contracts under EPA grants for DBEs. 40 C.F.R. § 33.101. The program implements Title X of the Clean Air Act Amendments of 1990, which establishes a 10% DBE goal for Clean Air Act research projects, and 42 U.S.C. § 4370d, which establishes an 8% goal for other EPA financial assistance programs. The EPA's notification of suspension relies on 2 C.F.R. § 1500.4(b), but that provision authorizes the EPA Director to grant exceptions to regulations "other than those which implement statutory . . . requirements." Thus, the Administrator exceeded his authority in effectively suspending compliance with grant conditions imposed by Congress.

346. Beginning in April 2024 through October 2025, EPA issued updated versions of the General Terms and Conditions ("EPA General Terms")—applicable to EPA grant recipients, pass-through entities, and subrecipients—incorporating new conditions that purport to implement President Trump's executive orders. The current EPA General Terms state that "[i]f the EPA General Terms and Conditions have been revised, . . . . the recipient must comply with the revised terms and conditions after the effective date of the EPA action that leads to the revision."

347. The first version of the EPA General Terms, issued on April 3, 2025, included at Paragraph 54 the following:

> By accepting this EPA financial assistance agreement, (A) the recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination

[22] EPA, RAIN-2025-G02, Class Exception from Requirements under 40 CFR Part 33 and Class Waiver from EPA Order 5700.6 A2 CHG 2, Section 7.0 (Apr. 7, 2025), https://www.epa.gov/grants/rain-2025-g02.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and (B) the recipient certifies that it does not operate any programs promoting Diversity, Equity and Inclusion that violate any applicable Federal anti-discrimination laws.

348. In revisions issued on August 25, 2025, the reference to DEI was removed. To the best of EPA Plaintiffs' knowledge, this change was made without any public explanation, let alone disavowal of the Administration's reinterpretation of federal civil rights laws. This updated version is included in the current EPA General Terms. These versions are referred to collectively as the "EPA Discrimination Conditions."

349. The EPA Discrimination Conditions appear to implement President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA.

350. Separate from the EPA Discrimination Conditions, the EPA General Terms have long required recipients of grant funding to comply with specified civil rights and nondiscrimination laws while performing activities under the grant at issue. These provisions are referred to collectively as the "EPA Civil Rights Provisions." For example, page 33 of the current EPA General Terms provide: "In carrying out this agreement, the recipient must comply with," among other things, Title VI, Section 504, and the ADA, as well as EPA's implementing regulations.

5. <u>Commerce Attaches New, Unlawful Conditions to Grants</u>

351. Commerce and its component entities have implemented President Trump's executive orders by making changes to Commerce policy and attaching new and unlawful conditions across the portfolio of Commerce grants established by Congress and demanding grant recipients' agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the "Commerce Conditions."



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

352. On March 5, 2025, Commerce Secretary Lutnick announced that Commerce had launched a "rigorous review" of the Broadband Equity, Access, and Deployment ("BEAD") program to expand access to high-speed internet, asserting in part that "because of the prior Administration's woke mandates," the program was "in dire need of a readjustment."[23] Secretary Lutnick stated Commerce was "ripping out" requirements imposed by the Biden Administration.

353. On June 6, 2025, the National Telecommunications and Information Administration—a Commerce administration that administers the BEAD program—announced reforms to the program consistent with Commerce Secretary Lutnick's statements, including, among other things, elimination of "DEI labor and employment edicts" and "DEI-[d]riven [c]oordination [r]equirements" from the program.[24]

354. Commerce publishes General Terms and Conditions ("Commerce General Terms") applicable to Commerce grants. The Commerce General Terms flow through to subrecipients.

355. In May 2025, Commerce issued a revised version of the Commerce General Terms applicable to awards or amendments made on or after September 22, 2025. The revised version includes a new provision allowing Commerce to terminate grant awards for "convenience" (the "Commerce Termination Condition"). It provides:

> In accordance with 2 CFR § 200.340(a), Federal award termination provisions, a Federal award may be terminated in part or in its entirety as follows:
>
> . . . .
>
> b. For convenience of Commerce or the pass-through entity. Commerce or the pass-through entity, to the extent authorized by law, may terminate a Federal

---

[23] Press Release, Nat'l Telecomm. and Info. Admin., Statement from U.S. Secretary of Commerce Howard Lutnick on the BEAD Program (Mar. 5, 2025), https://www.ntia.gov/press-release/2025/statement-us-secretary-commerce-howard-lutnick-bead-program.

[24] Nat'l Telecomm. and Info. Admin., Fact Sheet: Ending Biden's Broadband Burdens (June 6, 2025), https://www.ntia.gov/other-publication/2025/fact-sheet-ending-biden-s-broadband-burdens.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> award in part or its entirety if Commerce or the pass-through entity determines that a termination is in the interest of Commerce or the pass-through entity, including if a Federal award no longer effectuates the program goals, agency priorities, or the national interest.
>
> . . . .
>
> e. Pursuant to additional terms and conditions. Commerce or the pass-through entity, to the extent authorized by law, may terminate a Federal award in part or its entirety pursuant to any additional termination provisions included in the terms and conditions of the Federal award.
>
> f. Based on national interest. Commerce or the pass-through entity, to the extent authorized by law, may terminate a Federal discretionary award in part or its entirety for foreign assistance if Commerce or the pass-through entity determines the award no longer advances the national interest.

356. The current EDA NOFO, described in Section IV.D.2 *supra*, was issued in March 2023, and updated in October 2024 and September 2025. The September 2025 updates added a new provision (the "Commerce Discrimination Condition"), which states as follows:

> **Executive Order 14173: Ending Illegal Discrimination and Restoring Merit-Based Opportunity**
>
> Pursuant to Executive Order 14173, 90 FR 8633 (Jan. 21, 2025), Ending Illegal Discrimination and Restoring Merit-Based Opportunity, each recipient that accepts a U.S. Department of Commerce financial assistance award:
>
> > (1) agrees that compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of Title 31 United States Code; and
> >
> > (2) certifies to the Department that it does not operate any programs promoting diversity, equity, and inclusion that violate any applicable Federal anti-discrimination laws.

357. The EDA NOFO also incorporates the Commerce General Terms applicable on the date of the award. Separate from the Commerce Discrimination Condition, the Commerce General Terms have long required recipients of grant funding to comply with specified civil rights and nondiscrimination laws while performing activities under the grant at issue (collectively, the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"Commerce Civil Rights Provisions").

6. USDA Attaches New, Unlawful Conditions to Grants

358. USDA and its component entities have implemented President Trump's executive orders by making changes to USDA policy and attaching new and unlawful conditions across the portfolio of USDA grants established by Congress and demanding grant recipients' agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the "USDA Conditions."

359. USDA promptly took steps to comply with President Trump's executive orders. On February 13, 2025, Secretary Rollins issued a memorandum ordering "the rescission of all Diversity, Equity, Inclusion, and Accessibility (DEIA) programs" and directing USDA to "reprioritize unity, equality, meritocracy, and color-blind policies."[25] Among other things, the memorandum stated: "There shall be no USDA resources expended . . . in the creation, teaching, promotion, or facilitation of Critical Race Theory, DEIA, or Gender Ideology," that "'equity' is a concept at war with this nation's founding principles," and that "materials distributed both internally and externally by USDA [must] reflect [the] foundational truth" of only two sexes, "male or female."

360. Secretary Rollins issued another memorandum on March 13, 2025, further directing USDA to align its policies with the DEI Order.[26] This time, Secretary Rollins stated it was USDA's "priority" to ensure that USDA's grants "do not support programs or organizations that promote

[25] USDA Off. of the Sec'y, Sec'y's Memorandum 1078-001, Prioritizing Unity, Equality, Meritocracy, and Color-Blind Policies, in the United States Department of Agriculture 1 (Feb. 13, 2025), https://www.usda.gov/directives/sm-1078-001.

[26] USDA Off. of the Sec'y, Sec'y's Memorandum 1078-004, Directive on Departmental Grant and Cooperative Agreement Priorities (Mar. 13, 2025), https://www.usda.gov/sites/default/files/documents/sm-1078-004.pdf.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

or take part in [DEI] initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." The memorandum further stated "DEI policies and practices can violate both the letter and purpose of Federal civil rights laws and conflict with the Department's policy of prioritizing merit, fairness, and excellence in furtherance of the Department's mission." The memorandum directed "all USDA agencies and staff offices that issue awards" to review grant awards to "ensur[e] that [USDA] does not fund or no longer funds discriminatory practices—including in the form of DEI—that are either contrary to law or to [USDA's] policy objectives."

361. On December 31, 2025, USDA issued new General Terms and Conditions For Federal Awards (the "2026 USDA General Terms") that apply broadly to all recipients and subrecipients of USDA grants. In an accompanying memorandum, Secretary Rollins directed agency staff to "adopt and implement" the 2026 USDA General Terms for "all future awards and for all significant modifications (as determined by [the Office of the Chief Financial Officer]) to existing and future awards, to the maximum extent consistent with law."[27] That memorandum further stated that "no USDA awards may fund or otherwise support [DEI] initiatives or any other initiatives that discriminate on the basis of immutable characteristics."

362. The 2026 USDA General Terms contain new conditions that, to the best of USDA Plaintiffs' knowledge, had not previously been imposed on USDA grants.

363. Initially, Section 13.0 (the "USDA Executive Order Condition") provides:

> **13.0 Compliance with Executive Orders and Other Presidential Actions**
> USDA must comply with Executive Orders (EOs) and other Presidential Actions. When incorporated into Federal awards, the recipient must comply

[27] USDA Off. of the Sec'y , Secretarial Memorandum 1078-21, Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements 2 (Dec. 31, 2025), https://www.usda.gov/sites/default/files/documents/sm-1078-021.pdf.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> with EOs or Presidential Actions, as well as USDA awarding agency policies and regulations.

The USDA General Terms go on to list several specific executive orders that are expressly incorporated into the award, including the DEI Order, the Gender Ideology Order, and one of the Immigration Orders, as further set forth in this section.

364. Sections 12.2, 13.0 and 13.6 of the USDA General Terms (the "USDA Discrimination Condition") expressly incorporate the DEI Order and provide in relevant part:

> **12.2 Civil Rights Obligations/Nondiscrimination**
> The recipient must comply, and certifies that it will comply, with all applicable Federal antidiscrimination laws, regulations, and policies for the duration of the Federal award, to include the following without limitation:
>
> . . . .
>
> 4. Presidential Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity; and
>
> . . . .
>
> By accepting the award, the recipient certifies that it does not, and will not during the term of the award, operate any programs that advance or promote Diversity, Equity, and Inclusion in violation of Federal anti-discrimination laws. . . .
>
> The above requirements are conditions of payment that go to the essence of the Federal award, and they are therefore material terms of the Federal award. The recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Federal award. Payments under the award are predicated on compliance with the above requirements, and therefore the recipient is not eligible for funding under the award or to retain any funding under the award absent compliance with the above requirements. USDA reserves the right to terminate Federal financial assistance awards and recover all funds if the recipient, during the term of this award, operates any program in violation of Federal anti-discrimination laws.
>
> If the recipient either fails to comply with above requirements, or makes a knowing false statement related to compliance with the above requirements and/or eligibility for the Federal award, the recipient may be subject to liability



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

> under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. § 287 and 18 U.S.C. § 1.
>
> . . . .
>
> **13.6 EO 14173: Ending Illegal Discrimination and Restoring Merit-Based Opportunity**
> The recipient shall comply fully with all applicable Federal anti-discrimination laws and acknowledges said compliance is material to the government's payment decisions for purposes of 31 U.S.C. § 3729(b)(4). The recipient certifies they do not operate any programs that promote Diversity, Equity, or Inclusion (DEI) that violate any applicable Federal antidiscrimination laws.

365. Separate from the USDA Discrimination Condition, USDA's General Terms have long required recipients of grant funding to comply with specified civil rights and nondiscrimination laws while performing activities under the grant at issue (collectively, the "USDA Civil Rights Provisions").

366. Sections 13.0 and 13.5 of the 2026 USDA General Terms (the "USDA Gender Ideology Condition") expressly incorporate the Gender Ideology Order, providing in relevant part:

> **13.5 EO 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government**
> No funding shall be used to promote gender ideology.

367. Sections 13.0 and 13.10 of the 2026 USDA General Terms (the "USDA Immigration Condition") expressly incorporate one of the Immigration Orders, providing in relevant part:

> **13.10 EO 14218: Ending Taxpayer Subsidization of Open Borders**
> No funding shall be directed towards programs that allow illegal aliens to obtain taxpayer-funded benefits, provide public resources to meet the needs of illegal aliens, or provide incentives for illegal immigration by demonstrating the availability of public benefits.

7. <u>DOE Attaches New, Unlawful Conditions to Grants</u>

368. DOE and its component entities have implemented President Trump's executive orders by making changes to DOE policy and attaching new and unlawful conditions across the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

portfolio of DOE grants established by Congress and demanding grant recipients' agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the "DOE Conditions."

369. On January 23, 2025, then-acting DOE Secretary Ingrid Kolb issued a memorandum to department heads and national laboratories stating that, in accordance with President Trump's Government DEI Order, effective immediately" DOE would suspend "[DEI] policies, procedures, programs, activities, and reviews involving or relating to DEI objectives and principles."[28] The memorandum further stated the suspension "encompasses a broad spectrum of activities," including, among other things, the "awarding and assessments of grants, loans, loan guarantees, cost sharing agreements, or other funding opportunities of any kind." It also directed that "[a]ny requirement or obligation regarding DEI . . . shall be removed from all FOAs/NOFOs, grants, cost-sharing agreements, contracts, loans, loan guarantees, and any other funding awards."

370. In 2026, DOE issued revised Standard Terms and Conditions on its website ("2026 DOE Standard Terms"). The 2026 DOE Standard Terms apply to "all applicable DOE awards," including DOE's Weatherization Assistance Program and any future grant funding or financial assistance from DOE that may be available to the Local Governments.

371. Section II.L of the 2026 DOE Standard Terms is titled "Implementation of Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "DOE Discrimination Condition"). The DOE Discrimination Condition requires recipients to

[28] Memorandum from Acting Sec'y to Heads of Departmental Elements and Nat'l Lab'ys, Executive Order on Ending Radical and Wasteful Government DEI Programs and Preferencing, and Agency-Wide Policy to Promote Equal Opportunity (Jan. 23, 2025), https://www.energy.gov/sites/default/files/2025-02/Memorandum%20signed%20by%20Acting%20Secretary%20of%20Energy%20Ingrid%20C.%20Kolb%20dated%20January%2023%202025%20%28002%29.pdf.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"comply in all respects with all applicable federal anti-discrimination laws." By "requesting a drawdown or reimbursement of funds," a recipient "certifies that it does not operate programs promoting diversity, equity, and inclusion that violate any applicable federal anti-discrimination laws." The DOE Discrimination Condition further provides that "[c]ompliance with such Federal laws is material to DOE's payment decisions for purposes of" the FCA.

372. The title of the DOE Discrimination Condition itself purports to implement President Trump's DEI Order, which targets DEI policies "violat[ing] the text and spirit of our longstanding Federal civil rights laws" and "undermin[ing] the traditional American values of hard work, excellence, and individual achievement." Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025). The DOE Discrimination Condition also mirrors the language of Executive Order 14173, stating "[i]t is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work."

8. <u>DOL Unilaterally Imposes New, Unlawful Conditions to Grants.</u>

373. DOL and its component entities have implemented President Trump's executive orders by making changes to DOL policy that purport to impose new and unlawful conditions across the portfolio of DOE grants established by Congress, without grant recipients' consent. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the "DOL Conditions."

374. On January 22, 2025, then-acting DOL Deputy Assistant Secretary Michelle Paczynski sent a notice to state and local workforce agencies and certain grant recipients notifying "all Employment and Training Administration (ETA) recipients about changes ETA is making to



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

federal financial assistance awards" to prohibit DEI-related activities.[29] The notice stated: "Effective immediately, all recipients of federal financial assistance awards are directed to cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of the [DEI Order]."

375. On July 10, 2025, then-acting DOL Assistant Secretary Lori Bearden sent a notice to state and local workforce agencies and certain grant recipients providing "direction regarding work authorization verification for grant programs administered by the Employment and Training Administration (ETA)."[30] The notice directed entities receiving grants under various programs, including the WIOA Adult, Dislocated Worker, and Youth Activities Programs, to "revise policies, documentation requirements, and procedures" to align with DOL guidance intended to ensure program participants are "legally authorized to work in the United States." The notice further stated that ETA was "changing its prior guidance to clarify and establish that all participant-level services are considered 'federal public benefits' under PRWORA [Personal Responsibility and Work Opportunity Reconciliation Act of 1996]" and "grantees must verify work authorization for all participants served by WIOA and related programs . . . prior to delivering participant-level services."

---

[29] Training & Employment Notice No. 21-24, Immediate Implementation of Executive Orders "Ending Radical and Wasteful Government DEI Programs and Preferencing" and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (Jan. 22, 2025), https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEN/2024/TEN%2021-24/TEN%2021-24.pdf.

[30] Training & Employment Notice No. 10-23, Work Authorization Verification in Grant Programs Administered by the Employment and Training Administration (July 10, 2025), https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEGL/2023/TEGL%2010-23%20Change%202/TEGL%2010-23%20Change%202.pdf.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

9. Interior Attaches New, Unlawful Conditions to Grants

376. Interior and its component entities have implemented President Trump's executive orders by making changes to Interior policy and attaching new and unlawful conditions across the portfolio of Interior grants established by Congress and demanding grant recipients' agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the "Interior Conditions."

377. On January 30, 2025, then-acting Interior Secretary Walter Cruickshank issued an order titled "Ending DEI Programs and Gender Ideology Extremism."[31] It expressly "implements" President Trump's Gender Ideology and Government DEI Orders, and states it is intended to "direct broad action related to cessation of activities intended to further . . . equity-related concepts." Among other things, it directs that "Bureaus/Offices shall immediately cease any and all equity-related activities, under any name or characterization that they may appear" and "Department funds may not be used to promote the policies set forth in the equity-related [executive orders]."

378. In March 2026, Interior Chief Human Capital Officer Rachel M. Borra issued a memorandum to all Interior employees titled "Reporting DEI-Related Discrimination, Retaliation, and Related Whistleblower Disclosures."[32] The memo purports to "describe clear channels for you to report suspected DEI-related discrimination, retaliation, or related violations of law, along with strong protections against reprisal." It provides several "[c]ommon examples" of "DEI-related

[31] Sec'y of the Interior, Order No. 3416, Ending DEI Programs and Gender Ideology Extremism (Jan. 30, 2025), https://www.doi.gov/document-library/secretary-order/so-3416-ending-dei-programs-and-gender-ideology-extremism.

[32] Memorandum from Chief Hum. Cap. Officer to All Emps., Reporting DEI-Related Discrimination, Retaliation, and Related Whistleblower Disclosures (Mar. 18, 2026), https://www.doi.gov/sites/default/files/documents/2026-03/318-chco-all-employee-message.pdf.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

discrimination," including, among other things, requiring diverse slates or demographic targets in employment processes; restricting employee resource groups, networking events, or professional development to certain groups; using diversity metrics or goals to influence employment decisions; "DEI trainings or materials that stereotype or demean employees based on race, sex, or other protected traits"; and awarding recognition, compensation, or opportunities based in part on contributions to "diversity goals." The memo encourages employees to report any suspected diversity, equity and inclusion activities, provides multiple channels for doing so, and informs the workforce that such reporting represents protected whistleblower activity.

379. On April 1, 2025, Interior issued revised General Award Terms and Conditions applicable to Interior grants awarded after that date ("April 2025 Interior General Terms"), adding new conditions.

380. Page 1 of the April 2025 Interior General Terms (the "Interior Discrimination Condition") provides: "In accepting this award the grant recipient agrees to operating in compliance in all respects with all applicable Federal anti-discrimination laws, and certify that it does not operate any programs promoting diversity, equity and inclusion programs that violate any applicable Federal anti-discrimination laws."

381. Separate from the Interior Discrimination Condition, the Interior General Terms have long required recipients of grant funding to comply with specified civil rights and nondiscrimination laws while performing activities under the grant at issue (collectively, the "Interior Civil Rights Provisions").

382. On July 30, 2025, Interior issued revised General Award Terms and Conditions applicable to Interior grants awarded after that date ("July 2025 Interior General Terms"). The July 2025 Interior General Terms contain the same Interior Discrimination Condition and Civil Rights



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Provisions referenced above.

383. The 2026 CWMP NOFO incorporates the July 2025 Interior General Terms. The 2026 CWMP NOFO also contains a provision (the "Interior CWMP Executive Order Condition"), which provides in relevant part: "By applying in response to this Notice of Funding Opportunity, the applicant certifies awareness and compliance with all currently effective and applicable executive orders and secretary's orders, including, but not limited to [the Government DEI Order] as well as the Executive Order and Secretary's order titled Restoring Truth and Sanity to American History. Applicants are responsible for ensuring their proposed activities are consistent with the intent and requirements of these directives."

384. The 2026 ORLP NOFO at page 24 incorporates the current Interior General Terms. The 2026 ORLP NOFO at pages 9–10 also contains a provision (the "Interior ORLP Executive Order Condition"), which states:

> Prior to submitting an application, applicants should review presidential actions found at: https://www.whitehouse.gov/presidential-actions/ and DOI Secretary's Orders found at: https://www.doi.gov/document-library/secretary-order. By submitting an application in response to this Notice of Funding Opportunity, the applicant certifies awareness and compliance with all current and applicable executive and secretary orders, including the [the Government DEI Order] as well as the EO and SO on Restoring Truth and Sanity to American History.

385. The 2026 ORLP NOFO at page 3 states that "projects must align with the purposes and requirements of the LWCF Act and LWCF Manual."

386. Yet, the current version of the LWCF Manual—published most recently on May 1, 2026 (i.e., by the current Administration)—appears to conflict with the Interior Conditions. For instance, the Manual requires that projects benefit "minority and other underserved populations," that project sponsors "take all necessary affirmative steps to assure that [small and minority businesses, women's business enterprises, and labor surplus area firms] are used when possible as



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

sources of supplies, equipment, construction, and services," and that States ensure LWCF assistance is provided in a "non-discriminatory manner, especially with regards to minority, elderly, disabled, and other underserved populations and ensure a fair and equitable evaluation of all applications for LWCF assistance," as well as several additional provisions imposing equity or equitable considerations. While the LWCF Manual provides that a grant award's terms and conditions "will prevail" in the event of "a conflict" with the Manual's procedures and requirements, it is unclear how a grant recipient would determine whether and to what extent a conflict exists.

10. ONDCP Attaches New Unlawful Conditions to Grants

387. ONDCP and its component entities have implemented President Trump's executive orders by making changes to ONDCP policy and attaching new and unlawful conditions across the portfolio of ONDCP grants established by Congress and demanding grant recipients' agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the "ONDCP Conditions."

388. For instance, HIDTA grant agreements issued this year contain a provision (the "ONDCP Executive Order Condition"), which provides in relevant part:

> As a recipient of federal funding, compliance with all applicable laws and Executive Orders (EO) is a condition of this award[.]
>
> Failure to comply with applicable EOs may result in enforcement actions, including suspension or termination of funding, recovery of funds, or referral for debarment proceedings.
>
> Applicable EOs include, but are not limited to:
>
> - Executive Order 14159: Protecting the American People from Invasion
> - Executive Order 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
> - Executive Order 14182: Enforcing the Hyde Amendment
> - Executive Order: Restoring Gold Standard Science



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

- Executive Order 14321: Ending Crime and Disorder on America's Streets

Additional Executive Orders, including any issued during the period of performance, may apply. Applicants are responsible for ensuring compliance with all federal laws, regulations, Executive Orders and public policies governing financial assistance awards.

389. Thus, the ONDCP Executive Order Condition purports to make applicable to HIDTA grants the Gender Ideology Order, the Abortion Order, and one of the Immigration Orders.

11. <u>IMLS Attaches New Unlawful Conditions to Grants</u>

390. IMLS and its component entities have implemented President Trump's Executive Orders by attempting to dismantle the IMLS, making changes to IMLS policy, and attaching new and unlawful conditions across the portfolio of IMLS grants established by Congress and demanding grant recipients' agreement to those new conditions. These new conditions, as set forth, described, or referenced in this section, are referred to collectively as the "IMLS Conditions."

391. In March 2025, President Trump issued an executive order directing IMLS and several other agencies to eliminate their "non-statutory components and functions . . . to the maximum extent consistent with applicable law" and "reduce the performance of their statutory function and associated personnel to the minimum presence and function required by law." Exec. Order No. 14238 § 2(a), 90 Fed. Reg. 13043 (Mar. 14, 2025). Days later, Defendant Sonderling was sworn in as Acting Director of IMLS, stating that he was "committed to steering this organization in lockstep with this Administration . . . ."[33] He then fired or placed on administrative leave all or most IMLS employees and cancelled a broad array of grants and public programs. However, by April 2026, two lawsuits ultimately resulted in reinstatement of personnel, grants,

[33] Press Release, IMLS, Keith E. Sonderling Sworn In as Acting Director of Institute of Museum and Library Services (Mar. 20, 2025), https://www.imls.gov/news/keith-e-sonderling-sworn-acting-director-institute-museum-and-library-services.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and public programs; a permanent injunction against the executive order's implementation; and a binding settlement, in which the Administration agreed to award grants "to the full extent of Congressional appropriation except as otherwise authorized by law."[34] *See Rhode Island v. Trump*, 810 F. Supp. 3d 283, 314 (D.R.I. 2025); *Rhode Island v. Trump*, No. 26-1070, Order (1st Cir. Apr. 6, 2026).

392. Nevertheless, in administering long-standing grant programs, IMLS has continued to implement President Trump's political agenda by attaching new and unlawful conditions to grants established by Congress.

393. For instance, IMLS's Statement of Assurances and Certifications for 2026 Grants includes a new provision (the "IMLS Discrimination Condition"), which states in relevant part: "Grantees are advised to read and understand the Attorney General's Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (July 29, 2025)."

394. IMLS's Statement of Assurances and Certifications for 2026 Grants also includes a certification of compliance with executive orders (the "IMLS Executive Order Condition"): "The authorized representative, on behalf of the [State Library Administrative Agency], certifies that [it] will comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program."

12. <u>The Local Governments Have a Reasonable Concern that the Federal Agencies Will Attach All of the Challenged Conditions to Grants.</u>

395. As set forth above, the Federal Agencies have taken numerous steps to implement President Trump's executive orders calling for the use of grant conditions to implement his policy preferences to prohibit all kinds of DEI; facilitate federal immigration enforcement; prohibit the

[34] This settlement agreement is available at https://www.ala.org/sites/default/files/2026-04/ALA-v-Sonderling-Settlement-Agreement-as-of-April-9-2026-signed-1-6.pdf.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"promot[ion]" of "gender ideology" or "elective abortion"; restrict support to "educational agencies" with COVID-19 vaccination requirements; restrict support for activities framing domestic violence or sexual assault as "systemic social justice" issues; require adherence to executive orders unrelated to the purpose of the grant; or permit termination for convenience. This includes incorporating the Challenged Conditions into standard terms and conditions, NOFOs, grant awards, guidance, memorandum, and other agency directives. Most recently, the Proposed OMB Rule would impose many of the Challenged Conditions across all federal grants and other financial assistance. These steps have been continuing and evolving over time.

396. Based on the foregoing, the Local Governments have a reasonable concern that all of the Challenged Conditions will be imposed across all federal grants. As set forth in Section M, *infra*, this reasonable concern has interfered, and continues to interfere, with the Local Governments' ability to develop and implement budgets, as well as programs and services essential to the communities they serve.

**L. The Challenged Conditions Are Unlawful.**

397. The Challenged Conditions seek to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to say what the law means. Without Congress passing his ideological agenda, President Trump has granted himself unchecked Article II powers to legislate by executive order and impose his decrees on state and local governments seeking grant funding. This not only conflicts with the Constitution, but it also violates the APA. Indeed, as further described below, the Ninth Circuit largely upheld this Court's preliminary injunction against many of the same conditions imposed by HUD and DOT. *See Turner*, 2026 WL 2489361, at *3.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1. The Discrimination Conditions Are Unlawful.

398. Although the various DEI-related grant conditions (collectively, the "Discrimination Conditions") differ slightly in wording, they all stem from and implement the same directive in President Trump's DEI Order. Section 3(b)(iv)(B) of the DEI Order expressly instructs each federal agency head to include "in every . . . grant award" a term requiring the grant recipient to "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws. The challenged Discrimination Conditions mirror that mandate in substance and function. Each imposes a certification requirement, funding restriction, or programmatic prohibition targeting DEI-related activities, not as a neutral restatement of existing civil rights law, but as an additional condition of federal funding imposed pursuant to the DEI Order.

399. Many of the Discrimination Conditions purport to apply across "any programs" operated by the recipient promoting DEI—even those that are not paid for in any way with federal funds. In *Turner*, the Ninth Circuit held that such sweeping conditions "exceed the limits imposed by Congress because they apply not just to the programs receiving [federal] grant funding . . . , but to 'any programs' operated by the Local Governments" in that case. 2026 WL 2489361, at *6.

400. Some agencies and programs, such as the DOJ COPS Office and the LEMHWA Program, implemented the DEI Order in an unqualified and categorical manner, prohibiting any projects that "provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities," regardless of whether such activities comply with federal civil rights laws. Other agencies purportedly limit the prohibition to DEI-related activities "that violate any applicable Federal civil rights or nondiscrimination laws." That variation in phrasing, however, does not alter the unlawfulness of the conditions.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

401. All of the challenged Discrimination Conditions, including those containing a purported qualifier, are unlawful because they do not merely require compliance with existing federal civil rights laws, which is already mandated. Instead, they impose a novel certification regime and funding condition specifically targeting programs with components relating to diversity, equity, and inclusion, and elevate that certification to a material condition of payment, often expressly invoking the FCA. In doing so, the Federal Agencies supplant ordinary compliance obligations with a vague funding condition that chills lawful, protected, and congressionally authorized activities based on an executive order, not congressional statute.

402. While the Local Governments have routinely certified compliance with federal civil rights laws as a condition of federal funding in the past, the current Administration's communications to federal grant recipients make clear that the Federal Agencies seek compliance with a novel, incorrect, and unsupported interpretation of federal nondiscrimination law contrary to actual nondiscrimination statutes and inconsistent with what any court has endorsed when interpreting them.

403. The challenged Discrimination Conditions, although vague, clearly implicate a broader range of conduct than covered by applicable federal law. Simply placing a cursory clause, such as "with applicable laws," at the end of a condition cannot cure an otherwise vague, unauthorized, or unlawful condition, nor shield it from judicial review. *See City & Cnty. of S.F. v. Trump* , 897 F.3d 1225, 1239–1240 (9th Cir. 2018); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1278–79 (W.D. Wash. 2025).

404. For instance, it is possible to read the Discrimination Conditions as stating, contrary to prevailing law, that all programs with components relating to diversity, equity, and inclusion violate federal civil rights laws—particularly in light of the Administration's actions, including the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

DEI Order and former Attorney General Bondi's Discrimination Guidance Memo described above (which are both arguably incorporated into grant agreements via the Executive Order Conditions discussed *infra*, Section IV.L.4). But the U.S. Supreme Court has made clear that not all discussions of how race affects a person's life, "be it through discrimination, inspiration, or otherwise," are unlawful. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023).

405. The Administration's expansive reinterpretation of civil rights law is also evident when compared to the prior, long-standing interpretation reflected in their regulations. For instance, the February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex"—potentially reaching affinity groups or teaching about racial history.[35]

406. Neither the text of Title VI nor any other federal civil rights statute supports the Administration's insistence that it is unlawful to accord any concern and attention to DEI, let alone that the federal government can bar recipients of federal funding from doing so. The U.S. Supreme Court has never interpreted Title VI to prohibit DEI programs. Indeed, existing case law firmly rejects the Executive Branch's assertions regarding civil rights law with respect to DEI and DEIA, and instead holds that neither the Constitution nor federal civil rights laws prohibit affinity groups and DEI/DEIA trainings and initiatives, whether by governmental or nongovernmental entities. *See, e.g.*, *Diemert v. City of Seattle*, 776 F. Supp. 3d 922, 939–40 (W.D. Wash. 2025) (although "D.E.I. initiatives" and conversations about race, sex, and other matters "may prompt discomfort

[35] Memorandum from the Att'y Gen. to All Dep't Emps., Ending Illegal DEI and DEIA Discrimination and Preferences 1 (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline (quoting the DEI Order).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

or spark debate, they do not necessarily violate anti-discrimination laws. Multiple courts in recent years have reached the same conclusion . . . . Quite the opposite, many courts have held that anti-discrimination trainings play a vital role in preventing workplace discrimination . . . . D.E.I. and anti-discrimination trainings are not per se unlawful.") (collecting cases), *appeal filed*, No. 25-1188 (9th Cir. Feb. 25, 2025).

407. There are many federal laws and regulations that require recipients of federal funds to consider issues of diversity and equity—including statutes and regulations appliable to the grant programs at issue. *See, e.g.*, 34 U.S.C. §§ 10446(e)(2)(D), 12291(a)(46) (directing the Attorney General to "ensure that monies set aside to fund culturally specific services and activities for underserved populations are distributed equitably among those populations," including "underserved racial and ethnic populations" and populations "underserved because of . . . sexual orientation [or] gender identity"); 34 U.S.C. § 10382(c)(11) (COPS grant applicants must "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency"); 44 C.F.R. § 206.11(b) (FEMA personnel must perform work in an "equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, or economic status").

408. The Discrimination Conditions also squarely conflict with Title VI of the Civil Rights Act of 1964. For example, the DHS Discrimination Condition provides that "DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or the Secretary's designee determines that the recipient has violated any provision of [the Condition]." The USDA Discrimination Condition contains a materially similar provision. Title VI, however, sets out strict procedural requirements for agencies



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

that decide to terminate grant funding:

> [N]o such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

42 U.S.C. § 2000d-1. To the extent they allow termination of grants due to recipients' DEI policies, the Discrimination Conditions fail to provide recipients with notice and the ability to cure potential issues, despite Title VI mandating all agencies to provide such due process.

409. The Discrimination Conditions are also vague and ambiguous, fail to make clear what conduct is prohibited, and fail to specify clear standards for enforcement by the Federal Agencies. For example, they do not define the terms "DEI" and "DEIA" (other than by listing the words that each letter in each acronym represents); the term "operate" with respect to "programs"; or the terms "advance" and "promote" with respect to DEI, DEIA, and discriminatory equity ideology. The terms DEI and DEIA are expansive and could be understood to include conduct and speech that are lawful under the First Amendment and settled and longstanding understandings of civil rights law.

410. The presence of the separate Civil Rights Provisions further suggests that the Discrimination Conditions could be read to prohibit all programs that "advance or promote" DEI. There should be no need to include the Discrimination Conditions if programs that "advance or promote" DEI also violate the Civil Rights Provisions.

411. The Executive Branch's insistence on unlawfully reinterpreting civil rights law makes it impossible for recipients to understand the conditions with which they are agreeing to



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

comply. As a result, seemingly benign requirements, such as complying with Title VI of the Civil Rights Act of 1964, are treacherous: the Local Governments cannot take comfort in agreeing to abide by well-settled federal law. Instead, the Federal Agencies may seek to require the Local Governments to adhere to the President and Attorney General's interpretations of Title VI, which are both untethered to judicial interpretations and lacking in authority. This is true for all of the Civil Rights Provisions.

412. To remedy that particular harm, any relief related to the Challenged Conditions must also clarify that the references to statutes in the Civil Rights Provisions mean those statutes as enacted by Congress and interpreted by the judiciary, such that it would not be a breach of those conditions for a recipient to take actions that comply with the law as interpreted by the courts, even if those actions run counter to the Executive's view of those laws. Accepting the Discrimination Conditions would permit the Federal Agencies to threaten the Local Governments with burdensome and costly enforcement action, backed by the FCA's steep penalties, if they refuse to align their activities with this Administration's ideological agenda—or even threaten the Local Governments' officials with personal criminal liability. *See infra* ¶ 468. This threat is intensified by the conditions that purport to have recipients concede the DEI certification's "materiality"—an otherwise "demanding" element of an FCA claim. *Universal Health Servs., Inc.*, 579 U.S. at 192. Further, even short of bringing a suit, the FCA authorizes the Attorney General to serve civil investigative demands on anyone reasonably believed to have information related to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump Administration disapproves of. *See* 31 U.S.C. § 3733.

413. The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to civil rights law,



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

which is instead within the province of Congress in adopting the laws and the judiciary in interpreting them. Requiring recipients to certify that compliance "with all applicable Federal civil rights and nondiscrimination laws" is always "material" for purposes of the FCA imposes an impermissibly vague standard that is broader than the statute allows.

414. In implementing the DEI Order, the Federal Agencies also failed to engage in reasoned decision making, failed to consider the limits of their statutory authority, and failed to adequately explain how the Discrimination Conditions are consistent with governing civil rights statutes, longstanding agency interpretations, or the purposes of the underlying grant programs.

415. In sum, all of the Discrimination Conditions, including those containing a purported qualifier, are unlawful because they do not merely require compliance with applicable federal civil rights statutes, which is already mandated. Instead, they impose a novel certification regime and funding condition specifically targeting programs with components relating to DEI, and elevate that certification to a material condition of payment, often expressly invoking the FCA. In doing so, the Federal Agencies transform ordinary compliance obligations into a vague funding condition that chills lawful, protected, and congressionally authorized activities based on an executive order, not congressional statute.

416. For these reasons and as further set forth in Section V, *infra*, the Discrimination Conditions violate the Separation of Powers, the Spending Clause, and the APA.

2. The Immigration Conditions Are Unlawful.

417. Congress has not delegated to the Federal Agencies the authority to condition federal funding on a recipient's agreement to "comply with" conditions "related to coordination and cooperation" with federal immigration officials, to certify that they do not "operate any program that benefits illegal immigrants or incentivizes illegal immigration," or otherwise



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

acquiesce to the Administration's demands in pursuit of its aggressive and lawless attacks on immigrants living in their communities (collectively, the "Immigration Conditions"). It is also unclear what type of conduct this might encompass, leaving recipients of federal funds without fair notice of what activities would violate the prohibition and giving the Federal Agencies free rein to arbitrarily enforce it.

418. This Court, and multiple others, have already adjudicated grant conditions materially similar to the Immigration Conditions implemented by federal agencies across the Administration.

419. In a series of orders granting preliminary injunctions in *Turner*, this Court held that HUD, DOT, and HHS's imposition of conditions substantially similar to the Immigration Conditions likely violates the APA as unconstitutional, contrary to law, and arbitrary and capricious. In the recently decided appeal of the first preliminary injunction in that case, HUD and DOT elected not to contest the injunction as to the condition related to cooperation with federal immigration officials. *Turner*, 2026 WL 2489361, at *4.

420. For these reasons and as further set forth in Section V, *infra*, the Immigration Conditions violate the Separation of Powers, the Spending Clause, and the APA.

3. <u>The Gender Ideology, Abortion, Social Justice, and COVID Conditions Are Unlawful.</u>

421. The Federal Agencies exceed their statutory authority in imposing vague conditions on the use of funds—namely, prohibiting the promotion of "gender ideology" (the "Gender Ideology Conditions"), promoting of "elective abortion" (the "Abortion Conditions"), and restricting activities that frame domestic violence or sexual assault as "systemic social justice" issues (the "Social Justice Condition"), and that "direct[] or indirect[]" support to an educational institution that requires COVID-19 vaccines (the "COVID Condition").



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

422. The Gender Ideology Condition unlawfully seeks to force federal grant recipients to no longer recognize transgender, gender diverse, and intersex people. These conditions facially discriminate based on transgender status, contravening antidiscrimination laws and the Federal Agencies' own regulations that prohibit discrimination based on sex.

423. The U.S. Supreme Court has interpreted the term "sex" in the context of employment discrimination as encompassing gender identity and transgender status. The Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 660 (2020) definitively established that Title VII's prohibition on sex discrimination includes discrimination against transgender individuals, holding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." Although the Supreme Court recently upheld state laws on participation in girls' and women's athletic competitions, it did so in the "distinct[]" context of competitive sports—not disaster relief grants. *See West Virginia v. B.P.J. by Jackson*, 146 S. Ct. 2356, 2372 (2026).

424. Several statutes and regulations applicable to the grant programs at issue are in conflict with the Gender Ideology Conditions. *See, e.g.*, *supra* ¶¶ 116, 125–26, 252.

425. The Gender Ideology Conditions are also vague. The definition of "gender ideology" provided in the Gender Ideology Order is not only demeaning, but also idiosyncratic and unscientific. Further, given the expansive meaning of "promote," federal agencies have free rein to punish recipients for a broad and subjective range of activities that could be seen as promoting gender ideology, such as simply complying with existing federal nondiscrimination requirements, providing services in accordance with an individual's gender identity, or using inclusive language in policies, training materials, or public communications.

426. The Federal Agencies imposing the Gender Ideology Conditions failed to engage



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

in reasoned decision making, failed to identify any statutory authority permitting them to condition federal funding on adherence to an Executive Branch definition of "gender ideology," and failed to explain how the condition is consistent with governing civil rights statutes, longstanding agency interpretations, or the purposes of the underlying grant programs.

427. The Abortion Conditions (including the Abortion Order incorporated by reference) do not implement, but rather exceed, the Hyde Amendment's narrow prohibition on using federal funds to pay for, or require others to perform or facilitate, abortions. While the Abortion Order purports to apply the Hyde Amendment—a provision that has been enacted in successive appropriations acts that limits use of certain federal funds for abortions (subject to narrow exceptions)—in reality it goes well beyond the Hyde Amendment. Initially, Congress has only enacted the Hyde Amendment as to a few federal agencies, such as HHS. The Abortion Order, however, is directed to all federal agencies across the Executive Branch. But even where the Hyde Amendment applies, it specifically and narrowly prohibits the use of appropriated funds to "require any person to perform, or facilitate in any way the performance of, any abortion" or to "pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape or incest." *See, e.g.*, Pub. L. No. 118-42, §§ 202, 203, 138 Stat. 25, 135 (Mar. 9, 2024). The Local Governments are not aware of any Hyde Amendment that would require grant recipients to refrain from "promot[ing]" abortion—a vague prohibition that is susceptible to arbitrary enforcement. And in doing so, the Abortion Condition usurps Congress's spending, appropriations, and legislative power. And the Federal Agencies that have specifically incorporated the Abortion Order did not engage in any reasoned decision making to justify this new restriction.

428. In *Turner*, the Ninth Circuit held that HUD's condition prohibiting "promot[ion]"



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

of "gender ideology" or "lawful abortion" likely violates the APA as unlawful, explaining the conditions "cover the *effects* of funded activities and the ideas that they *promote*—even where Congress has either expressly authorized or declined to prohibit the activity at issue." 2026 WL 2489361, at *11 (emphasis in original).

429. The Social Justice Condition—which prohibits use of funds for "[a]ctivities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses"—fares no better. Terms like "frame" and "systemic social justice issues" are undefined, allowing federal agency officials to decide, case by case, which ideas about domestic violence and sexual assault they consider acceptable. It falsely pits criminal accountability against recognition of the systemic, economic, and institutional factors that can contribute to domestic violence and sexual assault, even though both can be addressed at the same time. And it gives the Federal Agencies broad discretion to threaten federal funding based not simply on what a grant recipient does, but on how it talks about the issues of domestic violence and sexual assault.

430. Imposition of the COVID Condition is also vague: is entirely unclear what it would mean to "directly or indirectly" support an educational institution that requires COVID-19 vaccines, or how that bears on any of the congressional purposes enumerated in enabling statutes for the programs at issue.

431. Nor did the Federal Agencies engage in any reasoned decision making in attaching the Social Justice or COVID Conditions. They did not explain how those conditions are consistent with the purposes of the underlying grant programs or the impact on grant recipients who rely on those funds.

432. For these reasons and as further set forth in Section V, *infra*, the Gender Ideology, Abortion, Social Justice, and COVID Conditions violate the Separation of Powers, the Spending



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Clause, and the APA.

4. The Executive Order Conditions Are Unlawful

433. Executive orders are formal directives issued by the President to federal agencies and Executive Branch officials. As implemented through the challenged grant conditions requiring compliance with executive orders (collectively, the "Executive Order Conditions") and applied to grant recipients, these orders are vague, unintelligible, and incapable of consistent or lawful enforcement.

434. None of the executive orders at issue directly impose requirements on grant recipients; rather, they direct the heads of executive agencies to impose conditions on federal funding. It is nonsensical to require the Local Governments to "comply with the requirements of Presidential Executive Orders" and unclear what requirements they purport to impose.

435. Even if executive orders could be said to directly regulate recipient behavior, the Executive Order Conditions compound ambiguities atop ambiguities because the executive orders themselves are replete with broad and ambiguous terms and instructions—such as what it means "to promote gender ideology," to "demonstrably advance the President's policy priorities" or to "promote," "encourage," or "facilitate" "racial preferences," "denial . . . of the sex binary . . . or the notion that sex is a chosen or mutable characteristic," or "initiatives that compromise public safety or promote anti-American values"; to "instill a patriotic admiration for our incredible Nation and the values for which we stand" or to engage in "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology"; to advocate or advance "immoral race- and sex-based preferences"; and to conduct activities that are "equity-related" or contain "DEI or DEIA performance requirements." *Supra* Section IV.K.1.

436. The scope and meaning of some Executive Order Conditions are also incapable of



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

being ascertained to the extent they purport to obtain recipients' acquiescence in advance to conditions that may come into existence in the future, if and to the extent the President subsequently issues or amends executive orders related to grants.

437. It is exceedingly likely that additional grant-related executive orders will issue. President Trump signed well over twice as many executive orders in the first eight months of the current presidential term than any President in the last seventy years has issued in any one full calendar year.

438. Further, a condition that simply directs compliance with executive orders "related to grants" provides no meaningful guidance as to what conduct is expected, tolerated, or prohibited. Executive orders vary in scope and subject matter, are subject to change at any time, and are addressed exclusively to Executive Branch actors. Grant recipients are left guessing whether, and how, a particular executive order applies to their conduct and risk loss of critical federal funding and FCA liability if they guess incorrectly.

439. The vagueness of the Executive Order Conditions invites arbitrary and discriminatory enforcement. By incorporating executive orders in sweeping, undefined terms, the Executive Order Conditions vest federal officials with unfettered discretion to determine whether a recipient is "in compliance" without reference to any objective standards. This discretion enables the Administration to wield grant funding as a tool of coercion, selectively enforcing vague obligations against disfavored recipients while overlooking the same conduct by others. The ambiguity of the Executive Order Conditions thus makes them ripe for use as a mechanism of retaliation against entities that express viewpoints or pursue policies disfavored by the current Administration. The absence of clear guidelines transforms the grant process, authorized by Congress to provide critical funding to protect public safety, public health, local economies, and



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

more, into a tool of political leverage that the Executive is using to force local governments to conform to its ideological agenda.

440. For these reasons and as further set forth in Section V, *infra*, the Executive Order Conditions violate the Separation of Powers, the Spending Clause, and the APA.

5. The Termination Conditions Are Unlawful.

441. The Federal Agencies exceeded their lawful authority in requiring recipients to agree that the awarding agency may terminate a grant award for convenience (the "Termination Conditions"). The Termination Conditions seek to permit termination at a federal agency's discretion for new and unspecified reasons after a grant recipient accepts grant funding and begins implementing projects in reliance on that funding.

442. Certain Termination Conditions cite the Grantmaking Order and 2 C.F.R. § 200.340, an OMB regulation, as sources of authority. Neither source, however, provides a legal basis to impose the Termination Conditions.

443. The federal government's authority to terminate grants differs significantly from its authority to terminate federal contracts, where termination for convenience provisions are common and authorized by regulation. *See, e.g.*, 48 C.F.R. §§ 52.249-1–.249-12. For federal grants, OMB has promulgated its Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, commonly known as the Uniform Guidance and codified at Title 2 of the C.F.R. The Uniform Guidance states that it "is guidance, not regulation." 2 C.F.R. § 1.105(b). But it also requires that "Federal agencies making Federal awards to non-Federal entities . . . implement" substantive portions of the Uniform Guidance "in codified regulations unless different provisions are required by Federal statute or are approved by OMB." 2 C.F.R. § 200.106 (requiring that awardees implement "the language in subparts C through F" of the



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Uniform Guidance, which includes award requirements, cost principles, and audit requirements); *see also* 2 C.F.R. § 200.107 (explaining that "OMB will review Federal agency regulations and implementation" of the Guidance, and that "[a]ny exceptions will be subject to approval by OMB and only with adequate justification from the Federal agency").

444. Each of the Federal Agencies named here has adopted and given regulatory effect to 2 C.F.R. Part 200, including 2 C.F.R. § 200.340, entitled "Termination," subject to certain exceptions not relevant here. *See* 2 C.F.R. §§ 2800.101 (DOJ), 3002.10 (DHS, including FEMA), 1500.2 (EPA), 1327.101 (Commerce), 400.1 (USDA), 910.120 (DOE), 2900.4 (DOL), 1402.100 (Interior), 3603.1 (ONDCP), 3187.1 (IMLS).

445. OMB's "Termination" provisions appear in a subpart of 2 C.F.R. Part 200 entitled "Remedies for Noncompliance," and list a limited number of reasons for which an agency can terminate an existing federal award. *See* 2 C.F.R. §§ 200.339–.343. From December 2013 to 2020, the Uniform Guidance's Remedies for Noncompliance permitted termination of a federal grant award only (1) if the recipient failed to comply with the terms and conditions of the award; (2) for cause; or (3) with the consent of the recipient. 2 C.F.R. § 200.339(a)(1)–(3) (2013); *see also* 2 C.F.R. § 200.339(a)(1)–(3) (2015). Termination of the grant award was also permitted when initiated by the recipient upon written notice to the awarding agency. 2 C.F.R. § 200.339(a)(4). The 2013 and 2015 versions of OMB's "Termination" provisions did not permit termination of federal awards for "convenience," nor when "the award no longer advances agency priorities or the national interest." *See* 2 C.F.R. § 200.339 (2013); 2 C.F.R. § 200.339 (2015).

446. OMB revised the Uniform Guidance in 2020 and 2024. *See* 2 C.F.R. § 200.340 (2020); 2 C.F.R. § 200.340. The current version of OMB's "Termination" provisions, last updated in 2024, provides four enumerated bases by which a federal award "may be terminated in part or



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

its entirety." 2 C.F.R. § 200.340(a)(1)–(4). None of these provisions allows termination "for convenience" or "when the award no longer advances . . . the national interest." *See* 2 C.F.R. § 200.340. One of the four enumerated bases, codified at 2 C.F.R. § 200.340(a)(4), provides that federal agencies may terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals *or agency priorities*." 2 C.F.R. § 200.340(a)(4) (emphasis added).

447. OMB first amended the termination provisions in 2020 to permit an agency, "to the greatest extent authorized by law," to terminate an award if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020). At that time, OMB made clear that this new termination provision granted federal agencies only limited new authority to terminate grants. Responding to concerns "that the proposed language will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause," OMB emphasized that "as written agencies are not able to terminate grants arbitrarily." OMB, Guidance for Grants and Agreements, 85 Fed. Reg. 49506, 49509 (Aug. 13, 2020). Rather, OMB clarified that "[t]he intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals." *Id*. at 49507. OMB explained that the new termination provision permitted federal agencies to terminate grants where, for instance, "additional evidence reveals that a specific award objective is ineffective at achieving program goals," or where "additional evidence . . . cause[s] the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id*. at 49507–08. At the same time, OMB clarified in its final guidance that agencies "are not able to terminate grants arbitrarily." *Id*. at 49509.

448. OMB revised the termination provisions in 2024 to clarify that an award could be terminated "pursuant to the terms and conditions of the Federal award, including, to the extent



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2024). OMB explained that this revision continued to permit termination of an award "pursuant to the terms and conditions of the Federal award," and that "this may include a term and condition allowing termination . . . , to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." OMB, Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024). OMB concluded that "the final version of the guidance provides greater clarity on the policy for termination of awards by the Federal agency or pass-through entity by underscoring the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id*. OMB never suggested, in either the 2020 or 2024 rulemaking, that a grant could be terminated even though the grant was continuing to serve the very goals for which the monies had initially been awarded, merely because the agency's priorities shifted midway during the use of the grant—let alone with no advance notice.

449. Nowhere do OMB's current Uniform Guidance, or the version of the Uniform Guidance in place at the time of the Federal Agencies' adoption, permit "termination for convenience." *See generally* 2 C.F.R. pt. 200. Nowhere do OMB's current Uniform Guidance, or the version of the Uniform Guidance in place at the time of the Federal Agencies' adoption, permit termination where the award no longer advances the "national interest." *See generally* 2 C.F.R. pt. 200.

450. Since the second Trump Administration began, federal agencies have used 2 C.F.R. § 200.340(a)(4) to terminate thousands of grant awards when the agency simply changes its mind. This new and unsupported interpretation of 2 C.F.R. § 200.340(a)(4) is the subject of litigation in *New Jersey v. U.S. Office of Mgmt. and Budget*, No. 1:25-CV-11816-IT, 2026 WL 2069832 (D.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Mass. July 17, 2026), where the court has ruled that "2 C.F.R. § 200.340(a)(4) (2024) and 2 C.F.R. § 200.340(a)(2) (2021) do not allow terminations of awards based on new program goals or agency priorities that an agency identifies after granting the award." *Id.* at *17. Numerous other plaintiffs have challenged specific terminations by this Administration purportedly on the basis of changed agency priorities.

451. 2 C.F.R. § 200.340(a)(4) authorizes the termination of an award only where the "award no longer effectuates the program goals or agency priorities," not where an agency changes its priorities after an award is made. The rulemaking history of 2 C.F.R. § 200.340(a)(4), discussed above, shows that OMB intended to permit terminations in only limited circumstances, and provides no support for a broad power to terminate grants on a whim based on agency priorities identified only after awards have been made. Further, the text of 2 C.F.R. § 200.340(a)(4) makes no reference to terminations based on changes in agency preferences that occur after a grant is awarded.[36] Yet, this Administration has used 2 C.F.R. § 200.340(a)(4) to reduce or terminate awarded grants based on newly identified agency priorities, even where those priorities conflict with the priorities of Congress in authorizing the program or the priorities of the agency at the time of the grant award.

452. The Administration has cited 2 C.F.R. § 200.340(a)(4) as the regulatory basis for the Termination Conditions, but the Conditions go well beyond the OMB clause, even as broadly and unlawfully used by this Administration. For example, the DHS Termination Condition, on its face, is not limited to a change in program goals or agency priorities as a basis for termination, and instead extends to any purported basis that the agency may unilaterally assert is a "convenience."

[36] Additionally, if an agency could terminate any award simply because it has changed its mind, that would render wholly superfluous the many other carefully crafted regulatory provisions that address agency termination authority. *See, e.g.*, 2 C.F.R. §§ 200.340(a)(1)–(3), 200.340(b).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Further, it expressly permits termination if the award no longer furthers "the national interest," a vague and undefined term. *See also* 2 C.F.R. § 200.340(b) (agencies must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award"). And, unlike 2 C.F.R. § 200.340(a)(4), it is not limited to terminations "authorized by law."

453. Additionally, the Grantmaking Order—also cited by the Administration as a legal basis—does not and cannot provide any separate legal basis for the Termination Conditions. *See* Grantmaking Order, *supra* ¶ 292. First, the Grantmaking Order on its own does not provide legal authority for federal agencies to impose new grant conditions on grant recipients. *City of Chicago v. Noem*, No. 25 CV 12765, 2025 WL 3251222, at *9 n.13 (N.D. Ill. Nov. 21, 2025) ("Similarly, the statutes funding the grants and programs in this case do not allow Executive Orders to control the distribution of funds."); *County of Santa Clara v. Noem*, 815 F. Supp. 3d at 1026–28, *appeal filed*, No. 26-402 (9th Cir. Jan. 20, 2026) (explaining Congress did not confer authority on DHS or FEMA to impose grant conditions that, among other things, forced compliance with all executive orders). Second, the Grantmaking Order requires federal agencies to insert termination for convenience clauses into their grant agreements for new and existing awards "to the maximum extent permitted by law." Grantmaking Order § 6(b). The Grantmaking Order states that it applies only to discretionary grant funds, not "programs where legislation establishes an entitlement to the funds on the part of the recipient, such as block grants; those awarded based on a statutory formula; or disaster recovery grants." *Id.* § 2(d).

454. By contrast, many of the Termination Conditions contain no limitation to the "extent permitted by law," nor are they all limited to discretionary grants. Moreover, the Grantmaking Order cites no statutory or regulatory authority for this new power it requires



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

agencies to wield to terminate grants unilaterally for "convenience," including for new and unannounced changes in agency priorities, other than 2 C.F.R. § 200.340(a)(4). *See* Grantmaking Order. And as discussed above, 2 C.F.R. § 200.340(a)(4) itself is intended to be narrow, does not permit terminations for post-award changes in agency priorities, and certainly does not support the broad termination power that the Federal Agencies now invoke. *See* 2 C.F.R. § 200.340(b). And importantly, the versions of the OMB termination regulation adopted by the Federal Agencies in 2013 and 2015 do not contain any provision allowing for termination based on agency priorities. *See* 2 C.F.R. § 200.339 (2013); 2 C.F.R. § 200.339 (2015).

455. The Federal Agencies do not have the power to terminate grants for "convenience," including for post hoc changes in agency priorities, where Congress has directed funds to be spent on particular grant programs. The Federal Agencies also do not have the power to substitute their own "agency priorities" for the program objective identified by Congress.

456. The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d at 1231. "Congress's power to spend is directly linked to its power to legislate. Incident to the spending power, Congress may attach conditions on the receipt of federal funds." *Id.* at 1231–32 (quoting *Dole*, 483 U.S. at 206–07) (alteration omitted).

457. The executive power vested in the President does not include the power to attach conditions on the receipt of federal funds. To the contrary, there is "no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* at 1232 (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

458. The Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *Id.* at 1234. *See also Chicago v. Barr*, 961



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

F.3d 882, 892 (7th Cir. 2020) ("The authority to pass laws and the power of the purse rest in the legislative not the executive branch."); *id.* at 887 (executive agencies "cannot pursue the policy objectives of the executive branch through the power of purse"). None of the authorizing statutes at issue allow the Federal Agencies to unilaterally terminate grants for "convenience." Where Congress has appropriated funds and directed that they be spent on a particular objective, an agency cannot simply substitute its own policy objectives or other reasons, defined as "convenience," to terminate already-awarded grants without violating separation of powers. *See Metro. Transp. Auth. v. Duffy*, No. 25-CV-1413 (LJL), 2026 WL 588117, at *56 (S.D.N.Y. Mar. 3, 2026), *appeal filed*, No. 26-1213 (2d Cir. Mar. 4, 2026) (agency did not have authority to terminate grant for pilot program at will where the authorizing statute did not provide such authority).

459. The Termination Conditions violate the separation of powers by effectively creating a backdoor to unlawful impoundment. Where Congress has appropriated funds and directed that they be spent on particular grant programs, terminating those grants for agency convenience without re-obligating those funds has the effect of unlawfully impounding and refusing to spend congressionally appropriated funds. *See In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (explaining that the Executive Branch "does not have unilateral authority to refuse to spend [congressionally appropriated] funds").

460. The Termination Conditions also violate Spending Clause principles. The Spending Clause requires Congress to provide grant recipients fair notice of the conditions that apply to the disbursement of funds they receive. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012). The funding conditions must be set out "unambiguously" in the relevant statute. *Arlington Cent. Sch. Dist. Bd.*



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). The Termination Conditions violate these Spending Clause mandates because they do not provide notice of or, on their face, set any limits on the reasons for which the Federal Agencies may terminate any of the Local Governments' grants.

461. To the extent the Termination Conditions would allow termination of grants due to recipients' DEI policies, they also conflict with Title VI for the same reasons discussed *supra* Section IV.L.1. Specifically, Title VI sets out strict procedural requirements for agencies that decide to terminate grant funding because of alleged discrimination. 42 U.S.C. § 2000d-1. The Termination Conditions would allow agencies to bypass those procedural requirements in violation of Title VI.

462. The Local Governments have a strong interest in obtaining clarity regarding their rights and obligations for grants to be awarded imminently and future grants that they anticipate applying for. They should not have to guess at whether the Federal Agencies can cut off their federal funding on a whim and for reasons not known to them at the time of the grant, thus suddenly and unlawfully upending carefully planned budgets and programs that account for these grants.

463. The Termination Conditions also provide the Federal Agencies with an opportunity to end-run any preliminary injunction issued in this case, allowing them to terminate a covered grant "for convenience" or for a newly claimed agency priority, when in reality the termination is due to participation in this lawsuit or for having a lawful program or policy disfavored by the Administration. Indeed, the Grantmaking Order justifies the requirement for agencies to add termination for convenience conditions because federal grant funding purportedly went to "diversity, equity, and inclusion and other far-left initiatives" that "propagat[e] absurd ideologies." Grantmaking Order § 1.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

464. The threat of unlawful, retaliatory, and/or arbitrary termination is real, concrete, credible, and not speculative. The Administration has reallocated, reduced, or terminated billions of dollars of grants to state and local governments for reasons deemed unlawful or likely unlawful by courts. *See, e.g.*, *Illinois v. Noem*, 813 F. Supp. 3d 282, 304 (D.R.I. 2025) (reallocation of hundreds of millions of dollars of HSGP grant funds away from states with sanctuary policies violated the APA), *appeal filed*, No. 26-1182 (1st Cir. Feb. 24, 2026); *Chicago v. DHS*, 815 F. Supp. 3d 727, 761 (N.D. Ill. 2025) (DHS's decision to withhold and eliminate Shelter and Services program funding to Chicago, Denver, and others based on purported noncompliance with changed agency priorities likely arbitrary and capricious under the APA); *Illinois v. Vought*, No. 26-CV-1566, 2026 WL 962287, at *4 (N.D. Ill. Mar. 12, 2026) (preliminarily enjoining decision to target four states for HHS grant terminations or suspensions, for reasons unrelated to the congressional authorization for public-health grants as likely arbitrary and capricious and contrary to law under the APA); *Washington v. Commerce*, 812 F. Supp. 3d 1169, 1184 (W.D. Wash. 2025) (termination of NOAA cooperative agreements for changed agency priorities likely arbitrary and capricious and violation of Spending Clause); *Washington v. FEMA*, 818 F. Supp. 3d 195, 204–06 (D. Mass. 2025) (permanently enjoining termination of the BRIC program). Based on this recent history and practice, if subject to the new Termination Conditions, the Local Governments cannot be certain that they will be able to rely on grant awards for their duration.

### M. The Local Governments Face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Grant Funding for Critical Programs and Services

465. The grant conditions that the Federal Agencies seek to impose leave the Local Governments with the Hobson's choice of accepting illegal conditions that are without authority, contrary to the Constitution, and accompanied by the poison pill of heightened risk of FCA claims, or forgoing the benefit of grant funds—paid for (at least partially) through local federal taxes—



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

that are necessary for crucial local services. The uncertainty caused by these illegal conditions has impeded the Local Governments' ability to budget and plan for services covered by the grants.

466. Nor is the heightened FCA risk merely hypothetical. A May 19, 2025 letter from then Deputy Attorney General Todd Blanche to certain DOJ divisions and offices and all U.S. Attorneys states that DOJ is setting up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws."[37] The letter asserts the FCA "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin." It further states that the Civil Fraud Section and Civil Rights Division will "engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients" and "will also establish partnerships with state attorneys general and local law enforcement to share information and coordinate enforcement actions." Finally, the letter states that DOJ "strongly encourages" private lawsuits under the FCA and "encourages anyone with knowledge of discrimination by federal-funding recipients to report that information to the appropriate federal authorities so that [DOJ] may consider the information and take any appropriate action."

467. DOJ reaffirmed this threat in June 2025, when Assistant Attorney General Brett Shumate announced DOJ's intent to dedicate "all available resources" of DOJ's Civil Division "to

[37] Memorandum from Deputy Att'y Gen. to DOJ Offices, Divisions, and U.S. Attorneys, Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl ("Blanche Letter").



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

pursue affirmative litigation combatting unlawful discriminatory practices" and to "aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws."[38]

468. The Federal Agencies have increased the stakes for state and local governments by placing their officials personally in the crosshairs of federal enforcement. For instance, as part of the DOJ OJP grant application, the Chief Executive Officer ("CEO") or another senior official of every state or local government applicant must certify to the applicant's compliance with certain immigration and civil rights laws. The CEO must attest that they received "appropriate legal advice" about the certification and acknowledge that a material false statement or omission of fact could subject them personally to criminal prosecution. This requirement is especially concerning, given the ambiguity surrounding what DOJ requires of applicants in the first place: officials must assume personal criminal liability for a certification without clear guidance as to what constitutes compliance.

469. The prospective loss of these federal funds, taken together, would have significant and lasting impacts on the Local Governments' finances and the essential services they provide. The Local Governments cannot replace these funds with local revenue without substantially cutting other critical services and projects.

470. Withholding DOJ grants from DOJ Plaintiffs would threaten or eliminate critical services and projects for their residents, including those that provide victim services and survivor assistance, improve the accuracy and accessibility of criminal history records, promote officer wellness and mental health, and fund the ability to purchase tactical and safety equipment. The

[38] *See* Memorandum from Assistant Att'y Gen. to All Civ. Div. Emps., Civil Division Enforcement Priorities (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

loss of this funding would have severe negative impacts on public safety and criminal justice systems.

471. Withholding DHS grants from DHS Plaintiffs would result in the loss of critical funding for public safety and disaster prevention, including funding to purchase security and surveillance equipment, protect public transportation systems from security risks, prepare for emergency and disaster response, and hire and employ firefighters and emergency responders. The loss of this funding would have severe negative impacts on public safety, disaster preparedness, and emergency response.

472. Withholding EPA grants from EPA Plaintiffs would result in the loss of funding for environmental protection and infrastructure projects, including those that reduce greenhouse gas emissions, monitor and protect wetlands, improve water quality, and restore shoreline habitats. The loss of this funding would have severe negative impacts on public and environmental health and safety.

473. Withholding Commerce grants from Commerce Plaintiffs would result in the loss of funding for economic development, job creation, and sustainable development, as well as for research related to climate change and environmental health. The loss of this funding would have severe negative impacts, including threatening or eliminating programs to help adult workers receive workforce skills training, expand electric vehicle fast-charging stations throughout the region, and study the impact of sea level rise and other climate hazards throughout the Puget Sound Basin.

474. Withholding USDA grants from USDA Plaintiffs would threaten or eliminate critical funding for wildfire fuel management, agricultural production, food security, and hunger prevention. The loss of this funding would have severe negative impacts, including on programs



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

that assist farmers and agricultural communities to improve long-term soil health, water, and air quality and that provide support for low-income seniors to receive fresh food at local farmers' markets. In addition, the loss of this funding would increase wildfire risks to vulnerable communities along the wildland-urban interface.

475. Withholding DOE grants from DOE Plaintiff would threaten the ability to provide weatherization services to eligible low-income households, which includes increasing the energy efficiency of dwellings and reducing total energy expenditures. The loss of this funding would have severe negative impacts on public health and safety, especially for low-income persons who are particularly vulnerable.

476. Withholding DOL grants from DOL Plaintiff would result in the loss of funding for employment, education, training, and workforce development. The loss of this funding would have severe negative impacts on workers, including adult or dislocated workers that have lost or are at risk of losing employment, as well as youths facing barriers to employment.

477. Withholding Interior grants from Interior Plaintiffs would threaten or eliminate programs related to natural resource conservation, recreation, and land and water management. The loss of this funding would have severe negative impacts on providing recreation, environmental, and community-health benefits to residents, as well as the ability to engage in water management and watershed restoration planning.

478. Withholding ONDCP grants from ONDCP Plaintiffs would result in the loss of funding for programs designed to reduce drug production, trafficking, and related violence in areas of the country experiencing significant drug-trafficking problems. The loss of this funding would have severe negative impacts on efforts to coordinate law enforcement, share intelligence, purchase investigative equipment, and fund public health initiatives.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

479. Withholding IMLS grants from IMLS Plaintiff would result in the loss of funding to support state library services. The loss of this funding would have severe negative impacts on the ability to fund professional training for library staff.

## V. CAUSES OF ACTION

### Count 1: Separation of Powers

480. The Local Governments re-allege and incorporate the above as if set forth fully herein.

481. The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d at 1231. This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* at 1231–32 (second alteration in original) (quoting *Clinton*, 524 U.S. at 438).

482. The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, *see* U.S. Const. art. 1, § 9, cl. 7. Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

483. "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

484. "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (alteration in original) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

485. The separation of powers doctrine thus represents perhaps the central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227. Consistent with these principles, the Executive acts at the lowest ebb of its constitutional authority and power when it acts contrary to the express or implied will of Congress. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

486. Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234. Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds *before* acting to withhold or pause federal payments. 2 U.S.C. § 681 *et seq*. The President has not done so.

487. Congress has not conditioned the provision of the Federal Agencies' grants on complying with a prohibition on all forms of DEI policies and initiatives, nor on promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, cutting off access to information about lawful abortions, restricting support to educational agencies that require COVID-19 vaccination, restricting support to activities framing domestic violence or sexual assault as "systemic social justice" issues, adhering to executive orders unrelated to the purpose of the grant, or allowing termination for convenience. Nor has Congress delegated to the Federal Agencies the authority to attach such conditions unilaterally.

488. By imposing the Challenged Conditions on grant recipients, the Federal Agencies



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

are unilaterally attaching new conditions to federal funding without authorization from Congress.

489. Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies" is "exclusively a judicial function." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 387 (2024) (internal quotations omitted).

490. Here, the Federal Agencies seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the judiciary's interpretation of the law's meaning.

491. For these reasons, the Federal Agencies' conditioning of their grants on compliance with the Challenged Conditions violates the separation of powers doctrine.

**Count 2: Spending Clause**

492. The Local Governments re-allege and incorporate the above as if set forth fully herein.

493. The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

494. As described above, the Federal Agencies violate the separation of powers because the Challenged Conditions are neither expressly nor impliedly authorized by Congress. For the same reasons, the Federal Agencies violate the Spending Clause as well.

495. The Spending Clause also requires states to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst*, 451 U.S. at 17, 25. The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296 (internal quotation omitted).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

496. Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *Dole*, 483 U.S. at 207–08.

497. Finally, federal funds "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id.* at 210.

498. Even if Congress had delegated authority to the Executive and/or the Federal Agencies to condition their grant funding on terms prohibiting all forms of DEI policies and initiatives, promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, cutting off access to information about lawful abortions, restricting support to educational agencies that require COVID-19 vaccination, restricting support to activities framing domestic violence or sexual assault as "systemic social justice" issues, requiring adherence to executive orders unrelated to the purpose of the grant, or allowing termination for convenience, the Challenged Conditions would violate the Spending Clause by imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17, and by imposing conditions that are not germane to the purposes of the statutes that authorize the grant programs, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs.") (internal quotation omitted).

499. Further, the prohibition on "promot[ion]" of "gender ideology" violates the Spending Clause by imposing a condition that purports to require grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex. *See Dole*, 483 U.S. at 210.

**Count 3: Ultra Vires Agency Action**

500. The Local Governments re-allege and incorporate the above as if set forth fully herein.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

501. An executive agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986).

502. As the head officials of the respective Federal Agencies, the individual defendants' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly . . . what they do is ultra vires." *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013).

503. The Federal Agencies' head officials lack the statutory authority to impose the Challenged Conditions. No provision of the relevant authorizing statutes gives them the power to impose these terms, and the statutes authorizing them to administer certain specific grants also preclude the Challenged Conditions' imposition.

504. In imposing all or some of the Challenged Conditions, the Federal Agencies' head officials exceed the statutory authority granted to them by Congress. These agency actions are therefore ultra vires.

505. The actual and threatened imposition of the Challenged Conditions have caused harm and will continue to cause harm to the Local Governments by forcing the Local Governments to choose between accepting the Challenged Conditions or forgoing critical federal funding.

506. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Center*, 575 U.S. 320, 326–27 (2015). The U.S. Supreme Court allows equitable relief against federal officials who act "beyond those limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

**Count 4: Administrative Procedure Act, 5 U.S.C. § 706(2)**

**Arbitrary And Capricious**



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

507. The Local Governments re-allege and incorporate the above as if set forth fully herein.

508. Defendants DOJ, DHS, FEMA, EPA, Commerce, USDA, DOE, DOL, Interior, ONDCP, and IMLS are all "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1); 5 U.S.C. § 701(b)(1).

509. Additionally, the Federal Agencies' issuance of standard and general terms and conditions, NOFOs, memoranda, letters, guidance, and other documents (collectively, "Agency Actions") adopting and imposing one or more of the Challenged Conditions on federal grant funding—including but not limited to those set forth in Sections K.1–12, *supra*—are all agency actions subject to review under the APA.

510. Final agency actions (1) "mark the consummation of the agency's decision-making process" and (2) are ones "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted).

511. The Agency Actions, as further described in this Complaint, are final agency actions because they reflect final decisions, in accord with presidential directives, to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving grant funding. *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (holding that agency decision to impose new conditions on federal grants satisfies both tests for final agency action because it "articulate[s] that certain funds" will "require adherence to the" new conditions and "opens up the [recipient] to potential legal consequences," including withholding of funds if the recipient declines to accept the conditions); *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same).



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

512. These actions determine rights and obligations and produce legal consequences because they exercise purported authority to create new conditions on already awarded funds that would obligate recipients to comply with the Executive's policy priorities.

513. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

514. "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id*. (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

515. The Federal Agencies have provided no reasoned explanation for their decisions to impose conditions related to grants related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

516. The Federal Agencies also ignore essential aspects of the problems they purport to address via the various grant programs, including the Local Governments' reasonable and inevitable reliance on now at-risk funds, the expectation of reimbursement from already



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

appropriated funds, and the threat to or elimination of a wide array of the Local Governments' services and projects for their residents, which will have severe negative impacts on public health and safety, criminal justice, law enforcement, disaster preparedness, emergency response, environmental health, economic development, agricultural production, food security, wildfire prevention, workforce education and training, natural resource conservation, and library services.

517. Further, in many instances, the Challenged Conditions contravene the civil rights laws and authorizing statutes they purport to implement.

518. The Local Governments therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the Challenged Conditions violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin the Federal Agencies from imposing those Conditions without complying with the APA.

**Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2)**

**Contrary To Constitution**

519. The Local Governments re-allege and incorporate the above as if set forth fully herein.

520. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

521. As described above, the imposition by the Federal Agencies of some or all of the Challenged Conditions violates bedrock constitutional provisions and principles including the separation of powers between the President and Congress, and the Spending Clause.

522. The Local Governments therefore ask the Court to declare under 5 U.S.C. § 706



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

and 28 U.S.C. § 2201 that imposing the Challenged Conditions violates the APA because it is contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin the Federal Agencies from imposing those Challenged Conditions without complying with the APA.

**Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2)**

**In Excess of Statutory Authority**

523. The Local Governments re-allege and incorporate the above as if set forth fully herein.

524. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

525. The Federal Agencies may exercise only authority granted to them by statute or the Constitution.

526. No law or provision of the Constitution authorizes the Federal Agencies to impose extra-statutory conditions not authorized by Congress on congressionally-appropriated funds.

527. Neither the enabling statutes for the grants programs, nor any other legislation authorizes the Federal Agencies to impose conditions on grant funding related to prohibiting all kinds of DEI; facilitating federal immigration enforcement; prohibiting the "promot[ion]" of "gender ideology" or "elective abortion"; restricting support to "educational agencies" with COVID-19 vaccination requirements; restricting support for activities framing domestic violence or sexual assault as "systemic social justice" issues; requiring adherence to executive orders unrelated to the purpose of the grant; or permitting termination for convenience.

528. Indeed, by threatening to unilaterally withhold funds on the basis of unauthorized



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

agency-imposed grant conditions, the Federal Agencies attempt to circumvent the process established in the Impoundment Control Act of 1974, which requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments. 2 U.S.C. § 681 *et seq*.

529. The Local Governments therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the Challenged Conditions violates the APA because it is in excess of the Federal Agencies' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin the Federal Agencies from imposing those Conditions without complying with the APA.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Local Governments request the following relief:

A. A declaration that the Challenged Conditions are unconstitutional, are not authorized by statute, and are otherwise unlawful;

B. A preliminary and permanent injunction enjoining DOJ from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

C. A preliminary and permanent injunction enjoining DOJ from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

D. A preliminary and permanent injunction enjoining DOJ from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

E. A preliminary and permanent injunction enjoining DHS from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

F. A preliminary and permanent injunction enjoining DHS from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

G. A preliminary and permanent injunction enjoining DHS from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

H. A preliminary and permanent injunction enjoining EPA from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

I. A preliminary and permanent injunction enjoining EPA from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

J. A preliminary and permanent injunction enjoining EPA from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

K. A preliminary and permanent injunction enjoining Commerce from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

L. A preliminary and permanent injunction enjoining Commerce from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

M. A preliminary and permanent injunction enjoining Commerce from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

N. A preliminary and permanent injunction enjoining USDA from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

O. A preliminary and permanent injunction enjoining USDA from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

P. A preliminary and permanent injunction enjoining USDA from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

Q. A preliminary and permanent injunction enjoining DOE from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

R. A preliminary and permanent injunction enjoining DOE from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

S. A preliminary and permanent injunction enjoining DOE from retaliating or taking any adverse based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

T. A preliminary and permanent injunction enjoining DOL from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

U. A preliminary and permanent injunction enjoining DOL from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

V. A preliminary and permanent injunction enjoining DOL from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

W. A preliminary and permanent injunction enjoining Interior from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

X. A preliminary and permanent injunction enjoining Interior from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

Y. A preliminary and permanent injunction enjoining Interior from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

Z. A preliminary and permanent injunction enjoining ONDCP from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

AA. A preliminary and permanent injunction enjoining ONDCP from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

BB. A preliminarily and permanent injunction enjoining ONDCP from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

CC. A preliminary and permanent injunction enjoining IMLS from imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions, with respect to any grant applications submitted by, or grant funds received by or awarded to, whether directly or indirectly, the Local Governments;

DD. A preliminary and permanent injunction enjoining IMLS from imposing or enforcing any interpretation of the Civil Rights Provisions as requiring anything other than compliance with the statutes cited in the Civil Rights Provisions as they have been enacted by Congress and interpreted by the judiciary;

EE. A preliminarily and permanent injunction enjoining IMLS from retaliating or taking any adverse action based on participation as a plaintiff in this lawsuit, including but not limited to reducing the amount of a grant award; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

FF. An award to the Local Governments of their reasonable attorney's fees and costs; and

GG. Any other further relief that the Court deems fit and proper.



PACIFICA LAW GROUP LLP
401 UNION STREET
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

DATED this 16th day of October, 2026.

PACIFICA LAW GROUP LLP

*/s/ Paul J. Lawrence*
Paul J. Lawrence, WSBA #13557
Jamie Lisagor, WSBA #39946
Sarah Du, WSBA #63807
Carly Zipper, WSBA #60598

*Attorneys for Plaintiffs*

LEESA MANION
King County Prosecuting Attorney

*/s/ Christopher Sanders*
Christopher Sanders, WSBA #47518
*General Counsel & Chief Legal Advisor to King County Executive Girmay Zahilay*

*/s/ Mika Rothman*
Mika Rothman, WSBA #55870
*Deputy General Counsel to King County Executive Girmay Zahilay*

*/s/ Erin King-Clancy*
Erin King-Clancy, WSBA # 57259
*Senior Deputy Prosecuting Attorney*

401 5th Avenue, Ste. 800
Seattle, WA 98104
(206) 477-9483
ChrSanders@kingcounty.gov
mrothman@kingcounty.gov
EClancy@kingcounty.gov

*Attorneys for Plaintiff Martin Luther King Jr. County*

CHAD M. ENRIGHT

Kitsap County Prosecuting Attorney

*/s/ Lisa Nickel*
Lisa Nickel, WSBA # 31221
*Civil Chief Deputy Prosecuting Attorney*

614 Division Street, MS 35-A
Port Orchard, WA 98366
(360) 337-4992
lnickel@kitsap.gov

*Attorney for Plaintiff Kitsap County*

JASON J. CUMMINGS
Snohomish County Prosecuting Attorney

*/s/ Bridget E. Casey*
Bridget E. Casey, WSBA #30459

*/s/ Rebecca J. Guadamud*
Rebecca J. Guadamud, WSBA #39718

*/s/ Rebecca E. Wendling*
Rebecca E. Wendling, WSBA #35887

3000 Rockefeller Avenue, M/S 504
Everett, WA 98201-4046
(425) 388-6392
Bridget.Casey@co.snohomish.wa.us
Rebecca.Guadamud@co.snohomish.wa.us
Rebecca.Wendling@co.snohomish.wa.us

*Attorneys for Plaintiff Snohomish County*

CITY OF BELLINGHAM

*/s/ Sarah W. Chaplin*
Sarah W. Chaplin, WSBA #51642
Sr. Assistant City Attorney

210 Lottie Street
Bellingham, WA 98225
360-778-8270
swchaplin@cob.org

*Attorney for Plaintiff City of Bellingham*

CITY OF BREMERTON

*/s/ Kylie J. Finnell*
Kylie J. Finnell, WSBA #34997
*Bremerton City Attorney*

*/s/ Brett Jette*
Brett Jette, WSBA #47903
*Bremerton Assistant City Attorney*

345 6th Street, Suite 100
Bremerton, WA 98337
legal@ci.bremerton.wa.us

*Attorneys for Plaintiff City of Bremerton*